# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

IN RE:

COROTOMAN, INC.

    Debtor

_____

COROTOMAN, INC.


    Plaintiff,


Vs.


CENTRAL WEST VIRGINIA REGIONAL
AIRPORT AUTHORITY, INC., BAILEY &
WYANT, PLLC,  L. R. KIMBALL &
ASSOCIATES, INC., CENTRAL
CONTRACTING, INC., AND DYNO
NOBEL, INC.


    Defendants.

**CHAPTER 11
CASE NO. 2:19-BK-20134**



**CASE NO: 2:19-AP-02013
Adversary Proceeding**

## <u>FIRST AMENDED COMPLAINT</u>

    NOW COMES, Plaintiff/Debtor, Corotoman, Inc., by and through the undersigned counsel

and amends its Amended Complaint against Defendants, Central West Virginia Regional Airport

Authority, Inc., Bailey & Wyant, PLLC, L.R. Kimball & Associates, Inc., Central Contracting,

Inc., and Dyno Nobel, Inc. alleging as follows:

## PARTIES

1.      Corotoman, Inc. ("Plaintiff/Debtor" or "Corotoman") is a West Virginia corporation organized and existing under the laws of the State of West Virginia with its offices and principal place of business located in Charleston, West Virginia.

2.      Corotoman is owned and controlled by John Wellford ("Wellford"), who is a citizen and resident of West Virginia.

3.      Defendant Central West Virginia Regional Airport Authority, Inc. ("Defendant" or "the Airport Authority") is a political subdivision.

4.      At all relevant times the Airport Authority owned and operated the largest airport in West Virginia, Yeager Airport ("Yeager") in Charleston, Kanawha County, West Virginia located 100 Airport Road, Suite 175, Charleston, West Virginia 25311.

5.      From 1999 through on or about July 18, 2015, Richard A. Atkinson, III ("Atkinson") was the acting airport director for Yeager.

6.      From on or about July 18, 2015 through September 2019, Terry D. Sayre ("Sayre") was the acting airport director for Yeager.

7.      Prior to July 18, 2015 during the relevant time, Sayre was the assistant airport director for Yeager.

8.      From on or about September 18, 2019 through the present, Nick Keller ("Keller") has been the acting airport director for Yeager.

9.      Prior to September 18, 2019, Keller was the airport assistant director at Yeager.

10.     Keller has been employed at Yeager since approximately May 2007.

11.     Pursuant to the Rules and Regulations of Yeager, "DIRECTOR" means the person employed by the Airport Authority to supervise the operation and management of the Airport and his or her duly authorized representatives.

12.     As part of their management and supervision duties for Yeager, during the relevant time period as airport directors, Atkinson and Sayre had the authority to enter into contracts on behalf of Yeager and the Airport Authority.

13.     Bailey & Wyant, P.L.L.C. ("Bailey & Wyant") is a West Virginia professional limited liability company and law firm.

14.     Charles R. Bailey ("Bailey") is a founding and managing member of Bailey & Wyant.

15.     During the relevant time period, Bailey was the general legal counsel for the Airport Authority and actively participated in negotiations with Corotoman regarding the subject of this action.

16.     L.R. Kimball & Associates, Inc. ("Kimball") is a Pennsylvania company based in Ebensburg, Pennsylvania 15931.

17.     Kimball provides various aviation services to airports throughout Pennsylvania and West Virgina.

18.     Richard L. Holes, PE ("Holes"), at all relevant times, was a principal at Kimball and the Director of Aviation Services with Kimball.

19.     Central Contracting, Inc., ("Central Contracting") is a West Virginia corporation based in Saint Albans, West Virginia.

20.     Central Contracting provides heavy contruction services throughout West Virginia and provided such services to the Airport Authority in accordance with certain Contract Documents that are the subject of this action.

21.     Dyno Nobel, Inc., ("Dyno") is a Delaware corporation which is licensed and registered to do business in the State of West Virginia with offices located in Clarksburg, West Virginia.

22.     Dyno provides explosives and blasting services throughout West Virginia and provided such services to the Airport Authority in accordance with certain Contract Documents that are the subject of this action.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

24.     Venue in this matter is proper pursuant to Rule 7003 of the Federal Rules of Bankruptcy Procedure in that the Corotoman, Inc.'s Chapter 11 bankruptcy proceeding is pending in this Court bearing case number 2:19-bk-20134.

25.     At all relevant times, Defendants were doing business in Kanawha County, West Virginia.

## FACTS

26.     Corotoman realleges and incorporates by reference Paragraphs 1 through 25.

27.     Yeager sits on a man-made plateau that was constructed in the 1940s by removing portions of the ridge and hilltops.

28.     In the original grading process of Yeager airport, more than 9 million cubic yards of earth and rock were moved with the aid of more than 2 million pounds of explosives.

29.     Yeager has a single asphalt runway, 5/23, 6,802 by 150 feet (2,073 x 46 m).

30.     In or around the mid-2000s, the Airport Authority decided to expand its runway and remove an obstruction that impacted airplane takeoffs and landings at Yeager.

31.     In order to make it easier for planes to take off from Yeager, the Airport Authority needed to remove an obstruction located about 4,100 feet from the Runway 5 threshold in the Northgate/Coal Branch Heights area of Charleston, West Virginia.

32.     The obstruction or "knoll," located off the south end of the main runway, needed to be removed to eliminate Federal Aviation Administration ("FAA") climb-out restrictions on aircraft departing runway 23 and decrease landing minimums for runway 05 at Yeager.

33.     The obstructions affected departures at Yeager because they limited an aircraft's weight during summer months on longer routes.

34.     Due to the climb-out and weight restrictions, some flights from Yeager lost three to four seats as a result of the steep departure climb gradient.

35.     Yeager projected that airlines would save approximately two million dollars ($2,000,000.00) annually by having the FAA climb-out restriction removed since airlines were bumping passengers on some of the airlines' flights.

36.     In addition, the obstructions affected approaches to Runway 5 because there were obstruction issues, and Runway 5 was not available for landing during poor weather conditions.

37.     By removing the obstructions/knoll, the decision height for pilots landing on runway 05 would be lowered.

38.     In or around 2008, the Airport Authority began acquiring land in the Coal Branch Heights and Northgate area of Charleston, West Virginia.

39.    The Airport Authority hired Kimball and Kimball's subcontractor O.R. Colan Associates of Florida, LLC ("O.R. Colan") to assist with land purchases.

40.    In total, the Airport Authority needed to acquire approximately 39 acres of land which included sixty (60) separate properties, nine (9) residences and 3.8 acres of City of Charleston streets.

41.    The Airport Authority entered into a contract with Kimball to provide construction and engineering design and administration services for the project to remove the obstruction.

42.    Kimball was contracted to supervise the removal of the obstruction/knoll and ensure proper implementation of the design documents as well as assist in providing coordination with the FAA.

43.    Kimball was to complete and oversee the design, bidding, and construction of the obstruction removal project for the Airport Authority.

44.    Corotoman owned a large portion of the land in the Northgate/Coal Branch Heights area that included the obstructions and knoll the Airport Authority wanted to remove.

45.    In order to remove the knoll in the path of the aircraft, the Airport Authority needed to acquire some land from Corotoman as well as an avigation easemen to fly below twelve hundred fifty (1250) grade feet above mean sea level ("MSL") as established by the United States Geological Survey in the 1981 avigation easement. ("the 1981 avigation easement").

46.    After the Airport Authority removed the knoll/obstructions, it needed to acquire a new avigation easement in the Coal Branch Height and Northgate area owned and controlled by Corotoman. The new avigation easement  would allow aircraft to fly through some of Corotoman's Airspace below one thousand two hundred fifty (1250) feet MSL established in 1981 Avigation

Easement and meet the the new climb out restrictions established by the FAA and to allow aircraft to utilize the new decision height established by the FAA.

47.     The new avigation easement is necessary as takeoffs and landings at Yeager occur partially through some of air space controlled by Corotoman and below the 1250 MSL established in the 1981 avigation easement.

48.     An avigation easement is an easement for providing the free and unobstructed passage of all aircraft in the airspace above or in the vicinity of a particular property together with the right to cause air space noise, vibration, fumes, dust, fuel particles and all other effects caused by the operation of aircraft at a certain elevation.

49.     On or around January 2010, the Airport Authority commissioned a report from Zdrojewski and Company that discussed the cost of the land in the Coal Branch/Northgate area that the Airport Authority would need to acquire.

50.     On or about February 24, 2011, the Airport Authority asserted its entitlement to Corotoman's land through condemnation via an offer package prepared by O.R. Colan.

51.     Attached as **Exhibit A** is a true and accurate copy of the report prepared by O.R. Colan dated January 20, 2010 but sent on February 24, 2011.

52.     In response to the February 24, 2011 offer package, Corotoman disputed the value of the condemnation offer package.

53.     However, in order to potentially resolve the dispute and protracted litigation between Corotoman and the Airport Authority, Wellford, on behalf of Corotoman, and Atkinson and Bailey, on behalf of the Airport Authority, began negotiating a settlement of the dispute regarding the value of Corotoman's land proposed in the condemnation offer package.

54.    The parties also discussed providing the Airport Authority with an avigation easement over some of Corotoman's land which would permit Yeager and the Airport Authority to use airspace below one thousand two hundred fifty (1250) grade feet above mean sea level as established by the United States Geological Survey.

55.    In emails with Corotoman's counsel in May 2011, Atkinson discussed how he and Wellford were negotiating providing Yeager with a license to remove dirt from his property and purchase an "air easement that would restrict the building height." Atkinson then unequivocally stated, ***"[t]he FAA is agreeable to that type of arrangement.*** If you and [Wellford] would like to discuss that further with me I am open to that." (emphasis added).

56.    Attached as **Exhibit B** are true and accurate copies of emails between Atkinson and Corotoman's counsel from May 13, 2011.

57.    Based upon Atkinson's May 13, 2011 email, on behalf of the Airport Authority, he explicitly represented that the FAA would be amenable to the type of arrangement that Corotoman and the Airport Authority eventually negotiated and agreed to honor.

58.    Based upon Atkinson's assurances and representations, Corotoman began negotiating a potential resolution of the condemnation issues that would be mutually beneficial to both the Airport Authority and Corotoman.

59.    Thereafter, during the spring and fall of 2011 and into 2012, Wellford and Atkinson negotiated terms regarding the fair market value of the land and airspace and terms that would permit the Airport Authority to remove the knoll/obstructions, use some of Corotoman's airspace, yet also permit Corotoman to use the land for development once the Airport Authority removed the knoll/obstruction.

60.     In addition, Wellford and Atkinson discussed the transfer of property in the Northgate/Coal Branch Heights area owned by the Airport Authority in exchange for other property owned by Corotoman as well as the transfer of an avigation easement from Corotoman to Yeager/the Airport Authority.

61.     Corotoman's avigation easement was a material term of the negotiations because the Airport Authority wanted airplanes arriving at and departing from Yeager to use Corotoman's airspace when taking off and landing at Yeager to ensure that the airspace controlled by Corotoman would perpetually remain free from obstructions.

62.     On or about October 26, 2011, Atkinson, at a Board of Directors meeting for the Airport Authority, announced that the Airport Authority and Corotoman had reached an agreement over Corotoman's land and airspace at issue.

63.     Attached as **Exhibit C** is a true and accurate copy of an article published on October 26, 2011 by the Charleston Gazette-Mail in which Atkinson reported the agreement with Corotoman to the Airport Authority.

64.     Specifically, in the October 26, 2011 article, Atkinson stated that "an agreement has been reached with Wellford, the largest single landholder in the obstruction removal zone, to make use of [Corotoman's] land in the obstruction area *in exchange for an easement and the swapping of adjacent parcels of land owned by the airport.*" *Id*. (emphasis added).

65.     Further, Atkinson reported that in order to remove the knoll/obstructions in the Northgate/Coal Branch Heights area it would cost approximately fifteen million dollars ($15,000,000.00) and last about two years. *Id*.

66.     The funds for the work were expected to come from the federal Airport Improvement Program. *Id*.

67.     In the spring of 2012, the Airport Authority and Corotoman continued negotiating an agreement as described above.

68.     On or about March 27, 2012, K.O. Damron sent a draft proposed Settlement Agreement to Bailey on behalf of Corotoman.

69.     Attached as **Exhibit D** is a true and accurate copy of an email sent by K.O. Damron to Bailey on or about March 27, 2012.

70.     The proposed Settlement Agreement sent by K.O. Damron to Bailey on March 27, 2012 contained the material terms that there would be a license and work agreement in which the properties at issue would be overblasted below the planned final grade, there would be an exchange of property between Corotoman and the Airport Authority, a payment to Corotoman, and an Avigation Easement provided to the Airport Authority in exchange for the property transfers.

71.     The very next day, on March 28, 2012, a meeting of the Board of Directors of the Airport Authority attended by R. Edison Hill, Sayre, Atkinson, Bailey and others.

72.     At the meeting, regarding the proposed Settlement Agreement sent the day before by Corotoman, it was reported: "*We have received the agreement from Corotoman, Inc.*, for the license to complete the work on the property and the permanent aviation [sic] easement that restricts the future building heights on the property. The established price for the easement and license agreement *and property swap* will be $350,000.00 the amount is included in the grant from the FAA for the purchase of the property rights for the project. Mr. Hill asked for approval of the agreement and authorization for him to sign *once the draft agreement was reviewed by legal counsel.* Mr. Shores made the motion for approval based on approval from legal counsel, seconded by Mr. Jones and was unanimously approved." (emphasis added).

73.    Attached as **Exhibit E** is a true and accurate copy of the Minutes of the Meeting of the Board of Directors of the Airport Authority from March 28, 2012.

74.    As shown by the March 2012 Airport Authority meeting minutes, the Airport Authority Board was fully aware of the Settlement Agreemnt and the License and Work Agreement, and the Board of Directors authorized it to be signed "once the draft agreement was reviewed by legal counsel."

75.    Thereafter, in March and April 2012, the parties exchanged various drafts of a proposed Settlement Agreement and License and Work Agreement.

76.    Indeed, in his time records and pursuant to the Board of Directors directive to review the draft agreement, on April 3, 2012, Bailey, as legal counsel for the Airport Authority, spent approximately two and a half hours reviewing "complete package of information and details regarding Corotoman settlement agreement, deeds and license agreement" and writing a follow up email to Atkinson.

77.    Attached as **Exhibit F** is a true and accurate copy of Bailey & Wyant's invoices identifying the work being done for the Airport Authority in April and May 2012 that the Airport Authority submitted to the FAA for reimbursement.

78.    Throughout April 2012, Bailey had several teleconferences with Corotoman's counsel about the terms of Corotoman's Settlement Agreement, license and work agreement, and the liquidated damages clause in Corotoman's agreement. *Id.*

79.    On or about April 23, 2012, Atkinson provided a draft of the land swap, easement and excavation license contract to Ben Zera, an employee of O.R. Colan.

80.    Attached as **Exhibit G** is a true and accurate copy of the emails between Ben Zera and Atkinson forwarding the proposed agreements between Corotoman and the Airport Authority.

81.     On April 24, 2012, Bailey and Corotoman's attorney's discussed what Bailey would recommend for liquidated damages.

82.     On April 25, 2012, Corotoman's counsel confirmed with Bailey that Wellford was fine with the $10,000 per breach for liquidated damages and that he had some changes regarding the 10-foot clearance language in the avigation easement, but that he had approved the rest of the language and the final draft should be ready the following week. Bailey confirmed that this would help speed things along.

83.     Attached as **Exhibit H** is a true and accurate copy of the emails between Corotoman's counsel Joe Merical and Bailey on April 25, 2012.

84.     On May 9, 2012, Corotoman's counsel sent a revised version with proposed redlines of the Settlement Agreement to Bailey stating, in relevant part, "[l]et us know if as soon as possible if the agreement is acceptable."

85.     Attached as **Exhibit I** is a true and accurate copy of the May 9, 2012 email with the draft settlement agreement.

86.     On May 9, 2012 at approximately 5:03 pm, Bailey forwarded the draft Settlement Agreement with Corotoman's proposed redlines to Atkinson.

87.     Attached as **Exhibit J** is a true and accurate copy of the May 9, 2012 email from Bailey to Atkinson.

88.     On May 11, 2012, Bailey also forwarded the May 9, 2012 draft Settlement Agreement to Jennifer Jackson.

89.     On May 11, 2012, Bailey responded to Corotoman's counsel that he would like to review all of the "maps and exhibits Monday afternoon" to "***make a final review of all agreements.***" (emphasis added).

90.     Attached as **Exhibit K** is a true and accurate copy of the May 11, 2012 email from Bailey.

91.     Bailey, as legal counsel for the Airport Authority, had an opportunity to review the May 9, 2012 draft settlement agreement with the final changes for approximately six weeks, but he never made any revisions to the draft Settlement Agreements sent on May 9, 2012.

92.     Since Bailey never proposed any revisions to the May 9, 2012 draft Settlement Agreements, it appeared to Corotoman and its counsel that the "draft agreement was reviewed by legal counsel" and the Board of Directors had approved the redlined version sent on May 9, 2012.

93.     Indeed, after sending the final draft with Corotoman's proposed redlines on May 9, 2012 attached as **Exhibit I**, on June 21, 2012, after receiving an email from Atkinson at 11:39, Bailey sent an email to Corotoman's counsel stating, in relevant part, "***please get [Wellford] to sign asp (sic) and I can have [Atkinson] sign tomorrow. Could you hand deliver to me today the final version with attachments and I will have [Atkinson] sign tomorrow.***" (emphasis added).

94.     Attached as **Exhibit L** is a true and accurate copy of the email from Bailey to Corotoman's counsel on June 21, 2012.

95.     Bailey's June 21, 2012 transmittal email to Corotoman's counsel was a clear statement that the May 9, 2012 "draft agreement was reviewed by legal counsel" and Atkinson had authority to execute the documents in question on behalf of the Airport Authority.

96.     Bailey's June 21, 2012 transmittal email warranted that the Airport Authority's legal counsel had reviewed and approved the May 9, 2012 draft agreement and represented that Atkinson had authority to execute the documents in question on behalf of the Airport Authority.

97.     During the course of his June 16, 2020, deposition, Bailey testified that even though he represented to Corotoman's counsel that Atkinson had authority to sign in his June 21, 2012,

transmittal email, that counsel for Cortoman had an affirmative duty or obligation to research whether Atkinson had authority to execute the documents in question on behalf of the Airport Authority.

98.     On or about June 22, 2012, Atkinson signed the settlement agreement with Corotoman, which he did in front of notary public Jennifer Sizemore, an employee of Bailey & Wyant.

99.     Attached as **Exhibit M** is a true and accurate copy of the Settlement Agreement without the attachments ("the Settlement Agreement") outlining terms of the Settlement between Corotoman and the Airport Authority.

100.    The Settlement Agreement and all of its attachments and requirements is a binding contract between the Airport Authority and Corotoman.

101.    As Airport Director, Atkinson had the power to bind Yeager/Airport Authority to all agreements that he enters on behalf of the Airport Authority.

102.    At all times during the negotiation process with Corotoman, Atkinson represented that he had the authority to enter into the agreement on behalf of Yeager/Airport Authority.

103.    At all times during the negotiation process with Corotoman, Bailey represented that Atkinson had the authority to enter into the agreement on behalf of Yeager/Airport Authority.

104.    At all times during the negotiation process with Corotoman, Bailey and Atkinson represented that all conditions precedent with regard to the Board of Directors of the Airport Authority had been authorized.

105.     At all times during the negotiation process with Corotoman, Corotoman and its counsel expected that Bailey and Atkinson were acting in good faith on behalf of the Airport Authority.

106.    As shown in the March 2012 meeting minutes, the Board of Directors of the Airport Authority reviewed, approved, and/or ratified the Settlement Agreement, the License and Work Agreement and all attachments and exhibits before Atkinson signed it on behalf of the Airport Authority as long as it the final agreement was reviewed by legal counsel.

107.    At the time Atkinson signed the Settlement Agreement and after all of the extensive negotiations between Corotoman and the Airport Authority through counsel, Atkinson and Bailey represented to Corotoman that Atkinson had full authority to enter into the Settlement Agreement on behalf of the Airport Authority.

108.    At the time Atkinson signed the Settlement Agreement and after all of the extensive negotiations between Corotoman and the Airport Authority through counsel, Corotoman believed that Atkinson had full authority to enter into the Settlement Agreement on behalf of the Airport Authority.

109.    Prior to the signing of the Settlement Agreement, Corotoman reasonably relied upon the representations of Bailey and Atkinson that they had the authority to negotiate and enter into the Settlement Agreement on behalf of the Airport Authority.

110.    If Atkinson did not have the authority to enter into the Settlement Agreement on behalf of the Airport Authority, Corotoman expected that Bailey or Atkinson would have disclosed this fact.

111.    If Atkinson and Bailey did not have the authority to enter into the Settlement Agreement, then the Airport Authority had a duty to disclose this fact to Corotoman or its agents before the Settlement Agreement was signed.

112.    On June 25, 2012, Atkinson sent letter to Kim Lewis at the Airport Authority conveying that Corotoman provided the appropriate documentation necessary to process payment for $250,000, and he enclosed the Settlement Agreement.

113.    Attached as **Exhibit N** is a true and accurate copy of the June 25, 2012 letter from Atkinson to Lewis transmitting the Settlement Agreement.

114.    Wellford as President of Corotoman, signed the Settlement Agreement on or about July 5, 2012 in front of a notary public, Kathy Strickmaker.

115.    As outlined and stated in the Settlement Agreement, in lieu of condemnation, Corotoman, *inter alia*, agreed to convey real property by General Warranty Deed to the Airport Authority, grant a license for work to be performed on property owned by Corotoman and to grant an avigation easement to the Airport Authority. *Id.*

116.    As fair and just compensation, the Airport Authority, *inter alia*, agreed to perform certain work on Corotoman's real property in accordance with a License and Work Agreement, exchange real property with Corotoman and reimburse Corotoman for severance damages for the acquisition of property rights under the Settlement Agreement. *Id.*

117.    The Settlement Agreement together with the Exhibits which were incorporated by reference contained the entire agreement between the parties. *Id.*

118.    The work to be performed by Airport Authority on Corotoman's land was detailed in the License and Work Agreement which was attached as Exhibit A to the Settlement Agreement.

119.    A true and accurate copy of the License and Work Agreement which was incorporated by reference and attached to the Settlement Agreement is attached as **Exhibit O**.

120.    Pursuant to the requirements of the License and Work Agreement the Airport Authority was to complete the blasting, excavating and grading in strict accordance with the

Grading and Construction Plans, Specifications, and Schedules set forth in the License and Work Agreement. *Id.* ¶ 5.

121.    Pursuant to the License and Work Agreement, the Airport Authority agreed to "overblast at least thirty-five (35) feet below the planned final grade, on drill dates and blasting plan acceptable to Corotoman and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules." *Id.*

122.    Critically, the Airport Authority also agreed that "the finished grade will be at least ten (10) feet below the elevation of the planned Avigation Easement at any point on the area covered by [the License and Work Agreement] and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules." *Id.*

123.    The Airport Authority agreed that the work would be commenced by the end of 2012 and completed within twenty-four (24) months after commencement and that time is of the essence in the completion of the work. *Id.* ¶ 6.

124.    For purposes of the License and Work Agreement, the completion of the work shall only occur when Corotoman receives a copy of a duly executed certificate of substantial completion or similar document, signed by an engineering professional licensed by the State of West Virginia and evidencing that the Project has been substantially completed in accordance with the Grading and Construction Plans, Specifications, and Schedules. *Id.* ¶ 7.

125.    All costs of the work, grading and construction would be borne by the Airport Authority. *Id.* ¶ 9.

126.    Any notice or communications regarding the License and Work Agreement was to be in writing and delivered to Corotoman with a copy to its attorney at Robinson & McElwee, PLLC and to the Airport Authority with a copy to its attorney at Bailey & Wyant, PLLC. *Id.* ¶ 14.

127.    If the Airport Authority failed to strictly abide by the terms and conditions set forth in the License and Work Agreement, then its acts constituted material breaches. *Id*. ¶ 15.

128.    The Airport Authority specifically agreed that "any breach by the Airport Authority occurring after commencement of the Project will cause significant harm to Corotoman, including lost profits, revenue, and rents; loss of use of Corotoman's property; potential third-party litigation costs, including attorney's fees and court costs; and annoyance and inconvenience." *Id*.

129.    Therefore, in the event of a breach occurring after commencement of the Project, Corotoman may, in its discretion and as the circumstances reasonably dictate, revoke the License granted herein and/or seek the greater of either (1) actual, compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ($10,000.00) per breach." *Id*.

130.    Atkinson signed the License and Work Agreement as Airport Director and on behalf of the Airport Authority. *Id*. at p. 7.

131.    The Board of Directors of the Airport Authority also reviewed, approved, or ratified the License and Work Agreement since it was referenced in the March 2012 meeting minutes.

132.    Wellford, as President of Corotoman, signed the License and Work Agreement. *Id*. at p. 7.

133.    On July 25, 2012, at an Airport Authority board meeting attended by, *inter alia*, Ed Hill, Chuck Bailey, Sayre, Tim Murnahan, Kim Lewis, Lorie Wynes; Joe Felix; and Atkinson, they approved the meeting minutes of June 27, 2012 and stated, "Mr. Foster provided the following invoices of that had been paid pursuant to the policy of the Board: Corotoman, Inc. $250,000 land acquisition/obstruction removal project".

134.    Attached as **Exhibit P** is a true and accurate copy of the July 25, 2012 board meeting minutes.

135.    At the July 25, 2012 Board Meeing, by unanimous approval, the Board increased Atkinson's pay by $15,000. Specifically, Mr. Hill on the Board praised Atkinson "for the outstanding job he has done at the Airport." *Id*.

136.    At the time Atkinson signed the Settlement Agreement, Atkinson was following the process and protocol for signing contracts or agreements on behalf of the Airport Authority.

137.    Specifically, on April 18, 2013, Atkinson sent an email to Sayre, Bailey, and others at the Airport Authority stating, in relevant part, "[a]s a reminder, no employee, including me, is authorized to bind the [Airport Authority] by contract or agreement, unless authorized to do so by the Board of the [Airport Authority]. It is our practice to have legal council review each contract document prior to execution in order to ensure that the terms are in accordance with state law and are do not [sic] place undue burden on the Airport Authority."

138.    Attached as **Exhibit Q** is a true and accurate copy of the April 18, 2013 email from Atkinson referenced above.

139.    As shown above, before signing the Settlement Agreement, the Settlement Agreement had been submitted to the Board of the Airport Authority before the March 2012 Airport Authority board meeting, and as shown by the emails from Bailey to Corotoman's counsel above as well as Bailey and Wyant's time records, Bailey reviewed the Settlement Agreement to ensure that the terms in accordance with applicable law and did not place an undue burden on the Airport Authority.

140.    On September 18, 2013, in a document entitled "Agreement" by and between The Central West Virginia Regional Authority as "Owner" and Central Contracting, Inc., as "Contractor" the parties entered into Contract known as Contract No. 2013-02: Runway 5 Approach Ground Obstruction Removal, Phase 34 (Erosion Control, Stormwater Management,

and Earthwork) and was for Central Contracting to identify, negotiate, permit and construct a waste area and remove the knoll and obstructions in the Coal Branch Heights/North Gate Area.

141.     Central Contrating was chosen as Contractor for the Project as the lowest responsible bidder with said Project being designed by L.R. Kimball who acted as Engineer in accordance with the Contract Documents.

142.     Upon information and belief, Dyno began performing work as a subcontractor of Central Contracting to assist in removing the knoll/obstruction in the Coal Branch Heights/North Gate Area.

143.     Based upon the agreement entered into between Corotoman and the Airport Authoity, in 2013, 2014 and 2014, Kimball, Dyno, and Central Contracting entered Corotoman's land and began removing the obstruction and knoll.

144.     The Settlement Agreement and License and Work Agreement was mentioned in a March 4, 2015 presentation entitled "Runway 5 Ground Obstruction Removal – A 10-Year Journey" by Kimbell to the Airport Authority.

145.     Attached as **Exhibit R** is a true and accurate copy of the March 4, 2015 presentation "Runway 5 Ground Obstruction Removal – A 10-Year Journey" by L.R. Kimbell.

146.     In the March 4, 2015 presentation, L.R. Kimbell stated, *inter alia*, that:

  a. Vast majority of the land in Coal Branch was owned by [Corotoman], a local developer;
  b. **The Airport Authority negotiated a Land-Use Agreement with Corotoman;**
  c. A total of 10 properties were acquired through eminent domain;
  d. Last property was acquired in early 2013;
  e. Total Value of Land Acquisition = $958,400;
  f. Site was primarily the top of a hill with a ridge running through the middle;
  g. Site was to be cut to 10 feet below the departure service elevation;
  h. Depth of cut varied from 15 feet to 95 feet. *Id.* at 6-7. (emphasis added).

147.    Pursuant to the Settlement Agreement and attached as Exhibits B and B-1, Corotoman was to convey real property, free of all liens and encumbrances except those of record in the office of the Clerk of the Kanawha County Commission to the Airport Authority.

148.    Attached as **Exhibit S** is a true and accurate copy of Exhibit B and B-1 to the Settlement Agreement.

149.    Pursuant to the Settlement Agreement and attached as Exhibits C and C-1, the Airport Authority was to convey real property, free of all liens and encumbrances except those of record in the office of the Clerk of the Kanawha County Commission to Corotoman.

150.    Attached as **Exhibit T** is a true and accurate copy of Exhibit C and C-1 to the Settlement Agreement.

151.    Pursuant to Section 3.04 of the Settlement Agreement and contingent upon the exchange of real property exchanged in Sections 3.02, 3.03 and Section 4 of the Settlement Agreement, Corotoman agreed to provide the Airport Authority with an Avigation Easement in the substantially similar to the form as the instrument attached as Exhibit D to the Settlement Agreement.

152.    Attached as **Exhibit U** is a true and correct copy of the Avigation Easement attached to the Settlement Agreement as Exhibit D, D1, D2 and D3.

153.    Pursuant to the draft Avigation Easement, Corotoman would grant the Airport Authority an exclusive easement for the free, unobstructed use and passage of all types of aircraft in and through the portions of the Aircraft Approach Zone exceeding the Base Easement Elevation. *Id*. ¶ 2.

154.    The "Base Easement Elevation" is defined as "[t]he elevation of said imaginary plane shall be calculated for any point within the Aircraft Approach Zone using the calculation set forth on Exhibit D3."

155.    Essentially, the draft Avigation Easement granted the Airport Authority the ability for airplanes to fly below the 1250 MSL floor which was established in the 1981 Avigation Easement on some parts of Corotoman's airspace. Without an Avigation Easenent, aircraft are not permitted to fly below 1250 feet MSL.

156.    In the draft Avigation Easement, Corotoman agreed for itself and its successors and assigns in ownership of the property at issue that "no improvement of any type shall be constructed or placed on the Subject Property in such as a way to interfere with or obstruct the Avigation Easement." *Id*. ¶ 4.

157.    "Notwithstanding this covenant, Corotoman, its successors and assigns, employees, agents, and contractors shall retain the absolute right to construct any and all improvements on the Subject Property, so long as said improvements do not exceed the Base Easement Elevation, and shall be entitled to make any and all reasonable uses of the Subject Property that do not interfere with the Airport Authority's rights hereunder." *Id*.

158.    At Closing, the parties were to exchange and record the deeds for the real property identified in Exhibits B and C of the Settlement Agreement as well as the Avigation Easement identified as Exhibit D.

159.    At all relevant times Corotoman was willing and able to meet the Closing deadlines.

160.    However, the Airport Authority was not ready to close, and the Closing as outlined in Section Four of the Settlement Agreement has never taken place.

161.    The license for Airport Authority to perform work on Corotoman's property was to be given in a separate agreement – the License and Work Agreement, which had to be executed within thirty (30) days of the execution of the Settlement Agreement.

162.    While the Airport Authority committed to commencing the work on the Project no later than December 31, 2012 pursuant to the License and Work Agreement, construction did not begin until September 2013.

163.    The contractor hired to remove trees and chip all limbs from the site was S&E Clearing and Hydroseeding of Pineville, West Virginia.

164.    While blasting was supposed to start in January 2014, it did not start until on or about February 17, 2014.

165.    Due to the need to remove earth and rock from the site, an adjacent valley that was primarily owned by Corotoman was identified as a place that the earth and rock would be  wasted.

166.    In or about early 2015, Corotoman discovered that the Airport Authority had not strictly abided by the terms and conditions of the License and Work Agreement.

167.    Specifically, Corotoman learned that the Airport Authority had not overblasted at least thirty-five (35) feet below the planned final grade and that the Airport Authority had not complied with the terms of the Settlement Agreement and the License and Work Agreement.

168.    Due to the Airport Authority's material breach of the License and Work agreement and the Settlement Agreement, Corotoman has been unable to use its land because the Airport Authority did not comply with the Settlement Agreement and the incorporated exhibits.

169.    In early 2015, Wellford on behalf of Corotoman and Atkinson on behalf of the Airport Authority began negotiating a potential resolution.

170.    However, while Wellford and Atkinson were in the process of negotiating a

potential resolution on March 12, 2015, the safety area at the end of Runway 5 catastrophically failed sending hundreds of thousands of cubic yards of fill and other material down onto the Keystone Drive area of Charleston destroying homes, a church, public roads and damming a stream.

171.    Therefore, in order to assist the Airport Authority with stabilizing the failed slope by Runway 5 and compensate Corotoman for the Airport Authority's failure to strictly abide by the terms of the License and Work Agreement, Corotoman and the Airport Authority began negotiating an "Amendment to License and Work Agreement".

172.    Attached as **Exhibit V** is a draft Amendment to License and Work Agreement that was initially negotiated by Atkinson and Bailey on behalf of the Airport Authority.

173.    Upon information and belief the draft Amendment to License and Work Agreement was created on or about March 29, 2015 by Bailey.

174.    Pursuant to the terms of the draft Amendment to License and Work Agreement, Corotoman would agree for the Airport Authority to enter certain of its property to remove rock and earth to help stabilize the slope that had failed on Runway 5. *Id.*

175.    In addition, pursuant to the terms of the draft Amendment to License and Work Agreement, Corotoman was to permit the Airport Authority the ability to transport the material over Corotoman's properties. *Id.*

176.    Pursuant to the terms of the draft Amendment to License and Work Agreement, the Airport Authority was to ensure that the finished grade for the area where it removed the remove rock and earth on Corotoman's property would be suitable for commercial development and graded and rolled in a good and workmanlike manner with the final grade approximately thirty-five (35) feet lower than the planned final grade set forth in the License and Work Agreement and

at least forty-five (45) feet below the elevation of the avigation easement. *Id*. ¶ 5.

177.    The draft Amendment to the License and Work Agreement states that, pursuant to a payment planned outlined in the amendment, the Airport Authority would pay Corotoman three million five hundred thousand dollars ($3,500,000.00) as a settlement for not complying with the License and Work Agreement. *Id*. ¶ 10.

178.    However, the Amendment to the License and Work Agreement was not signed by either Corotoman or the Airport Authority.

179.    On or about May 29, 2015, pursuant to the terms in the draft Amendment to the License and Work Agreement, the Airport Authority wrote a check for sixty thousand dollars ($60,000.00) to Corotoman, signed by Atkinson.

180.    Attached as **Exhibit W** is a true and accurate copy of the check from the Airport Authority to Corotoman for $60,000 from May 29, 2015.

181.    On or about June 22, 2015, Airport Authority wrote a check for fifty thousand dollars ($50,000.00) to Corotoman, signed by Atkinson and Lewis.

182.    Attached as **Exhibit X** is a true and accurate copy of the check from the Airport Authority to Corotoman for $50,000 from June 22, 2015.

183.    On or about June 26, 2015, pursuant to the terms of the payment contained in the draft Amendment to the License and Work Agreement, the Airport Authority wrote a check for three hundred ninety thousand dollars ($390,000.00) to Corotoman, signed by Atkinson and Sayre.

184.    Attached as **Exhibit Y** is a true and accurate copy of the check from the Airport Authority to Corotoman for $390,000 from June 26, 2015.

185.    After making the payment on June 26, 2015, Corotoman stopped receiving any additional funds pursuant to the Draft Amendment to the License and Work Agreement.

186.    On or about July 20, 2015, Atkinson resigned as the Director of Airport Authority.

187.    On or about July 22, 2015, Sayre was named the permanent Director for Airport Authority.

188.    Since the Airport Authority was not following through with its representations and agreements contained in the Settlement Agreement, the License and Work Agreement or the draft Amendment to the License and Work Agreement and pursuant to the notice requirements, on or about September 4, 2015, Kent J. George ("George") sent a letter on behalf of Corotoman to Bailey, attorney for the Airport Authority.

189.    Attached as **Exhibit Z** is a true and accurate copy of September 4, 2015 letter.

190.    The September 4, 2015 letter notified the Airport Authority that it had not completed the work pursuant to the Settlement Agreement or the License and Work Agreement. *Id*.

191.    George further advised that, due to the failure of the Airport Authority for not completing the work as agreed, "the consequential damages" are significant. *Id*.

192.    In light of the catastrophic failure of Runway 5, Corotoman expressed a desire to work "cooperatively" with the Airport Authority in order "to reach a mutually agreeable resolution" of the issues present rather than declaring the Airport Authority in breach of the Settlement Agreement and License and Work Agreement. *Id*.

193.    Thereafter, towards the end of 2015, Wellford met with Hill, the Chairman of the Board for the Airport Authority, about potentially resolving the issues between Corotoman and the Airport Authority.

194.    However, unbeknownst to Corotoman until recently, Bailey, Bailey & Wyant, Kimball and the Airport Authority were working to undermine the Settlement Agreement between

Corotoman and the Airport Authority to take Corotoman's property without just compensation.

195.    Unbeknownst to Corotoman until the documents were produced through discovery in this action, in 2015 and 2016, Bailey & Wyant, Kimball, and the Airport Authority were conspiring to deprive Corotoman of property and the use of the land as contemplated in the Settlement Agreement.

196.    Unbeknownst to Corotoman until the documents were produced through discovery in this action, Bailey & Wyant, Kimball, and the Airport Authority were conspiring in 2015 and 2016 to assert that Atkinson never had authority to enter into the Settlement Agreement with Corotoman.

197.    On August 25, 2015, Rick Holes with Kimball sent an email to the FAA with a copy to Keller and Sayre of the Airport Authority, stating in relevant part that Corotoman was to retain ownership of the land and was to take the land acquired in fee simple by the Airport Authority which is not allowed, and "[i]t may take a letter from the FAA putting in writing that the [Airport Authority] must own that property in order for the [Airport Authority] to take Mr. Wellford to court to gain that ownership. So, to make a long e-mail short, **we would like to discuss with you what the FAA could provide that the [Airport Authority] could use to its advantage to gain ownership over the rest of the cut area, at a minimum, from Corotoman**. . . . .Could we have a discussion at some point to talk about the right work agreement and what the FAA's expectation would be associated with the land included in the Right to Work Agreement?" (emphasis added).

198.    Attached as **Exhibit AA** is a true and accurate copy of the email sent by Holes to the FAA on or about August 25, 2015.

199.    Essentially, Kimball was requesting the FAA provide it and the Airport Authority

with an ability to undermine the Settlement Agreement with Corotoman, deprive Corotoman of its use of the property and take the avigation easement when it had not completed the requirements pursuant to the Settlement Agreement.

200.    Specifically, in late summer and throughout the fall of 2015, even though Bailey & Wyant had negotiated the Settlement Agreement with Corotoman and requested Corotoman sign it ASAP, Bailey & Wyant was working to undermine the Settlement Agreement..

201.    Attached as **Exhibit BB** is a true and accurate copy of Bailey & Wyant's invoice to the Airport Authority submitted on January 29, 2016 with time entries from August 2015 through December 2015.

202.    As shown throughout the January 29, 2016 Bailey & Wyant invoice, attorneys Jay M. Potter ("Potter"), Kelly C. Morgan ("Morgan"), Harold F. Salsbery ("Salsbery"), and Bailey met with Sayre and Atkinson on numerous occasions to investigate the events giving rise to the Settlement Agreement. *Id*.

203.    For example, on September 22, 2015, Bailey reviewed the settlement agreement between Corotoman and [the Airport Authority], letter from Atkinson to Corotoman, license and work agreement between Corotoman and Atkinson; amendment to license agreement (unsigned), and outline of agreement with Corotoman to determine closeout issues. *Id*.

204.    On September 23, 2015 and September 24, 2015, Potter prepared to interview Rick Atkinson with the "specific objective is to determine the extent of the information that the Authority had re Rick's 7-3-12 agreement regarding overblast an additional 35 feet." *Id*.

205.    On September 28, 2015, Potter received correspondence from Bailey discussing his "9-27 analysis of events leading up to [Atkinson's] execution of Corotoman agreements." *Id*.

206.    Then, on September 29, 2015, Potter researched the applicability of the doctrine of

ultra vires to dealings with Atkinson and Wellford. *Id*.

207.    On or about October 6 and 7, 2015, Potter began researching case law to identify legal theories that could be used in settlement negotiations or litigation that the Settlement Agreement with Corotoman "should be reformed to eliminate the 35-foot overblast requirement. Theories include mistake of fact, mistake of law, inadequate consideration, ambiguousness, and unconscionability. Also additional research re ultra vires and impracticality." *Id*.

208.    On October 19, 2015, Potter's time entry states, "Following up 10-19 meeting with [Atkinson] by analyzing various file documents (including Kimball obstruction removal project manual) to confirm, *or disprove, statements made by [Atkinson]* during the meeting." *Id*. (emphasis added).

209.    On October 27, 2015, Potter prepared for meetings with the FAA by "*determining extent to which FAA will support, or become actively involved in, efforts to acquire avigation easement without any further expenditure of funds.*" *Id*. (emphasis added).

210.    The above entry by Potter is similar to the email from Rick Holes to the FAA requesting the FAA assist the Airport Authority and Bailey & Wyant deprive Corotoman of its property (the avigation easement) without completing the work as required by the Settlement Agreement so that Corotoman could then use the land.

211.    None of the actions by Bailey & Wyant, L.R. Kimball, or the Airport Authority seeking to undermine the Settlement Agreemen or have the FAA interfere with the Settlement Agreement was disclosed to Corotoman.

212.    Corotoman believed that all negotions were being made in good faith.

213.    Even though the Airport Authority, Kimball and Bailey & Wyant were seeking to undermine and discredit the Settlement Agreement, in 2016, Corotoman and the Airport Authority

through Sayre and Bailey began working on negotiating amendments to the Settlement Agreement and another draft Amendment to the License and Work Agreement.

214.    Attached as **Exhibit CC** is a true and accurate copy of a June 18, 2016 draft "Amendment to License and Work Agreement."

215.    Attached as **Exhibit DD** is a true and accurate copy of a June 18, 2016 draft "2016 Amendment to Settlement Agreement."

216.    The June 18, 2016 drafts of the "Amendment to License and Work Agreement" and the "2016 Amendment to Settlement Agreement" were authored mutually by George and Bailey. *Id*.

217.    As shown in the draft "2016 Amendment to Settlement Agreement" and "2016 Amendment to License and Work Agreement," the parties discussed that the Airport Authority had not performed the work it had previously agreed to perform and the parties had not yet conveyed the real property previously agreed to, and Corotoman had not conveyed the Avigation Easement to the Airport Authority.

218.    Corotoman believed that the Airport Authority was working on terms to Amend the Settlement Agreement and the License and Work Agreement in a manner that was mutually beneficial in light of the fact that the Airport Authority had not performed the work as initially agreed to in the Settlement Agreement.

219.    In the draft "2016 Amendment to Settlement Agreement" the parties, *inter alia*, discussed that the conveyance of the real property identified in the original Settlement Agreement would be conveyed between the parties within sixty (60) days of signing the 2016 Amendment to Settlement Agreement.

220.   In the 2016 Amendment to License and Work Agreement, the Airport Authority and Corotoman discussed how there was certain work that had been agreed to be performed by the Airport Authority on Corotoman's real property.

221.   The draft 2016 Amendment to License and Work Agreement stated, *inter alia*, that the Airport Authority would not have any additional obligations to perform the overblast work on Corotoman's property, and, as long as the Airport Authority complied with certain conditions, Corotoman would provide the Airport Authority with the ability to remove rock and earth from Corotoman's property.

222.   As compensation for waiving its right to demand that the Airport Authority complete the overblast work as identified in the original License and Work Agreement, the 2016 Amendment to the License and Work Agreement stated that Corotoman would receive three million five hundred thousand dollars ($3,500,000.00) in total.

223.   Since the Airport Authority had already paid Corotoman five hundred thousand dollars ($500,000.00), the Airport Authority would only pay the remaining three million dollars ($3,000,000.00).

224.   However, neither of the 2016 Amendments to the Settlement Agreement or the License and Work Agreement were signed.

225.   On July 20, 2016, Corotoman's attorneys met with the Airport Authority's attorneys to discuss next steps with potentially resolving the issues between the Airport Authority and Corotoman.

226.   On July 20, 2016, Holes as a principal of Kimball or on behalf of the Airport Authority sent an email to the FAA stating, in relevant part, "I think we would all agree that the best case scenario would be that the [Airprot Authority] gets Corotoman/Wellford to agree that he

received fair market value for the land and, as a result, it rightly belongs to the Airport Authority. However, I also think we all would also agree that this may be a rather unlikely scenario. So, I am trying to come up with other possible options that we can pursue that, while not necessarily achieving the same end product, would protect the interests of the Airport. The one option that I thought about was that Corotoman/John Wellford would agree, at a minimum to grant an aerial easement over those properties for all current and future approaches to Runway 5 and, along with that easement, he would also grant permanent access to the properties for the purposes of maintenance. This would allow the Airport to achieve the same end result, while Corotoman would still maintain ownership of the properties. The Authority would also maintain ownership of those other parcels that were purchased in fee simple. I know that this doesn't address the issue of the FAA paying $250,000 for what you thought was fee simple ownership of the Corotoman/John Wellford properties, but it does protect the interest of the Airport. An additional option could be some sort of an agreeable 'land swap' where the Airport Authority would maintain ownership of the highest portions of the properties and the remaining properties would revert to Corotoman/John Wellford. I understand that this would require the Airport Authority to follow the Federal Land Release criteria and that the properties would have to be appraised and it may even be necessary that some money changes hands. I hope I haven't said anything that I shouldn't have. I think, in retrospect, we would all agree that the way this turned out is not the way it should have. My goal is to try to get something accomplished that protects the Airport, while I know for certain that you have additional concerns and requirements to protect the FAA's interests. If we can work out some acceptable scenarios, I know that Terry, Nick and I will do our damnedest to make something happen. Thanks."

227.    Attached as **Exhibit EE** is a true and accurate copy of Holes July 20, 2016 email.

228.    On July 21, 2016, the FAA responded, and Sayre sent an email to Potter, Rick Holes and Bailey stating, "Here is the latest from the FAA. See the second paragraph that has been bolded. We just need to get the easement done. Period."

229.    Attached as **Exhibit FF** is a true and accurate email from July 21, 2016 from Sayre.

230.    On or about August 1, 2016, Bailey sent a letter on behalf of Airport Authority to George stating, *inter alia*, that the FAA was refusing to approve the land agreement in exchange for the avigation easement as originally agreed in the Settlement Agreement, and that the Airport Authority would take whatever action is necessary to acquire the Avigation Easement without giving any additional consideration other than what has previously been given.

231.    Attached as **Exhibit GG** is a true and accurate copy of the August 1, 2016 letter from Bailey to George.

232.    On April 6, 2017, Bailey sent an email to Wellford copying Sayre and Hill and stating, "John last request for deed and easement otherwise suit will be filed next week. You cashed the check for the purchase of property and easement. If the airport is compelled to court it will seek attorneys fees and costs in addition to compelling you execute the deeds."

233.    Approximately two hours later, Bailey sent another email to Wellford stating, "John disregard for now. I did not receive your voice mail until this morning. I will call you later today. You can call me now if you're available."

234.    Attached as **Exhibit HH** is a true and accurate copy of the April 6, 2017 emails from Bailey to Wellford.

235.    Based upon his April 6, 2017 email, Bailey implicitly agreed that the Settlement Agreement containing the avigation easement is a valid and binding contract.

236.    To date, the Airport Authority has not performed the work as required by the License and Work Agreement or the Settlement Agreement.

237.    In addition, the Airport Authority has not conveyed the real property to Corotoman as required by the Settlement Agreement.

238.    Corotoman remains ready, willing and able to transfer the Avigation Easement and the real property identified in the Settlement Agreement upon confirmation that the Airport Authority will perform the work identified in the License and Work Agreement and the exchange of real property from the Airport Authority to Corotoman.

239.    In its initial Answer in this matter, the Airport Authority admits that Atkinson was the Director of the Airport Authority who had the authority to enter into "minor contracts" on behalf of the Airport Authority, yet it denied that Atkinson or his successor, Sayre had the authority to enter into the contracts or agreements at issue in this matter.

240.    In its Twelfth Affirmative Defense, the Airport Authority asserted that Corotoman is barred from recovery and the Settlement Agreement must be rescinded because "at the time said alleged agreements were entered into to, then-Director [Atkinson] was acting ultra vires or otherwise acting in excess of his lawful authority, and therefore the alleged agreements are invalid."

241.    However, as shown herein, the Settlement Agreement was provided to the Airport Authority, its attorneys, and its Board before it was entered into.

242.    Indeed, through Bailey & Wyant, the Airport Authority represented that on or about April 1, 2015, Corotoman and the Airport Authority entered into an Agreement and Option contract to purchase 9.39 acres in the Runway Protection Zone of Yeager Airport and three

separate easements for access, drainage and other uses of 21.0002 acres, 33.420 acres, and 3.053 acres.

243.    As part of its representation to the Court, the Airport Authority provided a copy of the Agreement and Option between Corotoman and the Airport Authority as Exhibits 1 and 2. The Agreement and Option attached to its filing was signed by Atkinson on behalf of the Airport Authority and Wellford on behalf of Corotoman.

244.    Then, in a subsequent filing to this Court through Bailey & Wyant, the Airport Authority represented, *inter alia*:

> For instance, **the parties entered into a Settlement Agreement on July 5, 2012 for a land and airspace avigation.** In that agreement, the parties agreed that the land deeded by Corotoman, Inc., would be free and clear of liens and encumbrances. See ***Exhibit 4*** attached hereto. **The instant agreement entered into in April 2015 is consistent with the parties' prior transactions.** (emphasis added).

245.    On December 10, 2019, the Airport Authority provided an Affidavit of its former counsel at Bailey & Wyant, Josef A. Horter ("Mr. Horter"), stating, in relevant part: "it was not my intent to validate the referred to Settlement Agreement of July 5, 2012 or to concede or contend that Rick Atkinson had authority to execute it. The intent was to show that John Wellford, as President of Corotoman, Inc., was willing to sell property free and clear of the liens of his wife, Katherine F. Wellford, who held a Deed of Trust on the property since November 5, 2007."

246.    Attached as **Exhibit II** is a true and accurate copy of the affidavit from Joseph Horter stating this.

247.    Mr. Horter's sworn statement contradicts the Bailey & Wyant billing records and the emails from Bailey telling Wellford/Corotoman to sign the Settlement Agreement "ASAP."

248.    All conditions precedent for filing this action have been met or waived.

249.    This action is timely filed before the expiration of any statutes of limitations or statutes of repose.

250.    Upon information and belief, the Airport Authority has permitted aircraft, including planes and helicopters, to fly through the airspace owned and controlled by Corotoman.

251.    However, the Airport Authority has not received an avigation easement by prescription through the airspace owned and controlled by Corotoman.

252.    Defendants are equitably estopped from relying upon a statute of limitations defense, to the extent any such defense applies to Corotoman's claims because the Airport Authority and Bailey & Wyant at all times, assured Corotoman and its agents that it would comply with its  obligations under the License and Work Agreement and the Settlement Agreement.

253.    Notwithstanding the allegations set forth above, the Airport Authority and Bailey & Wyant affirmatively assured Corotoman that they were working to comply with the obligations set forth in the Agreements.

254.    The Airport Authority and Bailey & Wyant assured Corotoman that Atkinson had authority to enter into the Settlement Agreement.

255.    The Airport Authority and Bailey & Wyant induced Corotoman to enter into the Settlement Agreement.

256.    Defendants intended by their actions,omissions and assertions that it would comply with the Settlement Agreement and the License and Work Agreement would be relied upon by Corotoman.

257.    Corotoman reasonably relied on the Airport Authority and Bailey & Wyant's affirmative statements regarding its purported compliance with the obligations under the

Settlement Agreement and License and Work Agreement and delayed filing this action until now in hopes the parties could resolve this matter without the need to resort to litigation.

258.    All conditions precedent for filing this action have been met.

## FIRST CLAIM FOR RELIEF
**(Breach of Contract-Settlement Agreement and License and Work Agreement Against Airport Authority)**

259.    Corotoman realleges and incorporates by reference Paragraphs 1 through 258.

260.    Pursuant to the Settlement Agreement and the License and Work Agreement, a valid and enforceable contract existed between Corotoman and the Airport Authority.

261.    The Settlement Agreement was reviewed and approved and ratified by the Airport Authority at the March 2012 meeting.

262.    The Settlement Agreement was reviewed and approved by the Airport Authority's counsel before it was signed by Atkinson.

263.    Atkinson followed the protocol of ensuring that the Settlement Agreement was sent to the Board for review and approved by the Airport Authority's counsel before it was signed.

264.    Pursuant to the License and Work Agreement, the Airport Authority agreed to "overblast at least thirty-five (35) feet below the planned final grade, on drill dates and blasting plan acceptable to Corotoman and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules."

265.    The Airport Authority also agreed that "the finished grade will be at least ten (10) feet below the elevation of the planned Avigation Easement at any point on the area covered by [the License and Work Agreement] and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules."

266.    The Airport Authority agreed that the work would be commenced by the end of 2012 and completed within twenty-four (24) months after commencement and that time is of the essence in the completion of the work.

267.    The Airport Authority failed to perform its obligations pursuant the Settlement Agreement and the License and Work Agreement.

268.    The Airport Authority has failed to transfer real property as agreed to by the Settlement Agreement.

269.    The Airport Authority, by and through its conduct and actions or the conduct and actions of its agents as described herein, breached multiple material terms of the contracts, the Settlement Agreement and the License and Work Agreement.

270.    The Airport Authority, by and through its conduct and actions or the conduct and actions of its agents as described herein, breached multiple material terms of the contracts on numerous occasions.

271.    Indeed, Corotoman permitted the Airport Authority and its contractors and subcontractors to enter its land based upon the provisions of the Settlement Agreement and License and Work Agreement.

272.    Corotoman has been damaged as a result of the Airport Authority's breach because the work it contracted with Airport Authority to complete has never been completed, and Corotoman is unable to use the property as contemplated and anticipated at the time of entering into the License and Work Agreement and the Settlement Agreement.

273.    The Airport Authority represented to Corotoman that the License and Work Agreement was a valid contract or had been ratified by the Airport Authority by, *inter alia*:

        a.    Making payments to Corotoman pursuant to the Settlement Agreement;

      b.  <u>Permitting the Airport Authority's contractors and subcontractors to perform work on Corotoman's land;</u>

      c.  Representing through filings that the Settlement Agreement was a valid contract; and

      d.  In other ways to be shown through discovery.

274.    The Airport Authority has committed numerous material breaches of the Settlement Agreement and License and Work Agreement by, *inter alia*:

      a.  Failing to comply with the terms of the License and Work Agreement;

      b.  Failing to transfer property as required by the Settlement Agreement;

      c.  Permitting aircraft to fly through Corotoman's airspace; and

      d.  In other ways to be shown through discovery and at trial.

275.    Due to the numerous, substantial, and material breaches of the License and Work Agreement by Airport Authority Corotoman is entitled to seek the greater of either (1) actual, compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ten thousand dollars per breach.

276.    Corotoman remains ready willing and able to perform all of its obligations in the Settlement Agreement and License and Work Agreement upon confirmation that the Airport Authority will meet each of its obligations.

277.    All conditions precedent for asserting this claim have been met.

278.    By reason of the foregoing and the numerous material breaches, Airport Authority is liable to Corotoman for the damages Corotoman has suffered as a result of Airport Authority's actions, in an amount to be determined at trial, plus attorneys' fees.

<u>**SECOND CLAIM FOR RELIEF**</u>
**(Breach of Contract - Breach of Good Faith and Fair Dealing Against Airport Authority)**

279.    Corotoman realleges and incorporates by reference Paragraphs 1 through 278.

280.    Every contract in West Virginia contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.

281.    Corotoman believed at all times that Bailey and Atkinson were acting on behalf of the Airport Authority.

282.    Further, Atkinson and Bailey represented that Atkinson had authority to sign the License and Work Agreement and the Settlement Agreement.

283.    Bailey and Atkinson, on behalf of the Airport Authority, represented that all conditions precedent for the Airport Authority entering into the Settlement Agreement and License and Work Agreement had been met, and they had authority to sign the agreements or the Airport Authority had delegated authority to Atkinson to sign the agreements.

284.    The License and Work Agreement and the Settlement Agreement are valid contracts.

285.    The Airport Authority has never completed the work on Corotoman's real property as agreed to by the Settlement Agreement and the License and Work Agreement.

286.    Corotoman reasonably expected that Airport Authority would commence and complete the work as agreed in the Settlement Agreement and License and Work Agreement.

287.    Without these reasonable expectations, Corotoman would not have agreed to the Settlement Agreement and the License and Work Agreement with the Airport Authority.

288.    The Airport Authority breached the implied covenant of good faith and fair dealing by not commencing and completing the work as described in the License and Work Agreement and frustrating Corotoman's reasonable expectations.

289.    The Airport Authority breached the implied covenant of good faith and fair dealing by permitting aircraft to fly through Corotoman's airspace.

290.     As a result of the Airport Authority's numerous, material, and substantial breaches it is liable to Corotoman for actual damages in an amount to be determined at trial and attorneys' fees.

### THIRD CLAIM FOR RELIEF
**(Breach of Quasi-Contract/Unjust Enrichment Against Airport Authority)**
*(Pleading in the Alternative)*

291.     Corotoman realleges and incorporates by reference Paragraphs 1 through 290.

292.     Corotoman relied upon the promises of the Airport Authority and its agents, including the affirmations, representations and conduct of the Airport Authority to perform work on Corotoman's real property with the ordinary skill, care and diligence in a skillful, careful and workmanlike manner and in accordance with the industry standards for overblasting.

293.     The Airport Authority reasonably expected Corotoman to rely upon its promises and Corotoman did, in fact, rely upon the Airport Authority's promises.

294.     The Airport Authority intended to induce Corotoman to rely on its misrepresentations that it would perform the work on Corotoman's real property in accordance with the scope of work outlined in the License and Work Agreement.

295.     The Airport Authority breached the terms of the implied contract by failing to perform the work on Corotoman's property in accordance with the License and Work Agreement.

296.     By virtue of the Airport Authority's numerous and material breaches, it has been unjustly enriched because it was able to remove the knoll/obstruction on Corotoman's property, but it did not perform the work as agreed to in the License and Work Agreement.

297.     Further, the Airport Authority was unjustly enriched because it induced Corotoman to settle a disputed condemnation proceeding on the basis of the Airport Authority's

representations that it would perform the work on Corotoman's property in conformance with the License and Work Agreement.

298.     As a result of the numerous and material breaches by Airport Authority, it is liable to Corotoman for actual damages in an amount to be determined at trial, and attorneys' fees.

### FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment against the Airport Authority)

299.     Corotoman realleges and incorporates by reference Paragraphs 1 through 298.

300.     This action concerns whether there was a valid Settlement Agreement and License and Work Agreement entered into between Corotoman and the Airport Authority.

301.     An actual controversy exists between Corotoman and the Airport Authority. Accordingly, a declaration is necessary and proper at this time.

302.     Specifically, Corotoman seeks an order of this Court that the Settlement Agreement and the License and Work Agreement were valid contracts between the parties.

303.     Accordingly, Corotoman seeks a judicial determination of its rights and duties as well as the Airport Authorities rights and duties with respect to the Settlement Agreement and the License and Work Agreement.

### FIFTH CLAIM FOR RELIEF
### (Negligence against Airport Authority)
#### *(Pleading in the Alternative)*

304.     Corotoman realleges and incorporates by reference Paragraphs 1 through 303.

305.     The Airport Authority was under a duty exercise reasonable care in its dealings with Corotoman.

306.     The Airport Authority was negligent in failing to properly supervise and oversee its principals and agents such as Kimball, Bailey & Wyant, and Atkinson.

307.    In the event the Settlement Agreement and its exhibits were invalid, then the Airport Authority had no right to permit its engineers and contractors to tresspass on Corotoman's property or to destroy Corotoman's property.

308.    The Airport Authority was negligent in permitting its engineers and contractors to trespass on Corotoman's property.

309.    The Airport Authority was negligent in permitting Atkinson and Bailey and Wyant to represent that they had the authority to negotiate with Corotoman if they did not have that authority.

310.    The Airport Authority was negligent in permitting Bailey & Wyant to represent that Atkinson had authority to Corotoman that Atkinson had authority to sign the agreements.

311.    The Airport Authority's failure to exercise reasonable care in permitting Atkinson and Bailey & Wyant to negotiate the Settlement Agreement with Corotoman when they did not have authority constitute breaches of the Airport Authority's duties.

312.    The Airport Authority was also negligent in permitting its agents Kimball and Bailey & Wyant to interfere with the Settlement Agreement by contacting the FAA to undermine the Settlement Agreement.

313.    The Airport Authority was negligent in failing to ensure that Kimball performed its work in accordance with the Settlement Agreement and License and Work Agreement.

314.    The Airport Authority was neglingent in failing to ensure that the obstruction/knoll was overblasted by 35 feet.

315.    The Airport Authority was negligent in permitting its engineers and contractors to tresspass on Corotoman's property.

316.	The Airport Authority was negligent in permitting its engineers and contractors to destroy Corotoman's property.

317.	The Airport Authority breached this duty by allowing Bailey and Atkinson to negotiate with Corotoman if they did not have the authority to negotiate the subject matter.

318.	As a direct, foreseeable, and proximate result of the Airport Authority's negligence, Corotoman has suffered damages, including damage to property.

319.	As set forth herein, the Airport Authority is liable for the cost to correctly overblast the knoll and property at issue so that it can be used by Corotoman as contemplated in the Settlement Agreement.

320.	Therefore, the Airport Auhtority must return the property to the state it was in 2012 or comply with the Settlement Agreement.

**SIXTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation against Airport Authority)**
*(Pleading in the Alternative)*

321.	Corotoman realleges and incorporates by reference Paragraphs 1 through 320.

322.	At all times, Bailey & Wyant, Bailey,  and Atkinson were the agents of Airport Authority.

323.	Corotoman maintains that the Settlement Agreement and the License and Work Agreement is a valid and enforceable contract.  In alternative and in the event the Airport Authority is successful in arguing against the validity of the contract, the Airport Authority is responsible for all damages proximately caused by the negligent misrepresentations of Bailey & Wyant, Bailey, and Atkinson.

324.    In the event the Settlement Agreement and its exhibits were invalid, then the Airport Authority had no right to trespass on Corotoman's property or to destroy Corotoman's property.

325.    These representations include, but are not limited to, representations that Atkinson had the authority to negotiate the contract with Corotoman regarding the Settlement Agreement and the License and Work Agreements.

326.    These representations include, but are not limited to, representations that Atkinson had the authority to sign the contract with Corotoman regarding the Settlement Agreement and the License and Work Agreements.

327.    These representations include, but are not limited to, representations that Bailey, as legal counsel for the Airport Authority, had reviewed and approved the Settlement Agreement and the License and Work Agreements.

328.    The Airport Authority was under a duty to negotiate with Corotoman in good faith.

329.    The Airport Authority was under a duty to notify Corotoman if the general counsel and executive director for the Airport Authority did not have authority to enter into or negotiate contracts.

330.    One under a duty to give information to another, who makes an erroneous statement when he has no knowledge on the subject, and thereby misleads the other to his injury, is as much liable in law as if he had intentionally stated a falsehood.

331.    Corotoman relied upon a course of dealing and extensive representations by Bailey & Wyant and Atkinson that the parties had the capacity to contract and were sophisticated entities negotiating at arm's length.

332.     In addition, the Airport Authority negligently represented to its contractors and engineers that the contractors and engineers could perform work on Corotoman's property.

333.     The Airport Authority negligently represented to its contractors and engineers that the contractors and engineers could perform work on Corotoman's property.

334.     The Airport Authority permitted its engineers and contractors to destroy Corotoman's property without adequate authority.

335.     The negligent misrepresentations by the Airport Authority have damaged Corotoman as stated herein because it permitted engineers and contractors to destroy Corotoman's property.

336.     The lack of overblasting to the contractually agreed depth amounts to a full taking of Corotoman's property without just compensation. Accordingly, the Airport Authority must return Corotoman's property to the manner in which it was prior to entering into the Settlement Agreement or comply with the Settlement Agreement.

### SEVENTH CLAIM FOR RELIEF
#### (Fraud against Airport Authority)

337.     Corotoman realleges and incorporates by reference Paragraphs 1 through 336.

338.     At all times pertinent to this matter, Atkinson, Bailey & Wyant, and Bailey held themselves out as agents of the Airport Authority.

339.     At all times pertienent to this matter and specifically prior to the signing of the Settlement Agreement, the Airport Authority knew that Atkinson, Bailey, and Bailey & Wyant were representing to Corotoman that they had the authority to enter into an agreement on behalf of the Airport Authority.

340.    At all times, the intentional omissions and material misrepresentations were within the course and scope of Atkinson, Bailey, and Bailey & Wyant's employment, agency or apparent agency with the Airport Authority.

341.    As demonstrated in the fact section *supra* and the exhibits attached hereto, the Airport Authority through Atkinson, Bailey, or Bailey & Wyant, made numerous material representations and statements that the Settlement Agreement and the License and Work Agreements are valid contracts.

342.    Specifically, the Airport Authority represented that the Settlement Agreement was a valid contract at the March 2012 and July 2012 Board Meetings.

343.    Bailey & Wyant, on behalf of the Airport Authority, negotiated with Corotoman and requested that Corotoman sign the Settlement Agreemnt "ASAP."

344.    In addition, Bailey & Wyant, on behalf of the Airport Authority represented that the Settlement Agreement was a valid contract in its representations to this Court.

345.    In addition, Bailey & Wyant, on behalf of the Airport Authority, represented that Atkinson had authority to sign the agreements on behalf of the Airport Authority.

346.    These statements were made in order to induce Corotoman to transfer property rights without receiving just compensation and avoid protracted litigation.

347.    Indeed, counsel for the Airport Authority performed research on "determining the extent to which the FAA will support or become actively involved in efforts to acquire avigation easement without any futher expenditure of funds."*See* **Exhibit BB**.

348.    As shown by the Airport Authoritys' failure to complete the work and conditions contained in the Settlement Agreement, these statements were material and false.

349.    The Airport Authority is liable for the intentional omissions and material misrepresentations of its employees, agents and apparent agents, including but not limited to Bailey & Wyant and Atkinson.

350.    Corotoman relied on the material representations and omissions of Bailey & Wyant and Atkinson to enter into the Settlement Agreement.

351.    Corotoman was justified under the circumstances including a course of dealing with Atkinson as the Airport Authority executive director and Bailey & Wyant as the Airport Authority general counsel.

352.    If Atkinson and Bailey & Wyant did not have authority to enter into the Settlement Agreement with Corotoman, then Corotoman would not have permitted the Airport Authority or its agents to enter onto Corotoman's land and perform the obstruction/knoll removal.

353.    Corotoman was damaged by his reliance on these representations and contractual promises of the Airport Authority to properly overblast the property.

354.    The Airport Authority's decision to not complete the Settlement Agreement and its attachments as negotiated by Bailey & Wyant and Atkinson was made for the Airport Authority's economic gain and to the detriment of Corotoman.

355.    The Airport Authority intentionally permitted its contractors and engineers to destroy Corotoman's property without adequate and agreed upon compensation.

356.    The Airport Authority intentionally permitted its contractors and engineers to trespass on Corotoman's property when Corotoman.

357.    The intentional misrepresentations as outlined herein, as well as the intentional withholding of information from Corotoman were all done for inducing reliance by Corotoman.

358.    As a result of the intentional misrepresentations and omissions and inducement to enter into the Settlement Agreement, Corotoman has sustained damages, including loss of use of property, interest thereon, and additional damages as shall be proven and developed throughout the course of discovery.

## EIGHTH CLAIM FOR RELIEF
### (Civil Conspiracy Against The Airport Authority, Bailey & Wyant, and Kimball)

359.    Corotoman realleges and incorporates by reference Paragraphs 1 through 358.

360.    A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not itself unlawful, by unlawful means.

361.    The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

362.    As discussed *supra* and in the attached exhibits, Defendants have engaged in concerted actions to deprive Corotoman of its property.

363.    As dicussed *supra*, Bailey & Wyant and the Airport Authority have engaged in actions to assert that Atkinson did not have authority to enter into the Settlement Agreement and License and Work Agreement when he had full authority to do so.

364.    Indeed, in 2015, counsel for the Airport performed research on "determining the extent to which the FAA will support or become actively involved in efforts to acquire avigation easement without any futher expenditure of funds." *See* **Exhibit BB.**

365.    Further, the August 25, 2015 correspondence from Rick Holes with L.R. Kimball to the FAA stated in relevant part that "[i]t may take a letter from the FAA putting in writing that the [Airport Authority] must own that property in order for the AA to take Mr. Wellford to court to gain that ownership. So, to make a long e-mail short, **we would like to discuss with you what**

the FAA could provide that the AA could use to its advantage to gain ownership over the rest

of the cut area, at a minimum, from Corotoman. . . . .Could we have a discussion at some point

to talk about the right work agreement and what the FAA's expectation would be associated with

the land included in the Right to Work Agreement?" (emphasis added); *See* **Exhibit AA.**

366.     As shown in detail and the documents attached hereto as exhibits and incorporated

by reference, all Defendants have engaged in actions to the injury of Corotoman including actively

conspiring to acquire Corotoman's land without overblasting the property to the contractually

agreed depth and requirements.

## NINETH CLAIM FOR RELIEF
### (Tortious Interference with Contract Against Bailey and Kimball)

367.     Corotoman realleges and incorporates by reference Paragraphs 1 through 366.

368.     Settlement Agreement and the License and Work Agreement are valid and

enforceable contracts between Corotoman and the Airport Authority.

369.     The actions of the Airport Authority, Bailey, and Kimball as detailed *supra* and in

the attached exhibits demonstrate intentional acts of interference by parties outside of the

relationship between Corotoman and Airport Authority.

370.     The intent of Bailey and Kimball to interfere with the contract was explicitly stated

by the Defendants.

371.     The Airport Authority's counsel explicitly billed for research on "determining the

extent to which the FAA will support or become actively involved in efforts to acquire avigation

easement without any futher expenditure of funds." *See* **Exhibit BB.**

372.     Further, the August 25, 2015 correspondence from Rick Holes with L.R. Kimball

to the FAA stated in relevant part that "[i]t may take a letter from the FAA putting in writing that

the [Airport Authority] must own that property in order for the AA to take Mr. Wellford to court

to gain that ownership. So, to make a long e-mail short, **we would like to discuss with you what the FAA could provide that the AA could use to its advantage to gain ownership over the rest of the cut area, at a minimum, from Corotoman**. . . . ." *See* **Exhibit AA.**

373.    The actions and interference of Bailey and Kimball complained of herein caused the harm sustained and damages.

374.    Corotoman is unable to use or develop the land at issue.

375.    Namely, that the breach of contract and failure to overblast the property as contemplated in the contract documents to the agreed depth renders it useless until it is properly overblasted.

## TENTH CLAIM FOR RELIEF
### (Tresspass Against Airport Authority, Kimball, Central Contracting and Dyno Nobel)
*(Pleading in the Alternative)*

376.    Corotoman realleges and incorporates by reference Paragraphs 1 through 375.

377.    The only lawful authority that permitted the Airport Authority, Kimball,  Central Contracting and Dyno Nobel, its agents, contractors and subcontractors to enter onto Corotoman's ground or property was the Settlement Agreement and License and Work Agreement.

378.    If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority never had the authorization or invitation to enter upon Corotoman's land and property.

379.    If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority never had the authorization or invitation to destroy any aspect of Corotoman's property.

380.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority never had the autheorization or invitation to permit Kimball, Central Contracting and Dyno Nobel or any of its agents, contractors, or subcontractors to enter and destroy any aspect of Corotoman's property.

381.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority,  Kimball, Central Contracting and Dyno Nobel each individually trespassed upon Corotoman's land/real property.

382.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority, Kimball, Central Contracting and Dyno Nobel,  intentionally or recklessly took unconscientious advantage of Corotoman and committed a willful or bad faith trespass.

383.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority, Kimball, Central Contracting and Dyno Nobel,  intentionally or recklessly destroyed Corotoman's land/real property and all natural trees, shrubs, plants on Corotoman's land/real property.

384.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority, Kimball, Central Contracting and Dyno Nobel,  intentionally or recklessly took unconscientious advantage of Corotoman and committed a willful or bad faith trespass.

385.   At all relevant times, Corotoman believed that it had entered into a valid and

binding contract with the Airport Authority when entering into the Settlement Agreement and License and Work Agreement, therefore it only permitted the Airport Authority, Kimball, Central Contracting and Dyno Nobel,   to enter its land based upon the terms set forth in the Settlement Agreement and License and Work Agreement.

386.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority, Kimball, Central Contracting and Dyno Nobel,  were not authorized, licensed or invited to enter, remain, or perform any actions on Corotoman's property.

387.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority, Kimball, Central Contracting and Dyno Nobel,   intentionally or recklessly took unconscientious advantage of Corotoman and committed a willful or bad faith trespass.

388.   If Atkinson was acting *ultra vires* or otherwise acting in excess of his lawful Authority when he signed the Settlement Agreement and License and Work Agreement, then the Airport Authority, Kimball, Central Contracting and Dyno Nobel,    entered upon Corotomans' land and real property without a privilege or authorization to do so.

389.   In the absence of a right arising out of contract, the Airport Authority, Kimball, Central Contracting and Dyno Nobel,  had no right to enter, to perform any work, or to destroy Corotoman's land or real property.

390.   The Airport Authority, Kimball, Central Contracting and Dyno Nobel, and their agents, contractors, and/or subcontractors  trespassed and destroyed Corotoman's property without adequate authority.

391.   Due to their unlawful and intentional and bad faith trespass, the Airport Authority,

Kimball, Central Contracting and Dyno Nobel,   and their agents, contractors, and/or subcontractors have damaged Corotoman and its property/land.

392.   Accordingly, the Airport Authority must return Corotoman's property to the manner in which it was prior to entering into the Settlement Agreement.

393.   Corotoman is entitled to treble damages for the Airport Authority and Kimball's wrongful destruction of Corotoman's land and property.

## PRAYER FOR RELIEF

WHEREFORE, Corotoman prays for a judgment against the Defendants, as follows:

1.     For actual and compensatory damages;

2.     Costs of suit;

3.     Pre- and post-judgment interest;

4.     For treble damages;

5.     For a judgment that the Settlement Agreement and the License and Work Agreement are valid and enforceable contracts;

6.     For specific performance of the Settlement Agreement;

7.     For specific performance of the License and Work Agreement;

8.     For equitable relief;

9.     For punitive damages;

10.    Reasonable attorneys' fees; and

11.    Such other relief as allowed by law the Court may find appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

This the 23rd day of September 2020.

/s/ James C. Wright
James C. Wright
W.VA Bar No. 6816
**HARTLEY LAW GROUP, PLLC**
2001 Main Street, Suite 600
Wheeling, West Virginia 26003
Phone (304) 233-0777
Facsimile (304) 233-0774
jwright@hartleylawgrp.com

John F. Leaberry (WV Bar 2164)
Law Office of John Leaberry PLLC
167 Patrick Street
Lewisburg, WV 24901
T: 304.645.2025 F: 888.469.6631

Scott C. Harris (*pro hac vice*)
N.C. Bar No. 35328
Andrew D. Hathaway (*pro hac vice*)
N.C. State Bar No. 36801
**WHTFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, North Carolina 27603
Phone (919) 600-5000
Facsimile (919) 600-5035
scott@whitfieldbryson.com
drew@whitfieldbryson.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of September 2020, I caused the foregoing to be filed

via ECF which will notify all counsel of record of the filing of same.

*/s/ James C. Wright*

# EXHIBIT A

# EXHIBIT E

# OFFER PACKAGE
# CORRESPONDENCE

APPRAISAL OF JUST COMPENSATION

Yeager Airport Obstruction Removal Project

Partial Taking of Rights in
Charleston North Tax District,
Map 10, Parcels 21.5, 29.5
Kanawha Parcel 110
Charleston, West Virginia 25311

Gentleman, Inc. - Property Owner

For:            O. R. Colan Associates of Florida, LLC
                Project Consultant
                22710 Fairview Center Drive
                Fairview Park, Ohio 44126

By:             Eugene M. Zdrojewski, Jr.
                Zdrojewski & Company
                855 McQueen Boulevard
                Saint Albans, West Virginia 25177-3752
                File No. 2009 030

Effective Date:      1/15/2010

Report Date:         1/20/2010

Rights Appraised:    Fee Estate

This appraisal report was prepared for the use and benefit of O. R. Colan Associates of Florida, LLC., L. Robert Kimball & Associates, Inc. and the Central West Virginia Regional Airport Authority. The appraiser/client relationship is with O. R. Colan Associates of Florida, LLC. as the Client. The report is based in part upon documents, writings and information owned, possessed and/or provided by O. R. Colan Associates of Florida, LLC.

This report is provided for information purposes only to third parties authorized to receive it. It should not be used for any purpose other than to understand the information available to and or provided by the client concerning the property.

Accepting a digital copy of this report constitutes agreement by the recipient to save the appraiser harmless from financial or legal consequences of fraud or identity theft resulting from the recipient's misuse, inadequate security or inappropriate distribution of the accepted digital copy of this report.



**Zdrojewski**
**& Company** Real Estate Services

Telephone 304-201-2221  Fax 304-727-4563

855 McQueen Boulevard    Saint Albans, West Virginia 25177-3752

January 20, 2010

Mr. C. Eric Kirk, MAI, SRA, Senior Appraisal Manager
O. R. Colan Associates of Florida, LLC
22710 Fairview Center Drive
Fairview Park, Ohio 44126

Re:  Yeager Airport Obstruction Removal Project
     Partial taking of property owned by Corotoman, Inc.
     Charleston North Tax District
     Map 46, Parcels 231 & 232 and Map 49, Parcel 140

Dear Mr. Kirk:

Per your request, the above property was observed in the company of Mr. John Wellford, Corotoman, Inc., October 23, 2009 for the purpose of developing an opinion of just compensation for the partial taking described in the attached report. The intended users of this appraisal report are O. R. Colan, L. Robert Kimball & Associates and the Central West Virginia Regional Airport Authority. The intended use of this appraisal is to provide the Airport Authority with as reliable an estimate of just compensation as possible based on the available information to initiate negotiations and/or to exercise the right of eminent domain. Since no physical changes are likely to have occurred since the date of observation, the effective date of the appraisal was adjusted to January 15, 2010. Subject to the assumptions limiting conditions described in the attached report, it is my opinion that just compensation for the proposed taking as of 1/15/2010 is

## ONE HUNDRED EIGHTY-SIX THOUSAND DOLLARS.

This entire amount is attributed to the property taken. Based upon the available information, it is the appraiser's opinion the taking does not result in damages to the residue or the larger parcel.

Respectfully submitted,

Eugene M. Zdrojewski, Jr.
WV Certified General Appraiser
Certificate No. CG013

**CERTIFICATION**

I certify that to the best of my knowledge and belief:

☐ The statements of fact contained in this report are true and correct.

☐ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and they are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

☐ I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

☐ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

☐ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

☐ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the Client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

☐ My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice, applicable state law and the instructions of O. R. Colan Associates.

☐ I made a personal, on-site observation of the property and gave the property owner an opportunity to meet with me on the subject property.

☐ No one provided significant real property appraisal assistance to me in the development of my analyses, opinions, and conclusions as reported herein.

☐ I have provided no other appraisal services regarding the subject property within the last three years.

Eugene M. Zdrojewski, Jr.
WV Certified General Appraiser
Certificate No. CG013

## 1.0   DEFINITION OF THE APPRAISAL PROBLEM

### 1.1   Physical Property under Consideration

The property to be acquired (the take) consists of 18.58 acres out of Charleston North Tax District, Map 46, Parcels 231 and 232 and Map 49, Parcel 140. Subject to verification by survey, these three tax parcels contain a total of 60.57 acres, referred to in this report as the entirety. The residue (after the take), therefore, is the area of the entirety less the property to be acquired or 41.99 acres. The entirety is part of approximately 288 acres of unsold developed and undeveloped land in NorthGate, a commercial development park owned by Corotoman, Inc., John Wellford, principal. The totality of unsold acreage in the park is essentially the larger parcel.



### 1.2   Property Rights under Consideration

Map 46, Parcel 232 is subject to an easement related to the operation of aircraft in the flight path to Runway 05 of Yeager Airport. While the flight path as designated in mapping

provided the appraiser (the turquoise/blue triangular shading in the above Google image) crosses part of Map 49, Parcel 140, neither it nor Parcel 231 appear to be subject to a formal easement based on the available information. Miscellaneous leases and utility easements also affect the property. The surface owner appears to own at least some of the mineral rights, but this has not been verified.

### 1.3    Current Property Owner

Title is held in the name of Corotoman, Inc., John Wellford, principal owner.

### 1.4    Client

O. R. Colan Associates of Florida, LLC
22710 Fairview Center Drive
Fairview Park, Ohio 44126

### 1.5    Intended Use of the Appraisal

The Client is a sub-contractor on the Yeager Airport, Runway 5 Approach Ground Obstruction Removal Project.

The intended uses of this appraisal are to provide a basis to begin negotiations with the property owner and/or to provide an independent and objective estimate of just compensation based on the available information about the take for purposes of filing documents to exercise the right of eminent domain. It is assumed an update with be performed when the taking is more precisely defined and a date of take is established.

### 1.6    Intended Users of the Appraisal

The sole intended users of this report are the Client, L. Robert Kimball & Associates, Inc. and the Central West Virginia Regional Airport Authority.

### 1.7    Scope of Appraisal Services

Extent of property identification

The property identification undertaken was as complete and as accurate as possible given the documents provided and the information available from the public record. (Metes and bounds descriptions of the entirety, the take and the larger parcel were not available for this appraisal. An abstract of title and definitive explanation of the existing avigation easements were not available for this appraisal. The descriptions in this report are the appraiser's interpretation of concept mapping provided by the Client and public record documents. These are subject to confirmation.



## Extent of property inspection

A casual, visual, on-site observation of the property was conducted by the appraiser in the company of the property owner.

## Type and extent of data researched

A thorough search for pertinent general market data and pertinent specific property data related to the appraised property and the comparable properties analyzed was conducted.

## Type and extent of analysis applied to arrive at opinions or conclusions

All analyses normally considered necessary for credible results by regular users of appraisal services and by the appraiser's peers were performed.

## Report Type

"Summary Report"[1]

### 1.8    Purpose of the Appraisal

Estimate just compensation as of the inspection date

### 1.9    Definitions

The Constitution of the State of West Virginia, Article III, Bill of Rights, Paragraph 9 requires the payment of **just compensation** when property is taken or damaged for a public use.

West Virginia Courts of Law have generally held that **just compensation** is the **fair market value** of the land actually taken at the time it was appropriated, plus the difference between the fair market value of the residue of land immediately before and immediately after the taking, beyond all benefits which may accrue to the residue from the construction of the improvement for which the land is taken and damaged.

Based on the information available for this appraisal, the appraiser is of the opinion the taking will not result in damage to the residue or the larger parcel. Just compensation is simply the fair market value of the property to be acquired.

**Fair market value** is defined "as the price in terms of cash, cash equivalent financing, or other precisely defined terms, a willing buyer would pay a willing seller, neither acting under compulsion or duress, both freely exercising prudence and intelligent judgment as to its value and familiar with the purposes for which the property is reasonably available."

---

[1] Uniform Standards of Professional Appraisal Practice 2010 – 11 Edition, The Appraisal Foundation, (Washington, D.C., 2009), p. U-24.

[2] Information for Appraisers, RW 6.30, 1-01-92, Sec. 30.01, p. 1.

Although the term fair market value is still used in the context of eminent domain in West Virginia, it is considered archaic in current appraisal practice. The term market value is now used in appraisal practice. The terms market value and fair market value are synonymous.

## 1.10    Date of Observation

10/23/2009 (In the company of John Wellford), also 1/14/2010 in a drive around observation from Deitrick Boulevard and Association Drive in NorthGate, Twilight Drive, which crosses the back of the property and from various vantage points in Coal Branch Heights, which adjoins the property.

## 1.11    Effective Date of the Appraisal

This report is being written during the first and second weeks of January, 2010.  No physical changes to the property are likely to have occurred during the information gather phase of this work. The effective date of the appraisal was adjusted to 1/15/2020.

## 2.0    ASSUMPTIONS & LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions. Accepting or using this appraisal constitutes accepting these assumptions and limiting conditions.

## 2.1    Limit of Liability

The liability of the appraiser is limited to the fee collected for preparation of the appraisal. The appraiser is responsible only to the Client and the other named intended users of this report. There is no accountability or liability to any third party and any third party using this appraisal does so at his/their own risk.

## 2.2    Copies, Publication, Distribution, Use of the Report

Possession of this report, or any copy thereof, does not carry with it the right of publication. This report may not be used for any purpose, by any party other than the Client and the other named intended users without the written consent of the appraiser and then only in its entirety.

Neither all nor any part of this report shall be conveyed to the public through advertising, public relations efforts, news, sales, or other media without the written consent and approval of the appraiser.

All conclusions and opinions concerning the analysis as set forth in the report were prepared by the appraiser. No change of any item in the report shall be made by anyone other than the appraiser and the appraiser is not responsible if any such unauthorized change is made.

If this report is communicated digitally via PDF file or other such media or file type, accepting a digital copy of this report constitutes agreement by the recipient (Client, intended or unintended users) to save the appraiser harmless from financial or legal consequences of fraud or identity theft resulting from the recipient's misuse, inadequate security or inappropriate distribution of the accepted digital copy of this report.

## 2.3    Testimony, Consultation, Completion of Contract for Appraisal Services

This appraisal is rendered under the assumption that the appraiser may be called upon to testify or appear in court because of having made this appraisal with reference to the property in question.   The contract for the report phase of these services is fulfilled and the total fee is payable upon completion of this report regardless of the results found. Services for testimony and consultation after the report is rendered will be provided for additional compensation.

## 2.4    Confidentiality

The appraiser may not divulge the material (evaluation) contents of the report, analytical findings or conclusions, or give a copy of the report to anyone other than the Client or the Client's designee as specified in writing, except as may be required by a court of law, a body with the power of subpoena, state enforcement agencies or a duly authorized professional peer review committee.

## 2.5   Extent of Process of Collection, Confirmation and Reporting of Data

Information about the property under consideration was obtained from the following sources:

1.   Casual, visual, on-site observation by the appraiser in the company of the property owner
2.   Public record information
3.   Preliminary mapping provided by the Client

## Limitations to the appraiser's scope of expertise

The appraiser is not an engineer, surveyor, structural, construction, legal, or hazardous waste/substance expert. It is assumed that no hidden or unapparent site conditions exist. No responsibility is assumed for unapparent conditions or for professional engineering, geological, soil sampling, core drilling, or other expert services required to discover such factors.

## Assumptions made concerning factors outside the appraiser's fields of expertise

No responsibility is assumed for matters legal in nature. The subject property is assumed to be owned in fee except as noted in the description of property rights. The title is assumed to be good and marketable and any existing liens or other encumbrances have been ignored.

## Extraordinary assumptions

An extraordinary assumption is defined as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."[3]

The above assumptions are extraordinary assumptions.   A number of additional assumptions related to the interpretation of easements, property boundaries, etc. have been

---

[3]  Uniform Standards of Professional Appraisal Practice 2010 - 11 Edition, The Appraisal Foundation, (Washington, D.C., 2009), p. U-3.

made and are described as they pertain to the various sections of this report.

Appraisal data for analysis and comparison purposes were obtained as follows:

The subject property is located within the market area in which the appraiser collects and confirms market data on an ongoing basis.

General appraisal data regarding local economic conditions and market trends were obtained from newspapers, economic bulletins and journals.

There is no independent, third-party real estate sales database available to appraisers in this market other than very limited land sales coverage by the Kanawha Valley MLS.  The appraiser's efforts to obtain comparable sales included calling other appraisers and brokers for leads as well as pursuing known active development areas for sales reported in the public record.  No known comparable sales were omitted.  Due to the unique nature of the subject property, the appraiser considered sales much older than sales normally used.

## 2.6    Exhibits

All the maps, plats, plans, sketches, and other renderings attached to this report are included only to aid the reader in visualizing the property.  They are not necessarily to scale.  No responsibility is assumed for accuracy.

## 2.7    Information Used

It is unlikely that a single appraiser or appraisal firm will have first-hand knowledge of all the factors and data pertinent to a particular appraisal problem.  As a practical matter, most appraisals are based to some extent on information supplied by outside sources.  The information, estimates, and opinions furnished by others contained in this report were obtained from sources considered reliable and believed to be true and correct; however, no responsibility for accuracy is assumed.  This appraisal is not based in whole or in part upon the race, color, or national origin of the present owners or occupants of the properties in the vicinity of the subject property.

## 2.8    Significant Professional Assistance

No one provided significant real property appraisal assistance to the appraiser in the development of the analyses, opinions, and conclusions reported herein.

## 2.9    Hypothetical Conditions

A hypothetical condition is defined as "that which is contrary to what exists, but is supposed for the purpose of analysis... **Hypothetical conditions assume conditions contrary to known facts** about physical, legal or economic conditions or trends, or the integrity of data used in an analysis."[4]

No hypothetical conditions pertain to this appraisal.

PROPERTY DESCRIPTION – ENTIRELY

[4] *Ibid* p. U-3.

## 3.1    Legal Description/Sales History



This map is an excerpt from a map recorded in Map Book 46, page 61. It is entitled 'A Survey of "The Farm" being a composite of properties totaling 363.76 acres ± on the waters of Coal

Branch, Tanyard Branch & Elk Two Mile Creek located in the North Annex District of the City of Charleston, Kanawha County, West Virginia to be conveyed to Corotoman Incorporated, January 1992.'

The 363.76 acres depicted and described by metes and bounds were conveyed to Corotoman, Inc. 3/5/1992 per Deed Book 2288, page 268 for $1,550,000 or $4,261/acre. The Grantors in this transaction were Commerce Bank, Trustee, McCabe-Henley Properties, Inc., Slatehill Company, Inc., Trojan Steel Company and Walhonde Corporation.

Tax Map 46, Parcel 232 consists of Tracts 10, 11 and 12 depicted on the above map that were part of the 363.76-acre conveyance. Tax Map 49, Parcel 140 is the residue of Tract 15 on the same map and part of the 363.76-acre conveyance. (Corotoman has developed and out-sold 2 commercial tracts from this parcel.)

One of the parcels shown on the map as exceptions totaling 29.21 acres is a 19.8-acre parcel conveyed by Ashton and Eva Deitrick to Corotoman, Inc. 3/6/1992 per Deed Book 2288, page 309 for $20,000 or $1,010/acre.

Tax Map 46, Parcel 231 is 9.9 acres of the 19.8 acres conveyed by Deitrick to Corotoman.

The Commerce Bank, et al and Deitrick acquisitions total 383.56 acres out of which approximately 95.36 acres have been sold leaving a total of 288 acres more or less.

## 3.2   Property Rights under Consideration

A title report was not available for this appraisal. It appears that Corotoman owns some of the minerals underlying the subject property. The value of the property to be acquired is primarily related to its potential for future use of the surface. The value of mineral rights to be acquired, if any, has been ignored.

It is presumed that the property is subject to utility easements, including overhead electric transmission lines and the above map shows parcels subject to leases and access easements.

Perhaps the most significant encumbrances to the property affected by the subject taking are two easements granted the Central West Virginia Regional Airport Authority by predecessors in title.

One of those easements, dated 12/14/1981, is recorded in Deed Book 1993, page 263. It pertains to 250 acres of the 384 acres (m/l) assembled by Corotoman in 1992. The Airport Authority was granted a perpetual easement to operate aircraft above 1,250' mean sea level and the right to cause air-space noise, vibration, fumes, dust, fuel particles and all other effects caused by operation of aircraft. The appraiser's limited title research suggests that this and the subsequent airspace agreement described below pertain only to Map 46, Parcel 231 because it is the only one that was part of the 250 acres in the original agreement. Map 46, Parcel 232 and Map 49, Parcel 140 not part of the 250 acres in the original agreement.

A second agreement and easement affecting the same acreage, recorded in Deed Book 2106,



page 676, was granted the Airport Authority 7/31/1985. The following is excerpted from that document:

> 1. Grantors GRANT and CONVEY unto the Grantee a perpetual easement and right-of-way in air space situate and lying above an imaginary plane beginning at an elevation of 947 feet mean sea level at the end of Airport Runway 5 and extending to air elevation of 1170 feet mean sea level on the ridge of the Property, said elevations to be as established by the United States Geological Survey, over, across, and above the Property (hereinafter called the "Air Space"), which easement and right-of-way shall be appurtenant to the Airport and shall be for the purpose of providing for the free and unobstructed passage of all aircraft ("aircraft" being defined for the purpose of this agreement as any contrivance now known or hereafter invented, used or designed for navigation of or flight in the air) by whomsoever owned and operated in and through the Air Space; together with the right to cause in the Air Space noise, vibration, fumes, dust fuel particles and all other effects caused by the operation of aircraft.
>
> Grantors further GRANT and CONVEY unto the Grantee the right to immediately enter by motor vehicle, foot, or any other reasonable means and by its agents and assigns, the Property in order to trim or, at the sole discretion of the Grantee, cut down,

Excerpt from Deed Book 2106, page 676, continued:

> dismantle, or remove in their entirety, all natural growth or other obstructions which penetrate that portion of the Air Space which lies within the Grantee's runway flight paths now or hereafter existing or obstructions on which are otherwise determined under the rules and regulations of the Federal Aviation Administration or other governmental agency to interfere with the free, safe, and unobstructed passage of all aircraft. Provided, however, that said rights of trimming, cutting, dismantlement, and removal may be exercised on the following portions of the Property and no other:
>
> > (1) Parcel 5 as described in said Deed Book 1907 at Pages 216 and 217; and
> >
> > (2) Parcels 1 and 2 as described in said Deed Book 1907 at Pages 223 and 224
>
> which together aggregate 30 acres, more or less. Provided further, that all material so trimmed or cut must be removed or, at the sole discretion of the Grantee, stacked and burned within a period of six (6) months after being cut or trimmed.
>
> > The above-described rights of entry, cutting, trimming, dismantlement, and removal are subject to that certain Lease dated July 27, 1984, from Grantors to Columbia Gas Transmission Corporation, duly recorded in the office of the Clerk of the Kanawha County Commission in Lease Book 226 at page 20.

The modification of property rights described above appears to pertain only to the 250 acres in the original agreement and to portion of that 250 acre section that lies below the "flight paths now or hereafter existing or obstructions on which are otherwise determined under the rules and regulations of the Federal Aviation Administration or other governmental agency to interfere with the free, safe, and unobstructed passage of all aircraft."

The current definition of the flight path is assumed to be depicted on the following drawing provided by the Client:



### 3.3 Site Description – Entirety

The area of the entirety was deduced from a comparison of the Assessor's tax maps and the above maps and drawings. It was sketched free-hand on a Google image as follows:



Note: The flight path of Runway 05 appears to overlap Map 49, Parcel 140 based on the mapping provided the appraiser. The appraiser's interpretation of public record documents is that this parcel and Map 46, Parcel 231 were not a part of the 250 acres referred to in the avigation agreements of record. And so, they are not currently legally encumbered by obstruction height restrictions as Map 46, Parcel 232 is.

### Site Area - Entirety

According to the Assessor's tax maps, Map 46, Parcel 232 contains 30.81 acres, Map 46, Parcel 231 contains 9.8 acres and Map 49, Parcel 140 contains 19.86 acres. The total area of the entirety is approximately 60.47 acres

## Photos – Entirety



Looking east from southwest corner Map 46/Parcel 232 – fence is site of navigation aid



Looking east from southwest corner Map 46/Parcel 232 – Yeager Airport left center of photo



Looking west from southeast corner 46/232 @ boundary with 46/231



Looking west along dirt access road – 49/140 left of road

Photos Entirety Continued



Twilight Drive, west boundary Parcel 46/232



From Coal Branch Heights – Antenna left of photo on ridge line is airport navaide at southwest corner of 46/232



Lower left part of photo shows point where dirt access road intersects Deitrick Boulevard – the access road essentially follows ridge line to upper right corner of photo.



Ridge line in photo essentially is north boundary of 49/140 (from Association Drive)

## Topography



The dirt access road (drawn in pink above) intersects Deitrick Boulevard (the main thoroughfare of NorthGate) at an elevation of about 1004' MSL. The access road follows the ridge line, which varies in elevation from 1125' to 1166' MSL. Twilight Drive is a narrow, public street that provides circuitous access through a primarily low-price range residential neighborhood called Coal Branch Heights. Twilight Drive bisects 46/232 and 46/231. It is located at an elevation of about 1000' MSL, or roughly 60 to 70 feet below the grade of the ridge and 40 to 50' below the flight path of Runway 05.

The average slopes from the ridge top to the north and south extremities of the subject entirety range from 25 to 40%. The topography is basically steep, mostly wooded hillside.

Excerpt from Drawing AP-03 illustrating topographic lines.



Note:  The upper right corner of this drawing indicates the proposed project will involve a
total cut of 1,279,716.3 cubic yards.  The area of the line of disturbance outside the
subject property is estimated by the appraiser to total 9.11 acres.  The cut area inside
the take is estimated to encompass 12.88 acres.  The total area of the cut is estimated to
be 21.99 acres.  Doing additional math, the average depth of the cut is estimated to be
36 feet.

### Utilities

Subject to verification, it appears that all public utilities including public water, sanitary sewer, natural gas, electricity and telephone are available within a reasonable distance.

### Flood Hazard Area

There is no flood hazard risk.

### Zoning



All of NorthGate and the subject entirety is zoned C-10, General Commercial District. Property. Uses within NorthGate are further restricted by development covenants and restrictions. Uses within the development include a residence type hotel, general and medical offices, a nursing home and assisted living facility, a small, residential subdivision and a call center. The parcel zoned R-6 in the center of the C-10 zone is a parcel that was not part of the original NorthGate assemblage and is not subject to the NorthGate covenants and restrictions.

## Real Estate Taxes

| Tax Year | 2009 | | | |
|---|---|---|---|---|
| District | Chas North | | | |
| Map | 46 | 46 | 49 | |
| Parcel | 231 | 232 | 140 | Totals |
| Land | $1,380 | $6,000 | $30,300 | $37,680 |
| Improvements | $0 | $0 | $0 | $0 |
| Total | $1,380 | $6,000 | $30,300 | $37,680 |
| Property Class | 4 | 4 | 4 | |
| Annual Taxes | $39.50 | $171.76 | $867.38 | $1,078.64 |
| Milrate | 2.8623% | 2.8627% | 2.8626% | 2.8626% |

2009 030 Worksheets RE Taxes



PROPERTY TO BE ACQUIRED (TAKE)

The take area is shown in red above. This is a free hand sketch by the appraiser based on drawing AP-03 provided by Kimball. A metes and bounds description is not yet available. The Client indicates the total area of take is 18.58 acres. The appraiser's allocation of the take area over the three tax parcels is as follows:

|  | Total Parcel Area | Area in Take | Residue |
|---|---|---|---|
| Tax Map 46 |  |  |  |
| Parcel 231 | 30.81 ac | 12.93 ac | 17.88 ac |
| Parcel 232 | 9.90 ac | 1.44 ac | 8.46 ac |
| Tax Map 49 |  |  |  |
| Parcel 140 | 19.86 ac | 4.21 ac | 15.65 ac |
| Totals | 60.57 ac | 18.58 ac | 41.99 ac |
|  |  | 31% | 69% |

2009 030 Worksheets Sheet 2

From the standpoint of topography, the most readily usable portion of the entirety is the ridge line area; however, roughly 60% the ridgeline in the take area is subject to the flight path easement.

The property owner indicates that he believes the fill material in the ridge is just as important as the area it currently occupies because it can be used to create usable site area in another part of the development. The property owner has hired a consultant to study the impact of the taking relative to the loss of fill, but the results of that study will not be available in connection with this report.

The property owner's off-hand remark was that he can do the cut and fill necessary to create usable land out of the affected area for about $2/SF, which the appraiser interprets to mean that he can create usable acreage after earthmoving costs of $87,120/acre created. Mr. Wellford is in the strip mining business and so he has the equipment and personnel to accomplish that step in the development process at a lower cost than the typical market participant. A typical market participant would in all likelihood have to pay far more. For instance, the subject project anticipates removing about 36' on average from roughly 22 acres. Assuming the developer could create 44 usable acres by exactly balancing the cut and fill, a total of 1,277,760 cubic yards would need to be moved. The cost manual, Marshall Valuation Service, Page 51/2, March, 2009, adjusted by current and local cost multipliers indicates the market cost of $5.46/cubic yard. Total earthmoving cost to create 44 usable acres would be on the order of $6,976,570 or $158,558/acre. This does not include any other development cost such as road, sewers, etc or any developer's profit.

With the exception of one very small tract of land that sold in 2007 for $433,880/acre all of the sales within NorthGate since 2000 have sold for $73,145/acre to $294,360/acre. Only 95 of 383 acres have been out-sold over the 18 year development history of the project. That is an absorption rate of 5.3 acres per year. The most recent out-sale occurred in 2007. It is the appraiser's opinion that development of the tax parcels subject to the take is not imminent and in fact is several years away.

There has been some discussion with the property owner about placement of cut material to be removed from the take area. This issue has not been decided upon and appraiser's instructions were to assume that all fill material would be removed from the site and the larger parcel. Obviously, if the material were moved and compacted to standards to a place in NorthGate with road frontage, this would be beneficial to the property owner.

NorthGate (outlined in blue)



## RESIDUE TRACT - LARGER PARCEL - DAMAGES

### Residue Tract

The residue of the entirety immediately after the take will be 41.99 acres.

### Larger Parcel

The concept of the Larger Parcel pertains to situations where the entirety is part of a "tract or tracts that are under the beneficial control of a single individual or entity and have the same, or an integrated highest and best use. Elements for consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unit of ownership and unit of highest and best use."[5]

This concept would be important if it can be shown that the take has an economic impact on the overall development of NorthGate outside of the boundaries of the entirety. When the property owner showed the appraiser the property, he stated that he was concerned about this issue, but that he felt development of the section was still a few years away. As noted above, development is likely to be more than just a few years away.

Based on the development history of NorthGate, its absorption rate and price trends, the appraiser concludes the taking will not have an economic impact on the residue of the entirety or the larger parcel of undeveloped or unsold land in NorthGate. The concept of a larger parcel greater than the entirety is not applicable to this appraisal problem.

### Damages

The appraiser is of the opinion no damages will result from the proposed taking.

---

[5] The Dictionary of Real Estate Appraisal Third Edition, The Appraisal Institute, Chicago, IL, 1993, p. 202.

## 6.0  EXTERNAL FACTORS THAT INFLUENCE VALUE

International, national and local economies experience periods of growth and slow down. These up and down trends – expansion and contraction – constitute the business cycle. The business cycle is an external factor that influences the value of real property.

The national economy was in a growth phase from November, 2001 to November 2007, but is now or has been in a recession or contraction phase of the business cycle. A recession is "a significant decline in economic activity spread across the economy, lasting more than a few months, normally visible in gross domestic product, real income, employment, industrial production, and wholesale-retail sales."[6]  An "average" recession lasts 11 months. The current recession is now in its 26th month. There are signs that the national economy may now be expanding in is out of recession, but business cycle economists have yet to declare the recession over.

The Federal Reserve Board normally attempts to modulate large swings of expansion and contraction in the national economy through monetary policy – controlling the money supply and the cost to borrow money. The "Fed Funds Target Rate" (the rate charged to banks for overnight loans) is one of the tools the Federal Reserve Board (the Fed) uses to control interest rates and the business cycle. Monetary policy is usually effective, but is slow to change the direction of economic activity. There is also a danger of over or under correction.

Interest rates were about as low as they can go for most of the 3rd Quarter 2008 through the 2nd Quarter 2009. Since then rates have trended slightly higher but are still affordable for viable projects and borrowers. Lending standards are now much tougher and many individuals and businesses are still trying to reduce debt and minimize risk.

The recession and financial system turmoil were so serious that other actions besides changes in monetary policy were taken by the Fed and the United States Government. The government has taken control of formerly independent companies in the financial, banking and automobile manufacturing sectors. Congress also passed fiscal stimulus legislation that included tax cuts, tax credits, "cash for clunkers" and public works spending. Solid improvement in the national economy is probably still a few months away and Federal government borrowing to finance these activities will also eventually have an impact on the economy and interest rates.

As the last economic expansion advanced, many areas of the country experienced development levels and price appreciation in real estate that could not be sustained in the long term. These excesses were partly the result of poor risk assessment and a belief that prices/values were not likely to decline. The areas with the most development and price appreciation during the expansion were generally the first to experience decline. Those markets began to experience residential real estate price declines in 2006. Home prices have been increasing in some markets since the fall, but in the top 20 urban markets in the

---

[6] National Bureau of Economic Research: Business Cycle Expansions and Contractions (http://www.nber.org/cycles.html).

US prices are still down significantly from 2006 levels. Commercial and industrial real estate values generally held up through 2007, but began to decline in some markets early in 2008. In many large urban markets commercial property values are also down as much as 30 and 40%.

Through most of the 2002 - 2007 expansion period West Virginia's economic growth lagged behind national growth. Because of historically low interest rates, however, real estate prices in West Virginia tended to increase even though the state economy was stagnant. West Virginia did not experience excessive speculation in real estate as other markets did between 2002 and 2006 and the state has not experienced the level of negative residential real estate price trends other markets have experienced since 2006.

The West Virginia economy began slowing in late 2008. Normal commercial and industrial real estate activity in West Virginia is usually not brisk even in good economic times. There is still very little evidence of actual price declines in the industrial and commercial real estate sector, but intuitively one would expect prices to have stayed the same or declined some from year ago levels.

## 6.1   County and City Data

The subject property is located in the City of Charleston, Kanawha County, West Virginia. Kanawha County is part of the Charleston, West Virginia MSA, which includes Boone, Clay, Kanawha, Lincoln, and Putnam Counties. Population data for the MSA from the Census Bureau website are summarized as follows:

| | 1990 Census | 2000 Census | Rate of change 1990 to 2000 | 2008 Estimate | Rate of Change 2000 to 2008 |
|---|---|---|---|---|---|
| United States | 248,709,873 | 281,421,906 | 1.24% | 304,059,724 | 0.94% |
| State of West Virginia | 1,793,477 | 1,808,344 | 0.08% | 1,814,468 | 0.04% |
| Kanawha County | 207,619 | 200,073 | -0.37% | 191,018 | -0.56% |
| Charleston | 57,287 | 53,421 | -0.70% | 50,302 | -0.73% |
| Putnam County | 42,835 | 51,589 | 1.88% | 55,488 | 0.89% |
| Boone County | 25,870 | 25,535 | -0.13% | 24,977 | -0.27% |
| Clay County | 9,983 | 10,330 | 0.34% | 10,075 | -0.30% |
| Lincoln County | 21,382 | 22,108 | 0.33% | 22,386 | 0.15% |
| Charleston MSA | 307,689 | 309,635 | 0.06% | 303,944 | -0.22% |

Census Data 07 01 2008 A  Charleston MSA Charleston

### Population Trends

Kanawha County and the City of Charleston are losing population. Putnam and Lincoln Counties are gaining population, but their rates of growth have slowed and they are not enough to off-set the loss in Kanawha County. While the population of Charleston is declining, its importance as a governmental and economic center has not declined.

## Comparison Employment & Wages 2003 v 2008

US, West Virginia, Charleston MSA & Kanawha County

| | US | West Virginia | Charleston MSA | Kanawha County |
|---|---|---|---|---|
| Manufacturing | 14,510,000 | 64,587 | 7,844 | 5,573 |
| Natural Resources, Mining, Oil & Gas | 571,000 | 23,194 | 6,182 | 2,235 |
| Construction | 6,735,000 | 32,662 | 7,146 | 4,705 |
| Trade, Transportation & Utilities | 25,287,000 | 132,691 | 28,091 | 20,958 |
| Financial Activities | 7,977,000 | 28,947 | 8,212 | 7,272 |
| Professional & Business Services | 15,987,000 | 55,759 | 13,893 | 12,013 |
| Education and Health Services | 16,588,000 | 102,658 | 19,356 | 17,036 |
| Leisure and Hospitality | 12,173,000 | 66,395 | 12,156 | 10,197 |
| Information & Other Services | 8,589,000 | 34,601 | 8,126 | 6,862 |
| Government | 21,583,000 | 135,527 | 27,205 | 21,789 |
| Other Industries (& rounding) | (1,000) | 803 | 72 | 56 |

| | US | West Virginia | Charleston MSA | Kanawha County |
|---|---|---|---|---|
| Manufacturing | 13,431,000 | 56,460 | 6,192 | 3,904 |
| Natural Resources, Mining, Oil & Gas | 773,000 | 32,077 | 8,131 | 3,081 |
| Construction | 7,215,000 | 39,125 | 9,235 | 5,182 |
| Trade, Transportation & Utilities | 26,385,000 | 138,669 | 28,346 | 20,800 |
| Financial Activities | 8,146,000 | 28,441 | 8,137 | 6,908 |
| Professional & Business Services | 17,778,000 | 60,883 | 15,361 | 12,791 |
| Education & Health Services | 18,855,000 | 110,575 | 21,004 | 18,108 |
| Leisure & Hospitality | 13,459,000 | 72,815 | 12,372 | 10,142 |
| Information & Other Services | 8,525,000 | 32,490 | 7,406 | 5,955 |
| Government | 22,500,000 | 137,629 | 26,762 | 21,329 |
| Other Industries (& rounding) | (1,000) | 411 | 40 | 24 |

| | US | West Virginia | Charleston MSA | Kanawha County |
|---|---|---|---|---|
| Manufacturing | (1,079,000) | (8,127) | (1,652) | (1,669) |
| Natural Resources, Mining, Oil & Gas | 202,000 | 8,883 | 1,949 | 846 |
| Construction | 480,000 | 6,463 | 2,089 | 477 |
| Trade, Transportation & Utilities | 1,098,000 | 5,978 | 255 | (158) |
| Financial Activities | 169,000 | (506) | (75) | (364) |
| Professional & Business Services | 1,791,000 | 5,124 | 1,468 | 778 |
| Education and Health Services | 2,267,000 | 7,917 | 1,648 | 1,072 |
| Leisure & Hospitality | 1,286,000 | 6,420 | 216 | (55) |
| Information & Other Services | (64,000) | (2,111) | (720) | (907) |
| Government | 917,000 | 2,102 | (443) | (460) |
| Other Industries (& rounding) | 0 | (392) | (32) | (32) |

Compound Rates of Change For Period:

Empl Stats Charleston MetroSA 03 v 08 Kanawha

Employment Trends

Highlights of the employment data presented on the preceding page are as follows:

Compound Rate of Change in Total Employment 2003 to 2008:

| | |
|---|---|
| US | 1.1%/year |
| WV | 0.9%/year |
| Charleston MSA | 0.7%/year |
| Kanawha County | -0.1%/year |

Compound Rate of Change in CPI and Total Wage and Salary Income 2003 to 2008:

| | |
|---|---|
| CPI Rate of Change | 3.2%/year |
| Wage & Salary Income Growth | |
| US | 4.0%/year |
| WV | 4.2%/year |
| Charleston MSA | 5.0%/year |
| Kanawha County | 3.2%/year |

Total employment in Kanawha County was essentially static between 2003 and 2008 while national and state employment increased at around 1%/year. Wage and salary growth in Kanawha County essentially kept pace with inflation during the study period.

Comparable data is not yet available for 2009. Preliminary indications suggest employment declined about 5% state wide in 2009 compared with the 2008 average.

## 6.2    Neighborhood Description



The development of NorthGate is the subject neighborhood.   It is located between Yeager Airport and the central business district of Charleston.   While access to the subject is available via Coal Branch Heights and Twilight Drive, this would not be a desirable access for development purposes.



**III. TYPE AND EXTENT OF ANALYSIS APPLIED**

## Scope of Work Rule

Certified appraisers in the United States follow the Uniform Standards of Professional Appraisal Practice (USPAP) published by the Appraisal Standards Board of The Appraisal Foundation.

The Scope of Work Rule proscribed in USPAP states:

"For each appraisal, appraisal review, and appraisal consulting assignment, an appraiser must:

1. identify the problem to be solved;
2. determine and perform the scope of work necessary to develop credible assignment results;
3. disclose the scope of work in the report."[7]

USPAP also states:

"The scope of work is acceptable when it meets or exceeds:

- the expectations of parties who are regularly intended users for similar assignments; and
- what an appraiser's peers' action would be in performing the same or a similar assignment.

An appraiser must be prepared to support the decision to exclude any investigation, information, method, or technique that would appear relevant to the client, another intended user, or the appraiser's peers."[8]

## Methodology Used in this Appraisal

The method of choice when appraising vacant land is the sales comparison method. The development method is sometimes considered when the appraised property is part of a proposed or on-going development. If development of the subject site were imminent, the development approach might properly be applied if there were sufficient cost data available; however, development of the subject is not likely to occur until well into the future. Only the sales comparison approach was applied.

---

[7] *Ibid*, p. 12.
[8] *Ibid*, p. 13.

## 8.0   VALUATION OF LAKE

### 8.1    Highest and Best Use

A market value estimate presumes the property under consideration will be purchased for its highest and best use.

In appraisal terminology, highest and best use is "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability."[9]

To arrive at an opinion of highest and best use, the appraiser analyzed the development and sales history of NorthGate. As noted in the sales history on page 10, the NorthGate site was assembled in 1992. The assemblage totaled 383.56 acres. The property owner provided a spreadsheet detailing out-sales as summarized on the following page. The spreadsheet was modified by the appraiser to show the price per total acre of the sales that have taken place to date. When prices are view this way, rather than by price per square foot of usable area as designated by the developer, the data shows virtually no price appreciation over the sales history of the park. Sales in the early stage of development tended to be in the $200,000 to $217,000/acre range. With the exception of the 0.92 acre sale to Emeritus Corp 4/17/2007 at $433,880/acre, no other sale exceeded the $294,360/acre paid by McKinley Carter Wealth Management in 2001 for a very small site. All of the more recent sales with the exception of the Emeritus sale sold at unit prices under $217,000/acre.

The average absorption rate of land in NorthGate since 1992 is 5.3 acres per year.

---

[9] The Dictionary of Real Estate Appraisal Third Edition, Appraisal Institute, (Chicago, 1993), p. 171.

## Property Owner's List of Sales



| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| McCabe Land Co. Ltd. Partnership | T.R.C. | 22-Nov-93 | 2329/55 | 11/23/1993 | 1.350 | 58,806.00 | 58,806.00 | $270,000.00 | $200,000 |
| McCabe Land Co. Ltd. Partnership | McCabe Land Co. | | 2676/443 | 11/22/2006 | 0.290 | 12,632.40 | 12,632.40 | | |
| Hill, Peterson, Carper, Bee & Deitzler | Hill, Peterson, Carper Bee & Deitzler | 01-Jun-94 | 2341/146 | 6/15/1994 | 1.443 | 62,847.42 | 50,094.00 | $250,000.00 | $173,277 |
| Bone & Joint, LLC | Bone & Joint, LLC | 29-Jul-94 | 2344/639 | 7/29/1994 | 1.492 | 65,000.50 | 65,000.50 | $325,000.00 | $217,798 |
| Jeanette L. Corey, as Trustee of the J.L.C. Marital Trust | Jeanette L. Corey | 23-Dec-96 | 2402/69 | 12/23/1996 | 3.834 | 167,000.03 | 167,000.03 | $835,000.00 | $217,800 |
| Cassis Family, LLC (Golden Star, LLC former owner) | Dr. Nicholas Cassis, Jr. | 10-Dec-96 | 2401/301 | 12/10/1996 | 1.162 | 50,623.99 | 23,900.00 | $119,500.00 | $102,825 |
| CG & H, LLC | Motion Masters | 20-Sep-96 | 2395/897 | 9/30/1996 | 1.135 | 49,435.85 | 25,200.00 | $126,000.00 | $111,024 |
| NorthGate Trust (former owner Charlotte Realty, LLC) | CAMC Sports Medicine Center | 19-Jun-97 | 2413/902 | 6/19/1997 | 2.870 | 125,000.49 | 125,000.00 | $625,000.00 | $217,799 |
| Glenmark Associates, Inc (formerly Multi-care Companies, Inc) | Oak Ridge Center | 08-Oct-97 | 2425/250 2466/20 (Corrective Deed) | 10/10/1997 4/12/1999 (Corrective Deed) | 5.284 | 230,167.23 | 174,240.00 | $675,000.00 | $127,746 |
| Residence Inn by Marriott | Residence Inn by Marriott | 30-Jun-98 | 2444/216 | 7/2/1998 | 2.717 | 118,373.01 | 118,373.00 | $700,000.00 | $257,592 |
| T. C. Properties | Thrasher Engineering | 2/10/1999 11/29/2001 | 2463/290 2544/540 Corrective Deed | 3/1/1999 3/5/2002 | 0.798 | -34,000.00 34,775.00 | 34,000.00 34,775.00 | $175,000.00 | $219,298 |

This property resold to JP Development 9/8/2005 for $178,200 or $154,956/acre.

## Property Owner's List of Sales Continued

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Regional Development Authority | Ticket Master, LLC | 05-Aug-99 | 2477/418 | 8/5/1999 | 6.828 | 297,440.00 | 243,358.00 | $1,460,150.00 | $213,839 |
| Emeritus Corp. & Charleston Assisted Living, LLC (assignee of Columbia Pacific Management, Inc.) | Charleston Assisted Living, LLC (aka Charleston Gardens) | 01-Sep-99 | 2479/936 | 9/9/1999 | 2.755 | 120,000.00 | 120,000.00 | $540,000.00 | $196,020 |
| Emeritus Corp. & Charleston Assisted Living, LLC (assignee of Columbia Pacific Management, Inc.) | Charleston Assisted Living, LLC (aka Charleston Gardens) | 17-Apr-07 | 2687/598 | 4/17/2007 | 0.918 | 39,989.20 | 39,989.20 | $398,313.00 | $433,860 |
| The Forbes Group, LLC | Executive Office Centers | 10-Sep-99 | 2480/91 | 9/10/1999 | 3.398 | 148,008.92 | 148,008.92 | $740,000.00 | $217,787 |
| CAMC Foundation, Inc. (Neumedia former owner) | The CAMC Education Center | 1/7/2000 (CAMC purchased 3/16/07) | 2488/932 to Neumedia (CAMC 2488/936/936 A & 1368) | 1/13/2000 | 4.880 | 212,572.00 | 212,572.00 | $1,275,436.80 | $261,361 |
| McKinley Carter Wealth Management Services (fomerly K I & T Holdings) | McKinley Carter Wealth Management Services | 19-Nov-01 | 2538/804 | 11/21/2001 | 1.000 | 43,560.00 | 31,447.00 | $294,360.00 | $294,360 |
| Greenway Condominium Office Building Unit Owners Assoc., Inc. | WV Hospital Association (owned by WV Health Services, Inc.) | 01-Feb-96 | 2380/891 | 2/1/1996 | | | 44,000.00 | $1,350,000.00 | |
| | WV Water Development Authority | 22-Jun-98 | 2442/672 | 6/22/1998 | | | | $960,000.00 | |
| | WV Economic Development Authority | 21-Mar-02 | 2545/763 2546/928 Quitclaim Deed | 3/26/2002 | | | | $739,160.00 | |
| | | 08-Apr-02 | | 4/9/2002 | 4.808 | 209,449.80 | 88,000.00 | | |
| Property Remodeling Development, LLC | Riverton Coal Production, Inc. (subsidiary of 3RA'S) | 31-Jul-02 | 2556/557 | 8/7/2002 | 21.550 | 938,718.00 | 143,256.00 | $473,000.00 | $23,949 |
| Stickler & Shin Properties | Stickler & Shin, Medabolix, Oppulence Spa | 14-May-03 | 2579/453 | 6/25/2003 | 1.673 | 72,891.54 | 66,188.00 | $351,000.00 | $209,758 |
| PeTech, LLC | RPM Engineers | 10-Jun-05 | 2633/415 | 6/10/2005 | 1.082 | 47,131.92 | 39,542.50 | $237,255.00 | $219,274 |
| Chesapeake Appalachia, LLC | Chesapeake Appalachia, LLC | 17-Jul-06 | 2665/763 | 7/17/2006 | 26.911 | 1,172,243.16 | 549,066.00 | $5,861,160.00 | $217,798 |
| Top Down Development, LLC | The Pointe at NorthGate | 17-Jul-06 | 2665/784 | 7/17/2006 | 8.790 | 382,892.40 | 107,157.60 | $642,945.60 | $73,145 |

Greenway Condominium did not derive from a land sale. The developer sold condominium offices.

The purchaser in this transaction is related or owned by the developer. The acreage in this sale was omited from the total, but the out sale to Top down Development was included.

Some of the more recent sales are summarized and analyzed as follows:

# EXHIBIT B

| From: | Stockton, Stephen B. <sbs@ramlaw.com> |
|---|---|
| Sent time: | 05/13/2011 03:32:15 PM |
| To: | Rick Atkinson <rick@yeagerairport.com> |
| Subject: | RE: maps and photos needed |

Thanks, Rick.  On a personal note, I wanted to thank you for all the help you have given Chari Carico in her run for South Charleston City Council.  We have been dating for the past couple of years, and I know that she really appreciates your help. Steve

**From:** Rick Atkinson [mailto:rick@yeagerairport.com]
**Sent:** Friday, May 13, 2011 3:31 PM
**To:** Stockton, Stephen B.
**Subject:** RE: maps and photos needed

Steve:

I am passing along both request to our engineering firm that is handling the design of the obstruction removal project that includes the Corotoman property and the same firm has the current airport property map in digital form.  Joe Felix from L. Robert Kimball is the engineer and they are using a sub consultant O. R. Colan on the property matters.  Ben Zera is the person with Colan. I will ask Mr. Felix to forward a copy of the property map and Mr. Zera to provide a copy of the appraisal.  I will say that Mr. Welford did mention to me that he would be interested in providing the airport a license to remove the dirt from his property and to purchase an air easement that would restrict the building height.  The FAA is agreeable to that type of arrangement. If you and Mr. Welford would like to discuss that further with me I am open to that.

Sincerely,

Rick Atkinson
Airport Director
304-344-8033

**From:** Stockton, Stephen B. [mailto:sbs@ramlaw.com]
**Sent:** Friday, May 13, 2011 3:08 PM
**To:** rick@yeagerairport.com
**Subject:** maps and photos needed

Rick,

I'm happy for the opportunity to deal with you professionally again.  When you get a chance, I would like to talk with you about a couple of things.  I looked up your LinkedIn profile, but you didn't list a telephone number, so I thought I would use your email instead of making a cold call.  I hope that doesn't cause a problem.

First thing I would like to discuss is the status of the project the airport has to improve the angle of approach over Armor Plate/Northgate.  Robinson & McElwee is working with John Wellford and Corotoman, Inc. regarding property they have in that area.  We have reviewed the appraisal report submitted by Eugene Zdrojewski; and, if it is possible, we would greatly appreciate getting better copies of the maps and photos included in the report.  If those maps and photos are available in digital form so we can blow them up, that would be great.  The documents in the report are too small to be of much help.  We need the maps and photos so we can determine exactly what the airport is trying to "take," and they would help us get back to you sooner with a counter offer.  I realize that you may not be the best person to approach about this; but I would appreciate it if you could point me in the right direction of the person we could ask about that.

Second, Robinson & McElwee is working with Reserve Oil and Gas regarding title work to facilitate bidding out the oil and gas leases for the airport.  It would make our job a lot easier if we had full-sized copies of maps and surveys of the airport.  We have a small version of a map dated July 18, 1968, titled "Map of Kanawha Airport" by J. Lewis Hark, that was attached to a deed recorded in Deed Book 1536 at page 493.  If you know where we can get a full-sized copy of that map (or any other full-sized boundary survey of the airport), it would help us tremendously.

Please give me a call at 304-347-8352 at your convenience so we can discuss these matters.  Thank you.

Response to Subpoena Duces Tecum
Confidential

Steve Stockton
Robinson & McElwee PLLC
700 Virginia Street, East
Charleston, West Virginia  25301
304-347-8352
sbs@ramlaw.com

To ensure compliance with requirements imposed by the IRS, we inform you that, unless specifically indicated otherwise, any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any tax-related penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.  In order for you to rely on written advice from Robinson & McElwee PLLC as protection from tax-related penalties, please contact us to discuss whether we can provide you with a formal written opinion.

This message contains information from the law firm of Robinson & McElwee PLLC that may be privileged, confidential or otherwise protected from disclosure.  Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message.  If you have received the message in error, please advise the sender by reply e-mail, and delete the message.  Thank you.

# EXHIBIT C

Case 2:19-cv-00313   Document 54-3   Filed 09/23/20   Page 2 of 3   PageID #: 365
6/13/2018                                    Yeager Airport's hilltop removal to cost $15 million | News | wvgazettemail.com
Exhibit C

https://www.wvgazettemail.com/news/yeager-airport-s-hilltop-removal-to-cost-million/article_f6704036-717f-5b30-b529-a8ce4212e274.html

# Yeager Airport's hilltop removal to cost $15 million

Rick Steelhammer   Oct 26, 2011

CHARLESTON, W.Va. -- Now that Yeager Airport's 500-foot runway extension project is complete, the airport's governing board wants to remove a knoll in the Northgate/Coal Branch Heights area that lies in the path of approaching and departing aircraft.Removal of the runway obstruction will involve moving nearly 1.3 million cubic yards of earth -- a process expected to cost about $15 million and last about two years.The airport has cleared the environmental review process for the project and has acquired nearly all of the approximately 18 acres in the vicinity of the knoll. Offers, counteroffers, and transactions have taken place to acquire the seven homes and more than 40 parcels of land that make up the tract.Yeager Airport Director Rick Atkinson said an agreement has been reached with Northgate developer John Wellford, the largest single landholder in the obstruction removal zone, to make use of his land in the obstruction area in exchange for an easement and the swapping of adjacent parcels of land owned by the airport.The knoll, located off the south end of the main runway, is being removed to eliminate Federal Aviation Administration climb-out restrictions on aircraft departing from Yeager. Aircraft are now required to gain elevation at faster-than-normal rates immediately after takeoff, to provide an extra margin of safety in the event of engine trouble after leaving the runway.To meet the FAA restriction, commercial aircraft on some of Yeager's longer nonstop flights, such as those to Houston or Atlanta, sometimes have to bump passengers to reduce weight, particularly on extremely hot days when engines run less efficiently.Airlines serving Yeager would save about $2 million annually by having the restriction lifted.As much as 110 feet need to be sheared off the top of the Coal Branch Heights knoll in order to eliminate the FAA restriction. On average, about 50 feet of the hilltop needs to be removed from the obstruction zone."This will be our main construction project for the next two years," Atkinson said during a meeting of the airport's board of directors on Wednesday. "It will eliminate our weight penalties and be the last piece to our overall airport improvement project."In recent years, Yeager has extended its runway 500 feet, widened and lengthened its taxiway, built an end-of-runway safety zone, added a pedestrian walkway connecting the passenger terminal to the parking garage, and installed a canopy over the passenger pickup/drop-off area.Atkinson said the obstruction removal project would probably go out to bid in February, and be under construction in May or June. It should be complete by the fall of 2013. Funds for the work are expected to come from the federal Airport Improvement Program, which has already paid for the planning process.In other action Wednesday, the Yeager board directed its attorney to draft an agreement that would give Better Foods, the airport's food service concessionaire, a six-year lease on a new cafe in the airport's secure waiting area. Currently, no food service is available in the terminal lobby beyond the security screening area.In exchange for the lease, Better Foods would

spend $200,000 to build the cafe according to board-approved plans. The cafe is expected to open early next year.Passengers using laptops, digital tablets and smart phones now have free use of an upgraded Wi-Fi system installed in Yeager's passenger terminal by Frontier Communications.Atkinson said the turnkey Wi-Fi network provided by Frontier improves coverage in areas of the airport where signal strength has been low and extends coverage to areas where it previously wasn't available. Since Frontier owns, maintains and supports the equipment for the Wi-Fi network, Yeager employees no longer have to maintain gear or handle customer service complaints.Yeager was the third airport in the nation to install free Wi-Fi service. *Reach Rick Steelhammer at rsteelhammer@wvgazette.com or 304-348-5169.*

# EXHIBIT D

Begin forwarded message:

**From:** KO <kodamron@aol.com>
**Date:** March 27, 2012 2:34:53 PM GMT-04:00
**To:** "Bailey, Chuck" <cbailey@baileywyant.com>
**Cc:** "jwellford@ukvdc.com" <jwellford@ukvdc.com>, "kjg@ramlaw.com" <kjg@ramlaw.com>
**Subject: Fwd: Proposed Contract with Airport Authority**

Chuck,

John Wellford asked that I email you this proposed Settlement Agreement and other docs relating to the Airport Authority's upcoming project and its interaction with Corotoman, Inc. properties.

Please note that there is an error that needs to be corrected on page 2 of the Settlement Agreement, in paragraph #5, line 6, delete the word **"dates"** and insert the word **"patterns"**.

As you may know, our lead attorney is Kent George of the Robinson & McElwee firm.

*Please send me back an email so I will know you have received this email and have successfully opened the attachment.*

Thank you.

K.O.

**K.O. Damron, *Broker***
Highwoods Real Estate Group
200 Association Drive, Suite 140
Charleston, WV 25311
Cell (304) 389-1455

000106
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT E



**MINUTES OF THE MEETING**
**OF THE**
**BOARD OF MEMBERS OF THE**
**CENTRAL WEST VIRGINIA AIRPORT AUTHORITY**

The monthly meeting of the Board of Members of the Central West Virginia Regional Airport Authority was held in the Public Use Conference Room of the Airport Director's Office, Yeager Airport, Charleston, West Virginia, on March 28, 2012, beginning at 12:00 p.m., pursuant to proper notice to the public and media.

**Board members present:** R. Edison Hill, Keith Wood, Col. Bill Peters Ret., Henry C. Shores, Karen Haddad and Charles T. Jones and H. B. Wehrle, III (VIA Phone) representatives of the Kanawha County Commission; James E. Foster (VIA Phone) representative of the City of Charleston; Gregory Tucker, a representative of the Nicholas County Commission; David Hill, a representative of the Boone County Commission and Gary Tillis a representative of the Putnam County Commission.

**Board Members Absent:** Harold Carter, Priscilla Haden, Sam Bowling representatives of the Kanawha County Commission. Norman W. Shumate, III, a representative of the City of Charleston.

**Also present:** Richard Atkinson, Airport Director, Timothy Murnahan, Assistant Airport Director, Terry Sayre, Assistant Airport Director, Kimberly Lewis, Assistant Airport Director, Lorie Wynes, Airport Comptroller, Nicholas Keller, Security and Safety Manager,  April Payne, Executive Secretary, Melissa Beckford, Accounts Payable Coordinator, Adam Dougherty, Intern, Jacob Ruddle, Intern, Scott Miller and Danny Kennedy, Executive Air,  Rodney Terry, Enterprise RAC, Chad Robinson, Compensation Strategies,  Mike Plante, Plante and Associates, Rick Steelhammer, Charleston Gazette Newspaper; Larry McKay, WQBE Radio; Leslie Koepsel, Kanawha County Commission; and J. D. Koontz, Summit Community Bank; John Green, WSAZ TV; Delegate Danny

1

CWVRAA_001706

Wells; Clayton White, Avis RAC; Charles Bailey, Legal Counsel , Bailey & Wyant, LLC.

Mr. Hill called the meeting to order and introductions were made.  Mr. Hill then called for approval of the minutes for the meeting of February 22, 2012.  Mr. Shores made the motion to approve the February 22, 2012 minutes, seconded by Mr. Jones and was unanimously approved.

***Personnel-***  Mr. Atkinson announced that Mr. Clayton White a 42 year employee of Avis Rental Car would be retiring. Mr. White was praised for his service to Yeager Airport and Avis Rental Car.

***Construction- RSA Runway 5/23 and Taxiway A –***  Mr. Jones reported that we are still awaiting approval from the FAA on the fixes to the light lane and certification that it operational before the ALS can be operational and flight checked. The last teleconference with the FAA, they confirmed that most of the issues have been resolved and approved. Cast and Baker has completed a walk through of the project and will do a punch list of items that needs to be completed and will re-seed small areas on the project. Overall the project has a very good ground cover established and the trees that were planted by Glenville State are thriving.

***Construction- Runway 5 Approach –Obstruction Removal Project-*** We have received the agreement from Corotoman, Inc., for the license to complete the work on the property and the permanent aviation easement that restricts the future building heights on the property. The established price for the easement and license agreement and property swap will be $350,000.00 the amount is included in the grant from the FAA for the purchase of the property rights for the project. Mr. Hill asked for approval of the agreement and authorization for him to sign once the draft agreement was reviewed by legal counsel. Mr. Shores made the motion for approval based on approval from legal counsel, seconded by Mr. Jones and was unanimously approved.  The owners of the last two occupied structures have made counter offers and O. R. Colon is working through the issues to make the final purchases. The WV DEP has issued a permit for the work and we are working with Corotoman to secure a waste area for the earth moving material so the area can be added to

2

the DEP permit before the bid for construction is issued. The TSA has indicated that they only have 15,000.00 available for the new checkpoint entrance project. The total cost of the project including engineering and construction inspection will be $32,500.00. Mr. Atkinson recommended approving the additional cost of $17,500.00 from the airport's budget and moving forward with the project. Mr. Shores made the motion for approval, seconded by Mr. Jones and was unanimously approved. Attached is the Airport Capital Improvement Plan for the next seven years. It shows project improvements to be considered for the Airport funded and prioritized by the FAA upon approval.  Mr. Jones made the motion to approve the ACIP and submit to the FAA, seconded by Mr. Shores and was unanimously approved.

***Finance-Approval of Invoices-*** Mr. Atkinson provided the following invoices over $5,000.00 for Board approval.

|  |  |
|---|---|
| Compensations Strategies | $15,000.00 |
| Government Relations |  |

Mr. Shores made the motion to approve the invoices, which was seconded by Ms. Haddad and was unanimously approved.

Mr. Atkinson provided the following invoices that had been paid pursuant to the policy of the Board:

|  |  |
|---|---|
| S &S Engineering Inc | $9, 500.00 |
| TSA-Screener Modifications |  |
| Trillion Aviation | $ 5,500.55 |
| Airline Use Agreement Professional Services |  |
| Cast & Baker Corporation | $150,625.00 |
| Construction-runway extension |  |

***Finance- Airline Use Agreement-*** Mr. Atkinson reported that the meeting with Trillion Aviation and the Airlines was very positive and an agreement

3

was reached on 98% of the items, and the airlines agreed that a reserve fund for the airport of 4 to 6 months of revenues was a proper size for the fund and Trillion is prosing methods to fully fund the required reserve over the course of the three year agreement. The budget process has begun and we will coordinate future meetings with the airlines to include budget discussions as we finalize the agreement. A copy of the FY 2011 audit was distributed to the members for review. The audit resulted in an unqualified opinion and shows positive results in cash flow and net assets for the year ending June 30, 2011.

*General Aviation*- Ms Haddad reported that the committee has met and recommends that we proceed with the renovations of the FBO and enter into contract with RC Contractors to complete the renovations. In additions it is recommended that an additional $250,000.00 be borrowed from the approved loan on the new hangar to complete funding for the renovations secured by an additional lease amounts from Executive Air for office space in the FAA Building. Mr. Shores made the motion for approval of the contract upon approval of legal counsel and for the additional funding, seconded by Mr. Jones and was unanimously approved. The Executive Air Terminal will be temporary located at the administration offices of Executive Air while the renovations are be completed there will be no interruptions in service. The administration offices have relocated to the FAA Building on Eagle Mountain Road. Mr. Hill asked for a resolution to make Mr. Shumate acting Secretary in the absence of Mr. Wehrle. (See attached Resolution)

*Marketing-* Ms. Haden reported that Better Foods is moving forward on the design and preparing for the build out of the lease space. Delta will be adding a 6th daily flight per day to Atlanta on June 2, 2012.  February enplaned passengers was up 18% over last year.

*Military Affairs-* Col. Peters reported that the 130th will be deploying units to Afghanistan for 120 day rotations.

### Contracts and Leases
#### Gas Well Proposals
Mr. Atkinson reported that Reserve Oil and Gas has submitted all permits and other documentation to the FAA for the gas well drilling authorization. The FAA has completed the Environmental Review and has requested additional information for the project prior to final approval.  Reserve is providing the additional information along with our consultant to satisfy the FAA's

4

CWVRAA_001709

requirements. Reserve has completed the rehabilitation of the exiting pipeline right of way on the airport's property that will be used to transport the gas that will be produced from the wells drilled.

***Operations Report-*** Mr. Murnahan reported that he was dealing with an issue concerning the VOR-A approach. The FISDO office is conducting test flights to resolve the issues. The final changes made to the sign plan are expected to be approved next week. The Taxi-Way "D" changes follow after the sign plan is approved.

***Security Update-*** Nothing to report for this month.


There being no further business to discuss the meeting adjourned.

R. Edison Hill, Chairman       Norman W. Shumate, III, Acting Secretary

5

CWVRAA_001710

**Central West Virginia Regional Airport Authority**

John D. Rockefeller IV Terminal
100 Airport Road, Suite 175 • Charleston, WV 25311 -1080
Phone: 304-344-8033                    Fax: 304-344-8034
E-Mail: fly@yeagerairport.com        www.yeagerairport.com



### BOARD RESOLUTION

### CENTRAL WEST VIRGINIA REGIONAL AIRPORT AUTHORITY

Whereas, The Central West Virginia Regional Airport Authority is desirous of obtaining financing for an improvement project at the General Aviation Area of Yeager Airport, and:

Whereas, Summit Bank has agreed to provide financing for the General Aviation Improvement Project on favorable terms and conditions, and;

Whereas, Summit Bank requires that certain documentation and applications be completed prior to formal approval of financing for the General Aviation Project at Yeager Airport, Now Therefore be it Resolved;

That the Airport Director, Chairman of the Airport Authority Board, Acting Secretary of the Airport Authority Board, and Airport Authority Legal Counsel take any and all actions necessary to secure the additional financing from Summit Bank, and that these persons are authorized signatories for the financing for the General Aviation Improvement Project:  Richard A. Atkinson, III, Airport Director; R. Edison Hill, Chairman, Central West Virginia Regional Airport Authority; Norman Shumate, Acting Secretary, Central West Virginia Regional Airport Authority and Charles R. Bailey, General Counsel, Central West Virginia Regional Airport Authority.

Adopted this 28th Day of March, 2012 at the regular Board Meeting of the Central West Virginia Regional Airport Authority.

R. Edison Hill, Chairman                              Norman Shumate, Acting Secretary

WEST VIRGINIA'S GATEWAY

CWVRAA_001711

# EXHIBIT F

500 Virginia Street, East
Suite 600 United Center (25301)
P.O. Box 3710
Charleston, WV  25337-3710
(304) 345-4222
FEIN 55-0771652

May 15, 2012

Central WV Regional Airport
Richard Atkinson III, Director
Suite 175-100 Airport Road
Charleston, WV  25311-1080

Invoice# 41035    CRB
Our file#  5900   00001
Billing through 04/30/2012

Central West Virginia Regional Airport Authority
General File 5900-1

| | | |
|---|---|---|
| Balance forward as of invoice dated   April 16, 2012 | | $1,885.00 |
| Payments received since last invoice | | 957.00 |
| Accounts receivable balance carried forward | | $928.00 |

## FOR PROFESSIONAL SERVICES RENDERED

| | | | | | |
|---|---|---|---|---|---|
| 04/03/2012 | CRB | Second review of general contract with RC General Contractor | | | |
| | | | 0.90 hrs. | 145.00 /hr | 130.50 |
| 04/03/2012 | CRB | Review of complete package of information and details regarding Corotoman settlement agreement, deeds and license agreements | | | |
| | | | 2.50 hrs. | 145.00 /hr | 362.50 |
| 04/03/2012 | CRB | Writing email to Rick Atkinson | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 04/03/2012 | CRB | Responding to email from broker | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/04/2012 | CRB | Telephone conference with Rick Atkinson re-Corotoman licensing agreement | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |
| 04/04/2012 | CRB | Review of final inspection SRFNOC 547250 and multiple documents provided by Ashok Sangavi regarding after the fact consent order | | | |
| | | | 3.00 hrs. | 145.00 /hr | 435.00 |
| 04/05/2012 | ATG | Review file and correspondence relating to Tolling Agreement with Army Corps and conduct research of the same, provide findings to CRB. | | | |
| | | | 4.20 hrs. | 95.00 /hr | 399.00 |

| 04/06/2012 | CRB | Telephone conference with Keith George re-license and work agreement for Corotoman | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 04/10/2012 | CRB | Telephone conference with architects overseeing RC General Contractors | | | |
| | | | 0.70 hrs. | 145.00 /hr | 101.50 |
| 04/10/2012 | CRB | Making final recommendations and revisions to the contract | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/10/2012 | CRB | Review of agreeement by and between Ascon and Yeager Airport in preparation for telephone conference | | | |
| | | | 1.10 hrs. | 145.00 /hr | 159.50 |
| 04/12/2012 | CRB | Meeting with Ken George re-modifications and editing of the various contracts by and between CWVRAA and Corotoman | | | |
| | | | 1.20 hrs. | 145.00 /hr | 174.00 |
| 04/24/2012 | CRB | Review of bond and agreements for Wiseman construction | | | |
| | | | 1.50 hrs. | 145.00 /hr | 217.50 |
| 04/24/2012 | CRB | Telephone conference with Joe Merical of Robinson, McElwee re-terms and conditions of Corotoman lease | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 04/24/2012 | CRB | Review of edits and deletions with regard to the Corotoman lease | | | |
| | | | 1.00 hrs. | 145.00 /hr | 145.00 |
| 04/24/2012 | CRB | Review of third redlined agreement regarding the Corotoman agreement | | | |
| | | | 0.80 hrs. | 145.00 /hr | 116.00 |
| 04/25/2012 | CRB | Attending monthly board meeting | | | |
| | | | 1.00 hrs. | 145.00 /hr | 145.00 |
| 04/25/2012 | CRB | Reading email from counsel re-liquidated damages issue in Corotoman agreement | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/25/2012 | CRB | Telephone conference with counsel re-liquidated damages issue in Corotoman agreement | | | |
| | | | 0.70 hrs. | 145.00 /hr | 101.50 |
| | | Total fees for this matter | | | $2,791.50 |

## DISBURSEMENTS

| 04/01/2012 | Lexis Nexis Research | | 19.54 |
| | Total disbursements for this matter | | $19.54 |

## BILLING SUMMARY

| Charles R. Bailey | 16.50 hrs | 145.00 /hr | $2,392.50 |

| Andrew T. Gunnoe | 4.20 hrs | 95.00 /hr | $399.00 |
|---|---|---|---|
| TOTAL FEES | 20.70 hrs | | $2,791.50 |
| TOTAL DISBURSEMENTS | | | $19.54 |
| TOTAL CHARGES FOR THIS BILL | | | $2,811.04 |
| PLUS NET BALANCE FORWARD | | | $928.00 |
| **TOTAL BALANCE NOW DUE** | | | **$3,739.04** |

CHARLES R. BAILEY

# BAILEY & WYANT, P.L.L.C.

500 Virginia Street, East
Suite 600 United Center (25301)
P.O. Box 3710
Charleston, WV 25337-3710
(304) 345-4222
FEIN 55-0771652

May 15, 2012

Central WV Regional Airport
Richard Atkinson III, Director
Suite 175-100 Airport Road
Charleston, WV 25311-1080

Invoice# 41036   CRB
Our file#  5900   00078
Billing through 04/30/2012

CWVRAA Runway 5 Condemnations

*Arp 5p*

| | | |
|---|---|---|
| Balance forward as of invoice dated   April 16, 2012 | | $1,786.60 |
| Payments received since last invoice | | 1,786.60 |
| Accounts receivable balance carried forward | | $0.00 |

## FOR PROFESSIONAL SERVICES RENDERED

| 04/02/2012 | CRB | Attend hearing on Motion to Consolidate | | | |
|---|---|---|---|---|---|
| | | | 1.30 hrs. | 145.00 /hr | 188.50 |
| 04/02/2012 | KCM | Supplement proposed Order Granting Motion to Consolidate, prepare proposed Order Appointing Guardian Ad Litem, and otherwise prepare for hearing on Motion to Consolidate. | | | |
| | | | 2.00 hrs. | 145.00 /hr | 290.00 |
| 04/02/2012 | KCM | Attend hearing on Motion to Consolidate, discussions with Respondents who attended hearing, and confirming Lawrence's Judgment Order with Magistrate Court. | | | |
| | | | 1.30 hrs. | 145.00 /hr | 188.50 |
| 04/02/2012 | KCM | Prepare Answer to Lawrence's Counterclaim. | | | |
| | | | 1.00 hrs. | 145.00 /hr | 145.00 |
| 04/02/2012 | KCM | Prepare Agreed Partial Dismissal Order re James Clark and Lawrence property and prepare correspondence to Lawrence re Agreed Partial Dismissal Order. | | | |
| | | | 0.80 hrs. | 145.00 /hr | 116.00 |
| 04/02/2012 | KCM | Prepare correspondence to Rick Atkinson re hearing on Motion to Consolidate and Orders entered by Court. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/02/2012 | KCM | Review and analyze Response of Harlan Ray, Jr. in the Ray case. | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |

| 04/02/2012 | KCM | Review Notice of Appearances by counsel for AEP in Davis, Edwards and Hodges. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/03/2012 | KCM | Prepare correspondence to Guardian Ad Litem re all Petitions re unknown persons. | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |
| 04/03/2012 | KCM | Prepare proposed Order Appointing Special Commissioners and hearing to present evidence to Special Commissioners. | | | |
| | | | 1.20 hrs. | 145.00 /hr | 174.00 |
| 04/03/2012 | KCM | Discussions with Guardian Ad Litem re Petitions involving unknown persons, possibility of having review of appraisals, and hearing to present evidence to Special Commissioners. | | | |
| | | | 0.50 hrs. | 145.00 /hr | 72.50 |
| 04/03/2012 | KCM | Analyze potential appraisers to conduct review. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/03/2012 | KCM | Analyze files re titles search for all properties involving unknown persons to ensure files could be produced to Guardian ad Litem. | | | |
| | | | 0.50 hrs. | 145.00 /hr | 72.50 |
| 04/04/2012 | CRB | Meeting with Eric Hundnall and surveyor regarding unknown persons and moving forward with the condemnation proceeding | | | |
| | | | 1.70 hrs. | 145.00 /hr | 246.50 |
| 04/04/2012 | KCM | Prepare for meeting with Guardian Ad Litem and Appraiser by gathering and reviewing all Appraisals. | | | |
| | | | 0.50 hrs. | 145.00 /hr | 72.50 |
| 04/04/2012 | KCM | Meeting with Guardian Ad Litem and potential Appraiser re appraisals conducted on each parcel, potential problems and potential review. | | | |
| | | | 1.70 hrs. | 145.00 /hr | 246.50 |
| 04/04/2012 | KCM | Call from Gervia Coleman re hearings for Eminent Domain. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/05/2012 | CRB | Read Order of Consolidation | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/05/2012 | CRB | Read Order Appointing Guardian Ad Litem | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/05/2012 | CRB | Read Agreed Partial Dismissal Order | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/05/2012 | KCM | Review and analyze Answer of Appalachian Power re the Davis, Edwards and Hodges parcels. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/05/2012 | KCM | Prepare correspondence to Guardian Ad Litem re Commissioner's Hearing. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/05/2012 | KCM | Discussions with Ben Zera re appraisals, whether appraiser was certified and prior practice in similar cases. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |

| 04/05/2012 | KCM | Review and analyze FAA regulations re appraisals and requirements | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 04/06/2012 | CRB | Review of email from Eric Hudnall re-issues surrounding the appraisals undertaken by firm in Ohio | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 04/06/2012 | CRB | Conference with Kelly Morgan re-fact that the appraisals were not done by a licensed appraiser in the State of WV | | | |
| | | | 0.70 hrs. | 145.00 /hr | 101.50 |
| 04/06/2012 | CRB | Writing email to Rick Atkinson | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/06/2012 | CRB | Review of email from Rick Atkinson | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/10/2012 | KCM | Discussions with Guardian Ad Litem re Appraiser Jay Goldman conducting Review, amending Petitions to clarify proper lot by Agreed Order, and list of all Respondents. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/10/2012 | KCM | Prepare correspondence to Guardian Ad Litem providing list of all Respondents. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/10/2012 | KCM | Review correspondence from Guardian Ad Litem re budget for anticipated fees and expenses. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/11/2012 | KCM | Review all appraisals in analysis for full appraisals for condemnation proceedings. | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 04/11/2012 | KCM | Call from Guardian Ad Litem re budget for services. | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |
| 04/11/2012 | KCM | Review correspondence from Guardian Ad Litem re conflict which cannot be waived, and providing withdrawal to court. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/16/2012 | KCM | Analyze potential guardian ad litems to replace prior guardian ad litem to quickly address issues prior to haring on Petitions for Eminent Domain. | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |
| 04/16/2012 | KCM | Review and analyze Order Granting Guardian Ad Litem's Motion to Withdraw entered by Court. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/16/2012 | KCM | Call to newly appointed Guardian Ad Litem re files to review and status of case. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 04/16/2012 | KCM | Prepare Motion for Leave to File Amended Petition for Eminent Domain, proposed Agreed Order Granting Motion for Leave to File Amended Petition for Eminent Domain, and proposed Amended Petition for Eminent Domain. | | | |
| | | | 1.50 hrs. | 145.00 /hr | 217.50 |

5900     Central WV Regional Airport     Invoice #34103          Page   4

| 04/16/2012 | KCM | Prepare correspondence to newly appointed Guardian Ad Litem re Motion for Leave to File Amended Petition for Eminent Domain, proposed Agreed Order Granting Motion for Leave to File Amended Petition for Eminent Domain, and proposed Amended Petition for Eminent Domain. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/16/2012 | KCM | Review correspondence from newly appointed Guardian Ad Litem re agreement with proposed Order Granting Motion for Leave to File Amended Petition. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/18/2012 | KCM | Prepare correspondence to Guardian Ad Litem re proposed date for Special Commissioner's Hearing. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/20/2012 | KCM | Review correspondence from Guardian Ad Litem re executed Agreed Order re Motion to Amend Petition. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/20/2012 | KCM | Prepare correspondence to Judge re Motion to Amend Petition, Amended Petition and Agreed Order Granting Motion to Amend Petition. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/27/2012 | KCM | Discussions with Court re Order granting leave to file Amended Petition. | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |
| 04/27/2012 | KCM | Prepare Amended Petition for filing. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 04/30/2012 | CRB | Read Order granting leave to file Amended Petition | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |

|  | Total fees for this matter | $3,059.50 |

## DISBURSEMENTS

| 04/02/2012 | Photocopies - $.20 per copy = 435 | 87.00 |
| 04/02/2012 | Postage | 24.70 |
| 04/03/2012 | Photocopies - $.20 per copy = 398 | 79.60 |
| 04/03/2012 | Postage | 0.65 |
| 04/04/2012 | Photocopies - $.20 per copy = 698 | 139.60 |
| 04/20/2012 | Photocopies - $.20 per copy = 989 | 197.80 |
| 04/20/2012 | Postage | 1.70 |
| 04/27/2012 | Photocopies - $.20 pcr copy = 468 | 93.60 |
| 04/27/2012 | Postage | 0.85 |

|  | Total disbursements for this matter | $625.50 |

5900      Central WV Regional Airport     Invoice# 410.      Page 5

<u>BILLING SUMMARY</u>

| | | | |
|---|---|---|---|
| Charles R. Bailey | 5.00 hrs | 145.00 /hr | $725.00 |
| Kelly C. Morgan | 16.10 hrs | 145.00 /hr | $2,334.50 |
| TOTAL FEES | 21.10 hrs | | $3,059.50 |
| TOTAL DISBURSEMENTS | | | $625.50 |
| TOTAL CHARGES FOR THIS BILL | | | $3,685.00 |
| **TOTAL BALANCE NOW DUE** | | | **$3,685.00** |

CHARLES R. BAILEY

# BAILEY & WYANT, P.L.L.C.

500 Virginia Street, East
Suite 600 United Center (25301)
P.O. Box 3710
Charleston, WV 25337-3710
(304) 345-4222
FEIN 55-0771652

June 15, 2012

Central WV Regional Airport
Richard Atkinson III, Director
Suite 175-100 Airport Road
Charleston, WV 25311-1080

Invoice# 41271   CRB
Our file#  5900   00078
Billing through 05/31/2012

CWVRAA Runway 5 Condemnations

| | |
|---|---|
| Balance forward as of invoice dated   May 15, 2012 | $3,685.00 |
| Payments received since last invoice | 0.00 |
| Accounts receivable balance carried forward | $3,685.00 PD |

## FOR PROFESSIONAL SERVICES RENDERED

| | | | | | |
|---|---|---|---|---|---|
| 05/01/2012 | KCM | Prepare correspondence to Guardian Ad Litem re upcoming hearing on Petitions for Eminent Domain. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 05/02/2012 | CRB | Attending hearing before Judge Stucky with regard to appointment of Special Commissioners | | | |
| | | | 1.00 hrs. | 145.00 /hr | 145.00 |
| 05/02/2012 | CRB | Meeting with Nick Barth, GAL, regarding next steps in evaluation | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 05/02/2012 | CRB | Separate conference with Eric Hudnall regarding Highway's liens | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 05/02/2012 | CRB | Separate conference with one of the plaintiffs regarding next steps | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 05/02/2012 | KCM | Discussions with counsel for WVDOH re representations made by Burdette re his property and whether any potential for resolution due to lien. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 05/02/2012 | KCM | Discussions with Jay Goldman re conducting review of valuations. | | | |
| | | | 0.50 hrs. | 145.00 /hr | 72.50 |

5900        Central WV Regional Airport    Invoice# 412...        Page  2

| Date | | Description | | | |
|------|-----|-------------|---|---|---|
| 05/02/2012 | KCM | Prepare numerous correspondences to Jay Goldman re documents to review for 12 properties. | | | |
| | | | 0.50 hrs. | 145.00 /hr | 72.50 |
| 05/02/2012 | KCM | Supplement proposed Order re Commissioners and otherwise prepare for hearing on Petitions for Eminent Domain. | | | |
| | | | 1.50 hrs. | 145.00 /hr | 217.50 |
| 05/02/2012 | KCM | Call from Guardian Ad Litem re potential condemnation commissioners and upcoming hearing on Petitions for Eminent Domain. | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |
| 05/02/2012 | KCM | Attend hearing on Petitions for Eminent Domain. | | | |
| | | | 1.00 hrs. | 145.00 /hr | 145.00 |
| 05/02/2012 | KCM | Discussions with Guardian Ad Litem re additional information needed for evaluation of Petitions for unknown persons. | | | |
| | | | 0.40 hrs. | 145.00 /hr | 58.00 |
| 05/02/2012 | KCM | Prepare Notice of Commissioner's Hearing. | | | |
| | | | 0.30 hrs. | 145.00 /hr | 43.50 |
| 05/02/2012 | KCM | Discussions with Rick Atkinson re status of case, hearing on Petitions for Eminent Domain, map of applicable properties, and upcoming Special Commissioner's Hearing. | | | |
| | | | 0.20 hrs. | 145.00 /hr | 29.00 |
| 05/04/2012 | KCM | Review correspondence from Jay Goldman re files for each property. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 05/07/2012 | CRB | Read Order Appointing Commissioners | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 05/07/2012 | KCM | Review correspondence from Jay Goldman re receiving all 12 files and requesting conference to discuss concerns about valuations. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 05/07/2012 | KCM | Discussions with Jay Goldman re concerns about valuations and need to conduct appraisals. | | | |
| | | | 0.50 hrs. | 145.00 /hr | 72.50 |
| 05/07/2012 | KCM | Prepare correspondence to Rick Atkinson re Jay Goldman conducting Appraisals. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 05/07/2012 | KCM | Review correspondence from Rick Atkinson re approval for Jay Goldman to conduct appraisals. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 05/07/2012 | KCM | Prepare correspondence to Jay Goldman confirming authority to proceed with Appraisals. | | | |
| | | | 0.10 hrs. | 145.00 /hr | 14.50 |
| 05/14/2012 | KCM | Discussions with each of the Court appointed Condemnation Commissioners re attending Commissioner's Hearing. | | | |
| | | | 0.80 hrs. | 145.00 /hr | 116.00 |

| Date | | Description | | | | |
|------|------|-------------|------|------|------|------|
| 05/14/2012 | KCM | Prepare correspondence to Commissioner re Notice of Commissioner's Hearing. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| 05/14/2012 | KCM | Prepare Legal Advertisement for Commissioner's Hearing. | | | | |
| | | | 1.00 hrs. | 145.00 /hr | | 145.00 |
| 05/15/2012 | KCM | Call from Jay Goldman re identification of properties and inconsistencies with tax map, and preparing Appraisals for Commissioner's Hearing. | | | | |
| | | | 0.30 hrs. | 145.00 /hr | | 43.50 |
| 05/15/2012 | KCM | Discussions with Rick Atkinson re marking properties for identification and map of properties. | | | | |
| | | | 0.30 hrs. | 145.00 /hr | | 43.50 |
| 05/16/2012 | KCM | Prepare correspondences to five Condemnation Commissioners confirming availability and willingness to attend Commissions Hearing. | | | | |
| | | | 0.30 hrs. | 145.00 /hr | | 43.50 |
| 05/17/2012 | KCM | Call from Jay Goldman re obtaining tax maps and proceeding with Appraisals. | | | | |
| | | | 0.20 hrs. | 145.00 /hr | | 29.00 |
| 05/17/2012 | KCM | Prepare correspondence to Rick Atkinson re Jay Goldman re obtaining tax maps and proceeding with Appraisals. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| 05/18/2012 | KCM | Review correspondence from Rick Atkinson re Engineer preparing map of properties for use in Commissioner's Hearing. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| 05/24/2012 | KCM | Prepare correspondence to Jay Goldman requesting status of preparing Appraisals. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| 05/29/2012 | KCM | Discussions with Jay Goldman re status of Appraisals, value compared to prior valuations, extent of report for Appraisals, and preparing for Commissioner's Hearing. | | | | |
| | | | 0.50 hrs. | 145.00 /hr | | 72.50 |
| 05/29/2012 | KCM | Prepare correspondence to Rick Atkinson re status of Appraisals, and preparation for Commissioner's Hearing. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| 05/30/2012 | KCM | Call from Sandra Fadal re unavailability to serve as Condemnation Commissioner. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| 05/30/2012 | KCM | Call to John Asseff re serving as Condemnation Commissioner. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| 05/30/2012 | KCM | Prepare correspondence to John Asseff re serving as Condemnation Commissioner. | | | | |
| | | | 0.10 hrs. | 145.00 /hr | | 14.50 |
| | | Total fees for this matter | | | | $1,798.00 |

5900       Central WV Regional A. port       Invoice# 4127.          Page  4

## DISBURSEMENTS

| | | |
|---|---|---:|
| 05/07/2012 | Photocopies - $.20 per copy = 448 | 89.60 |
| 05/07/2012 | Postage 1.09 | 1.09 |
| 05/17/2012 | Photocopies - $.20 per copy = 10 | 2.00 |
| 05/29/2012 | Charleston Newspapers re: Legal Advertisement | 343.44 |
| | Total disbursements for this matter | $436.13 |

## BILLING SUMMARY

| | | | |
|---|---|---|---:|
| Charles R. Bailey | 2.20  hrs | 145.00  /hr | $319.00 |
| Kelly C. Morgan | 10.20  hrs | 145.00  /hr | $1,479.00 |
| TOTAL FEES | 12.40  hrs | | $1,798.00 |
| TOTAL DISBURSEMENTS | | | $436.13 |
| TOTAL CHARGES FOR THIS BILL | | | $2,234.13 |
| PLUS NET BALANCE FORWARD | | | $3,685.00 |
| **TOTAL BALANCE NOW DUE** | | | **$5,919.13** |

CHARLES R. BAILEY

# EXHIBIT G

**Rick Atkinson**

| | |
|---|---|
| From: | Ben Zera <bzera@orcolan.com> |
| Sent: | Monday, April 23, 2012 2:46 PM |
| To: | Rick Atkinson |
| Subject: | RE: Proposed Contract with Airport Authority |

Thanks Rick. That's a hefty document.  I'll take a read through it tonight.

Ben

**From:** Rick Atkinson [mailto:rick@yeagerairport.com]
**Sent:** Monday, April 23, 2012 2:43 PM
**To:** Ben Zera
**Subject:** FW: Proposed Contract with Airport Authority

Ben:

Here is the draft from Welford on the land swap, easement and excavation license contract.   Cost of easement is going to be $250,000 not the 350,000 in the contract.

Thanks,


**Rick Atkinson, Airport Director**
**Yeager Airport**
**John D. Rockefeller IV Terminal**
**100 Airport Road, Suite 175**
**Charleston, WV 25311**

**(O) 304-344-8033**
**(C) 304-741-0500**



**From:** Bailey, Chuck [mailto:cbailey@baileywyant.com]
**Sent:** Tuesday, March 27, 2012 3:27 PM
**To:** atkinson
**Subject:** Fwd: Proposed Contract with Airport Authority



Sent from my iPhone

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.

86

000107
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT H

## Barney, Joan

| | |
|---|---|
| **From:** | Bailey, Chuck |
| **Sent:** | Wednesday, April 25, 2012 11:05 AM |
| **To:** | 'Merical, Joe K.' |
| **Cc:** | Kent J. George |
| **Subject:** | RE: Corotoman Agreement |

Yes it does

Charles R. Bailey, Esq. <mailto:cbailey@baileywyant.com>

Bailey & Wyant, PLLC

500 Virginia Street East, Suite 600

P.O. Box 3710

Charleston, West Virginia 25337-3710

T: 304.345.4222 | F: 304.343.3133

greenleafConserve paper.  Think before you print.

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.

From: Merical, Joe K. [mailto:jkm@ramlaw.com]
Sent: Wednesday, April 25, 2012 10:58 AM
To: Bailey, Chuck
Cc: Kent J. George
Subject: RE: Corotoman Agreement

I spoke with John Wellford.  He's fine with $10,000 per breach for the liquidated damages.  Also, he had some changes regarding the 10-foot clearance language in the avigation easement.  We haven't seen the exact language he's proposing, but he said it was more stylistic than substantive.  Other than that, he approved the rest of the language.  We should have the final draft to you by the end of next week.  Hope this helps speed things along.

-- Joe

000119
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT I

| | |
|---|---|
| **From:** | Bailey, Chuck |
| **Sent:** | Friday, May 11, 2012 1:14 PM |
| **To:** | 'Rick Atkinson' |
| **Subject:** | FW: Corotoman Agreement |
| **Attachments:** | Settlement Agreement (Corotoman Changes Redlined) (R0699998).DOCX |

Charles R. Bailey, Esq. <mailto:cbailey@baileywyant.com>

Bailey & Wyant, PLLC

500 Virginia Street East, Suite 600

P.O. Box 3710

Charleston, West Virginia 25337-3710

T: 304.345.4222 | F: 304.343.3133

greenleafConserve paper.  Think before you print.

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.

From: Merical, Joe K. [mailto:jkm@ramlaw.com]
Sent: Wednesday, May 09, 2012 3:03 PM
To: Bailey, Chuck
Cc: Kent J. George
Subject: Corotoman Agreement

Chuck:

1

000257
Response to Subpoena Duces Tecum
Confidential

Redlined version of the settlement agreement is attached. We have copies of all the maps to be attached as exhibits available for review at our office. However, I believe they are all based on maps provided by the Airport Authority. Let us know as soon as possible if the agreement is acceptable. Thank you.

-- Joe

========================

Joseph K. Merical

Robinson & McElwee PLLC

P.O. Box 1791

Charleston, WV 25326

Phone: (304) 347-8318

Fax: (304) 344-9566

jkm@ramlaw.com

http://www.ramlaw.com/

2

000258
Response to Subpoena Duces Tecum
Confidential

DRAFT AGREEMENT OF MUTUAL OFFERS TO COMPROMISE
SUBJECT TO EXCLUSION PURSUANT TO W. VA. R. EVID. 408

## SETTLEMENT AGREEMENT BETWEEN
## THE CENTRAL WEST VIRGINIA REGIONAL AIRPORT AUTHORITY
## AND COROTOMAN, INC.

This Settlement Agreement, dated _____, 2012, is entered into between Corotoman, Inc., a West Virginia corporation ("Corotoman"), and the Central West Virginia Regional Airport Authority, a public corporation created pursuant to West Virginia Code §§ 8-29-1 *et seq.* ("Airport Authority").

## RECITALS

**WHEREAS,** the Airport Authority owns and operates Yeager Airport, located in Kanawha County, West Virginia, and owns additional undeveloped real property in the vicinity of Yeager Airport;

**WHEREAS,** Corotoman owns and operates a major commercial development, North Gate, and owns multiple additional tracts of land, all of which are adjacent to and/or otherwise located near Yeager Airport;

**WHEREAS,** the Airport Authority seeks to obtain certain interests in real property presently owned by Corotoman in connection with an aircraft approach zone for a proposed runway improvement at Yeager Airport;

**WHEREAS,** pursuant to W. Va. Code § 8-29-12, the Airport Authority has the power to exercise eminent domain to acquire said property rights from Corotoman, and the Airport Authority has contacted Corotoman and made offers to purchase multiple tracts and portions of tracts from Corotoman under threat of condemnation;

**WHEREAS,** the taking of Corotoman's property by the Airport Authority will result in certain direct and indirect damages, including, without limitation, the value of any and all property taken and severance damages to Corotoman's remaining property; and

**WHEREAS,** the Airport Authority and Corotoman have agreed upon the terms of a settlement, in lieu of condemnation, that (1) meets the needs of the Airport Authority, (2) fairly and adequately compensates Corotoman for the property interests which it agrees to relinquish and for the severance damages that such relinquishment will cause to the value of Corotoman's remaining property, and (3) is acceptable to both parties.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## SECTION ONE
## RECITALS & EXHIBITS

The recitals above and the Exhibits attached to this Settlement Agreement shall constitute part of this Settlement Agreement and are hereby incorporated herein by reference.

000259
Response to Subpoena Duces Tecum
Confidential

### SECTION TWO
### NATURE OF AGREEMENT

In lieu of condemnation, Corotoman agrees to grant a license for certain work to be performed on certain real property currently owned by Corotoman and to grant an easement for the passage of aircraft over certain real property. As fair and just compensation for said rights, including severance damages to Corotoman's remaining property rights, the Airport Authority agrees to perform certain work on certain real property owned by Corotoman, exchange certain other real property with Corotoman, and reimburse Corotoman for the severance damages caused by the Airport Authority's acquisition of property rights under this Settlement Agreement.

### SECTION THREE
### PARTIES' OBLIGATIONS

**3.01    License and Work Agreement.** Within thirty (30) days of execution of this Settlement Agreement, the parties agree to execute a License and Work Agreement, in substantially similar form to that instrument set forth in **Exhibit A**, regarding the Airport Authority's blasting, excavating, and grading of certain real property, situate in Kanawha County, West Virginia, now owned, in part or in whole, by Corotoman and described more particularly in **Exhibit A-1** (said work to be completed under the License and Work Agreement collectively referred to herein as the "Project"). The Project shall be completed in strict accordance with the Grading and Construction Plans, Specifications, and Schedules set forth in **Exhibit A-2**. In performing its obligations under the License and Work Agreement, the Airport Authority shall purchase and maintain insurance, including workers' compensation insurance for its employees, adequate and reasonable to protect against claims that may arise out of or result from its own operations under the License and Work Agreement or this Settlement Agreement,. Further, the Airport Authority shall require all of its contractors and subcontractors to purchase and maintain insurance, including workers' compensation insurance for their employees, adequate and reasonable to protect against claims that may arise out of or result from their operations under the License and Work Agreement or this Settlement Agreement. All insurance policies required by this Paragraph shall name Corotoman, its successors, and assigns, as additional insureds.

**3.02    Conveyance to Airport Authority.** Pursuant to the provisions of Section Four of this Settlement Agreement, Corotoman agrees to convey to the Airport Authority, by General Warranty Deed in substantially similar form to that set forth in **Exhibit B**, and the Airport Authority agrees to accept, certain real property, situate in Kanawha County, West Virginia, and more particularly described in **Exhibit B-1**, free of all liens and encumbrances except those of record in the Office of the Clerk of the Kanawha County Commission and those specifically set forth in said exhibits.

**3.03    Conveyance to Corotoman.** Pursuant to the provisions of Section Four of this Settlement Agreement, the Airport Authority agrees to convey to Corotoman, by General Warranty Deed in substantially similar form to that set forth in **Exhibit C**, and Corotoman agrees to accept, certain real property, situate in Kanawha County, West Virginia, and more particularly described in **Exhibit C-1**, free of all liens and encumbrances except those of record in the Office of the Clerk of the Kanawha County Commission and those specifically set forth in said exhibits.

Settlement Agreement                                                                    Page 2 of 7

000260
Response to Subpoena Duces Tecum
Confidential

**3.04    Avigation Easement.** Contingent upon the exchange of real property set forth in Paragraphs 3.02 and 3.03 and pursuant to the provisions of Section Four of this Settlement Agreement, Corotoman agrees to grant to the Airport Authority, and the Airport Authority agrees to accept, certain interests in, and obligations with respect to, real property, to be memorialized in substantially similar form to the instrument set forth in **Exhibit D** (said interests herein collectively referred to as the "Avigation Easement"). Notwithstanding anything to the contrary in this Settlement Agreement or any exhibit, attachment, or addendum thereto, Corotoman reserves and retains all property rights not expressly conveyed by any deed, easement, or other instrument executed pursuant to this Settlement Agreement, including all rights in fee to the property underlying the Avigation Easement, and all mineral rights and all surface rights inherent in the final grade of the property.

**3.05    Compensation.** As fair and just compensation for Corotoman's severance damages caused by the grant of the Avigation Easement and other rights to the Airport Authority and for the loss of and limitations placed upon Corotoman's remaining property interests, the Airport Authority agrees to pay Corotoman the sum of three hundred fifty thousand dollars ($350,000.00), due and payable upon execution of this Settlement Agreement.    The parties hereby acknowledge that the consideration described herein constitutes full and complete satisfaction for the property rights taken from Corotoman by the Airport Authority under the threat of the latter's exercise of its condemnation authority, and that these property rights include but are not limited to severance damages.

### SECTION FOUR
### CLOSING

**4.01    Closing Date.** All interests in real property to be conveyed under Section Three of this Settlement Agreement shall be conveyed at a Closing to be held within sixty (60) days of the execution of this Settlement Agreement, at a time and place to be agreed upon by the parties.

**4.02    Inspection of Property and Title.** Each party agrees to accept any deed or other conveyance required to be conveyed to it by this Settlement Agreement, unless the receiving party determines, in good faith, that (1) the deed or conveyance does not substantially satisfy the terms and conditions of this Settlement Agreement and the exhibits attached hereto, (2) a defect exists over the granting party's title to the property interest, or (3) any physical or environmental hazards exist on the property interest.    Within a reasonable time after the request of the other party, each party shall provide to the other party, at the requesting party's expense, copies of any documents (including deeds, title opinions, abstracts, certifications, and title insurance policies) in that party's possession evidencing, certifying, or insuring the that party's claim of title to any property interest to be conveyed by that party.    Prior to Closing, each party agrees to allow the other party reasonable physical access to any real property interest to be conveyed pursuant to this Settlement Agreement for the purposes of determining whether to accept or reject said property interest.    If a property interest is rightfully rejected by the receiving party under this Paragraph, the granting party must, within thirty (30) days of receiving written notice of said rejection or prior to Closing, whichever is earlier, either cure any defects in the deed, conveyance, title, or property, or pay to the receiving party the fair market value of the property interest affected, provided that the fair market value is calculated as though the defect or hazard

Settlement Agreement                                                                                   Page 3 of 7

000261
Response to Subpoena Duces Tecum
Confidential

did not exist.   Each party agrees that it shall not unreasonably reject any deed or other conveyance to be conveyed to it under this Settlement Agreement.

**4.03   Deliveries at Closing.**   At Closing, the parties shall first simultaneously execute and deliver the deeds to be conveyed under Paragraphs 3.02 and 3.03 of this Settlement Agreement.   Immediately thereafter, both parties shall execute the Avigation Easement to be granted under Paragraph 3.04 of this Settlement Agreement.

**4.04   Closing Costs.**   Each party shall bear its own costs and expenses associated with the transactions contemplated herein, including costs of inspection of title and property, costs of preparing any deeds, conveyances, maps, plats, surveys, or other documents, and attorneys' fees.

**4.05   Recordation.**   After receipt of any interest in real property under this Settlement Agreement, the receiving party shall, at its own expense, promptly and properly record any and all deeds, conveyances, and other documents necessary to protect its rights and interests.

## SECTION FIVE
## INDEMNIFICATION

**5.01   Indemnification by the Airport Authority.**   The Airport Authority shall defend, indemnify, and hold harmless Corotoman, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors, against and from all expenses, liabilities, obligations, damages, penalties, claims, actions, and costs (including reasonable attorneys' fees) paid in connection with loss of life, bodily injury, or damage to property (1) caused by an intentional or negligent act or omission (including blasting or any other abnormally dangerous activity) of the Airport Authority or its licensees and invitees, (2) caused by the Airport Authority's failure to perform any obligation under this Settlement Agreement, or (3) arising out of the use by the Airport Authority or its licensees and invitees of any portion of Corotoman's property, unless such expense, liability, obligation, damage, penalty, claim, action, or cost is caused by an intentional or negligent act or omission of Corotoman or its licensees and invitees or by the failure of Corotoman to perform any of its obligations under this Settlement Agreement.   The Airport Authority's obligations under this Paragraph are independent of any obligations they may have with respect to liability insurance and shall not be negated or reduced because of the existence of any insurance or the denial of insurance coverage for any occurrence or the refusal of any insurer to provide a defense.

**5.02   Indemnification by Corotoman.**   Corotoman shall defend, indemnify, and hold harmless the Airport Authority, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors, against and from all expenses, liabilities, obligations, damages, penalties, claims, actions, and costs (including reasonable attorneys' fees) paid in connection with loss of life, bodily injury, or damage to property (1) caused by an intentional or negligent act or omission of Corotoman or its licensees and invitees, (2) caused by Corotoman's failure to perform any obligation under this Settlement Agreement, or (3) arising out of the use by Corotoman or its licensees and invitees of any portion of the Airport Authority's property, unless such expense, liability, obligation, damage, penalty, claim, action, or cost is caused by an intentional or negligent act or omission of the Airport Authority or its licensees and invitees or by the failure of the Airport Authority to perform any of its obligations under this Settlement

Settlement Agreement                                                        Page 4 of 7

000262
Response to Subpoena Duces Tecum
Confidential

Agreement. Corotoman's obligations under this Paragraph are independent of any obligations they may have with respect to liability insurance and shall not be negated or reduced because of the existence of any insurance or the denial of insurance coverage for any occurrence or the refusal of any insurer to provide a defense.

## SECTION SIX
## SETTLEMENT & RELEASE

**6.01    Final Resolution.** The parties acknowledge that this Settlement Agreement shall constitute the full, complete, and final resolution of any and all disputes between Corotoman and the Airport Authority arising out of the threatened condemnation or acquisition of Corotoman's real property that was the subject of offer package correspondence, dated February 24, 2011, sent by O.R. Colan Associates of Florida, LLC, to Corotoman, attached hereto as **Exhibit E** and incorporated for purposes of defining the scope of the real property covered by this Settlement Agreement.

**6.02    Mutual Release.** Each party mutually agrees to release the other party, its successors and assigns, from any and all claims, known or unknown, that arose or may arise out of the prior acts or omissions of the parties related to the threatened condemnation or acquisition of any property that is the subject of this Settlement Agreement, including, but not limited to, any and all claims for compensatory, statutory, or punitive damages; declaratory or injunctive relief; and any other costs and expenses, including attorneys' fees and surveying and/or appraisal costs.

**6.03    Limitation on Further Condemnation.** The Airport Authority acknowledges that the property rights conveyed to it by this Settlement Agreement are sufficient for its present and immediate needs. The Airport Authority agrees not to exercise its rights of eminent domain with respect to the Project and the remaining property interests of Corotoman for the duration of the period of either five (5) years from the completion of the Project or seven (7) years from the effective date of this Settlement Agreement, whichever is longer. If any event covered by Paragraph 7.07 of this Settlement Agreement shall occur, the time period set forth in this Paragraph shall be extended by the duration of said event.

## SECTION SEVEN
## OTHER PROVISIONS

**7.01    Entire Agreement.** This Settlement Agreement, together with its Exhibits, contains the entire agreement of the parties with respect to the subject matter hereof. All prior understandings and agreements between the parties are set forth within this Settlement Agreement, which alone fully and completely sets forth the understanding of the parties.

**7.02    Notices.** Any notices or communications required by this Settlement Agreement shall be in writing and delivered or sent through certified or registered mail to the following:

a. If the notice is to Corotoman, Inc.:

Corotoman, Inc.
Attn: John H. Wellford, III

Settlement Agreement                                                                Page 5 of 7

000263
Response to Subpoena Duces Tecum
Confidential

200 Association Drive, Suite 140
Charleston, WV 25311

With a copy to:

Robinson & McElwee, PLLC
Attn: Kent J. George, Esq.
Post Office Box 1791
Charleston, WV 25326

b. If the notice is to the Central West Virginia Regional Airport Authority:

Central West Virginia Regional Airport Authority
100 Airport Road, Suite 175
Charleston, WV 25311

With a copy to:

Bailey & Wyant, PLLC
Attn: Charles R. Bailey
500 Virginia Street East, Suite 600
Charleston, WV 25301

Either party may change its address for purposes of this Paragraph by notice to the other in accordance with the foregoing requirements.

**7.03   Further Assurances.**   The parties agree to execute any and all documents reasonably necessary to consummate this Settlement Agreement.

**7.04   Binding Effect.**   This Settlement Agreement shall be binding on the parties, all of their related and affiliated companies and persons, and their successors and assigns.

**7.05   Captions.**   The titles, captions, and headings of the sections and paragraphs of this Settlement Agreement are for context and reference only and in no way define, limit, or describe the scope or intent of this Settlement Agreement.

**7.06   Amendments.**   This Settlement Agreement may be amended only by a writing executed by both parties.

**7.07   Force Majeure.**   In the event either party to this Settlement Agreement shall be delayed, hindered in, or prevented from the performance of any act required under this Settlement Agreement by reason of an act of God (including inclement weather which prevents normal construction work), strike, lockout, labor trouble, failure of power, riot, insurrection, war, or other reason of a like nature not the fault of or reasonably within the control of the party delayed in performing or doing acts required under by the terms of this Settlement Agreement, then performance of such act shall be excused for the duration of the hindrance, and the period for the performance of any such act shall be extended for a period equivalent to the duration of the hindrance. This provision shall likewise apply to the exercise of affirmative rights granted to

Settlement Agreement                                                                 Page 6 of 7

000264
Response to Subpoena Duces Tecum
Confidential

either party by this Settlement Agreement, and any such aforementioned occurrence shall operate to extend the period for the exercise of said rights for a period equivalent to the duration of the hindrance. In no event shall financial inability or acts or omissions within the control of the party seeking an excuse or extension be a cause for excuse or extension hereunder.

**7.08** **Compliance with Laws.** Each party shall perform all obligations required by it under this Settlement Agreement only after obtaining all required governmental licenses, permits, and approvals, and thereafter in compliance with all such licenses, permits, and approvals, and otherwise in compliance with all applicable constitutional provisions, laws, rules, regulations, and directives of authorities of competent jurisdiction. This Settlement Agreement, and all related agreements, conveyances, or other instruments, shall be governed by and construed in accordance with West Virginia law.

**7.09** **Severability.** If any term or provision of this Settlement Agreement, or the application thereof to any person, agency, entity, or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Settlement Agreement, or the application of such terms or provisions to persons, agencies, entities, or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each and every term and provision of this Settlement Agreement shall be valid and enforceable to the fullest extent permitted by law.

**IN WITNESS WHEREOF,** the parties have executed this Settlement Agreement to be effective as of the date first written above.

> **CENTRAL WEST VIRGINIA**
> **REGIONAL AIRPORT AUTHORITY**
>
> By: _____
>
> Its: _____
>
>
> **COROTOMAN, INC.**
>
> By: _____
>
> Its: _____

Settlement Agreement

Page 7 of 7

000265
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT A

# LICENSE & WORK AGREEMENT

000266
Response to Subpoena Duces Tecum
Confidential

## LICENSE AND WORK AGREEMENT

This License and Work Agreement ("Work Agreement"), dated _____,
2012, is entered into between Corotoman, Inc., a West Virginia corporation ("Corotoman"), and
the Central West Virginia Regional Airport Authority, a public corporation created by the
Kanawha County Commission pursuant to West Virginia Code §§ 8-29-1 *et seq.* ("Airport
Authority").

### RECITALS

**WHEREAS,** the Airport Authority seeks to augment and maintain an approach zone for
aircraft landing and taking off from Yeager Airport in Kanawha County, West Virginia;

**WHEREAS,** Corotoman now owns or will acquire certain real property, all situate in
Charleston North District, Kanawha County, West Virginia, underlying the desired approach
zone, (said real property hereinafter referred to as the "Project Site" and more particularly
demonstrated on **Exhibit A-1**, attached hereto and incorporated herein by reference);

**WHEREAS,** by agreement ("Settlement Agreement") dated _____,
2012, Corotoman and the Airport Authority mutually agreed to resolve any and all claims
regarding the threatened condemnation of Corotoman's property, including the Project Site;

**WHEREAS,** pursuant to the Settlement Agreement, Corotoman will grant the Airport
Authority certain property rights in the form of an avigation easement ("Avigation Easement")
over the Project Site and certain other property that is currently owned by or will be acquired by
the Airport Authority and that will be conveyed to Corotoman; and

**WHEREAS,** in order to completely and safely utilize the Avigation Easement, the grade
and elevation of the Project Site and surrounding real property that is now owned or will be
acquired by the Airport Authority must be altered by excavating, blasting, grading, removing the
surface thereof, and/or other similar work (said alteration of the grade and elevation of the
Project Site and surrounding property interests herein collectively referred to as the "Project").

**NOW, THEREFORE,** in consideration of the recitals above, the mutual promises and
covenants set forth below, and other good and valuable consideration, the receipt and sufficiency
of which are hereby acknowledged, the parties hereby agree as follows:

1.      **Incorporating Recitals.** The recitals above shall constitute part of this Work
Agreement and are hereby incorporated herein by reference.

2.      **Grant of License.** Corotoman hereby grants to the Airport Authority, and its
officers, employees, agents, successors, assigns, and contractors and subcontractors, a non-
exclusive license ("License") to enter onto the Project Site for the purpose of excavating,
blasting, grading, and/or removing any portion of the Project Site, as necessary for the Airport
Authority's completion of the Project. The Airport Authority shall be responsible for properly
repairing any damage caused by the exercise of its rights under this Paragraph and/or
compensating Corotoman for the same. This License shall extend to any real property within the

License and Work Agreement                                                    Page 1 of 7

000267
Response to Subpoena Duces Tecum
Confidential

Project Site that Corotoman acquires from the Airport Authority after execution of this Work Agreement.

3.      **Term.** This License shall be irrevocable until the earlier of the completion of the Project or twenty-four (24) months from the date of this Work Agreement.

4.      **Use of License.** The Airport Authority agrees to use the License solely for the purposes of the undertaking and completion of the Project. The Airport Authority further agrees to exercise its rights under the License in strict compliance with the terms and conditions of this Work Agreement.

5.      **Scope of Project.** As consideration for the License granted herein, the Airport Authority agrees to undertake the Project in strict accordance with the terms and conditions set forth in this Work Agreement. The Airport Authority agrees to complete the Project in accordance with the Grading and Construction Plans, Specifications, and Schedules, attached hereto as **Exhibit A-2** and incorporated herein by reference.

The Airport Authority agrees to overblast at least twenty~~thirty-five (2035)~~ feet below the planned final grade, on drill dates and blasting plan acceptable to Corotoman and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules.

The Airport Authority agrees the finished grade will be at least ten (10) feet below the elevation of the planned Avigation Easement at any point on the area covered by this Work Agreement and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules.

6.      **Commencement of Project.** The Airport Authority agrees to commence the Project no later than December 31, 2012. At least ninety (90) days prior to commencement of the Project, the Airport Authority shall provide Corotoman with written notice of its intended commencement date. Prior to commencement of the Project, Corotoman shall have the right, but not the obligation, to remove any or all timber then growing on the Project Site.

7.      **Completion of Project.** The Airport Authority agrees that the Project will be completed no later than twenty-four (24) months after commencement, excepting any time during which work stoppages are necessitated by weather, state of emergency, strike, riot, war, or other extraordinary event beyond the control of the Airport Authority. The parties agree that time is of the essence in completing the Project. For purposes of this Work Agreement, the completion of the Project shall only occur when Corotoman receives a copy of a duly executed certificate of substantial completion or similar document, signed by an engineering professional licensed by the State of West Virginia and evidencing that the Project has been substantially completed in accordance with the Grading and Construction Plans, Specifications, and Schedules attached hereto.

8.      **Stormwater Retention and Control.** During all phases of the Project, the Airport Authority shall construct, maintain, and clean stormwater retention facilities sufficient to prevent an increase in stormwater discharge on properties adjoining or near the Project Site. Upon completion of the Project, the Airport Authority shall leave in place any stormwater settlement ponds and related facilities constructed as part of the Project, whether on the Project Site or on property to be conveyed to Corotoman under the Settlement Agreement. At the time

License and Work Agreement                                              Page 2 of 7

000268
Response to Subpoena Duces Tecum
Confidential

of completion of the Project, the Airport Authority shall clean and repair these settlement ponds and any related stormwater handling facilities and/or construct additional features such that the ponds and related facilities can retain and handle one hundred percent (100%) of their design capacity.

9. **Costs of Project.** All costs and expenses of the Project shall be borne by the Airport Authority, its contractors, subcontractors, employees, and assigns. The Airport Authority expressly waives any claims against Corotoman for restitution, quantum meruit, contribution, or any other claim for payment for any aspect of the Project.

10. **Insurance.** Prior to commencement of the Project and throughout the duration of the Project, the Airport Authority agrees to provide, either directly or through its contractors or subcontractors, liability insurance to the benefit of Corotoman, its successors, and assigns, which shall be listed as additional named insureds in any such policy, in the following types and minimum amounts:

    a. **Commercial General Liability Insurance.** Commercial general liability insurance, which shall include premises operation (including explosion, collapse, and underground coverage), independent contractors, completed operations, and blanket contractual liability on all written contracts, including this Work Agreement, in the minimum amounts of:

        i. Five million dollars ($5,000,000) for personal injury per occurrence;

        ii. Five million dollars ($5,000,000) for property damage per occurrence; and

        iii. Five million dollars ($5,000,000) additional per occurrence for personal injury or property damage arising from blasting or other ultrahazardous activities.

    b. **Motor Vehicle Coverage.** Motor vehicle coverage, which shall cover claims for damages because of bodily injury or death of any person or property damage arising out of the ownership, maintenance, or use of any motor vehicle, in the minimum amount of one million dollars ($1,000,000.00) per occurrence for personal injury or property damage.

    c. **Workers' Compensation Coverage.** Adequate workers' compensation coverage that shall cover claims for damages because of bodily injury, occupational sickness or disease, or death of its employees under any applicable employers' liability law, including claims brought under West Virginia Code § 23-4-2 and the decision of the West Virginia Supreme Court in *Mandolidis v. Elkins Industries, Inc.*

11. **Indemnification.** The Airport Authority agrees to indemnify, defend, and hold Corotoman, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors, harmless from and against any and all liabilities, costs, demands, actions, judgments, expenses, losses or damages, including (but not limited to) attorneys' fees, which Corotoman may incur, or which may be asserted against Corotoman, arising or alleged to arise,

License and Work Agreement                                    Page 3 of 7

000269
Response to Subpoena Duces Tecum
Confidential

from or in connection with the performance or breach of this Work Agreement (including, but not limited to, blasting or other ultrahazardous activities) by the Airport Authority, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors. The obligations created by this Paragraph shall survive the termination of this Work Agreement and the completion of the Project and forever inure to the benefit of Corotoman, its successors and assigns.

12.    **Standard of Work.** All work to be performed in connection with the Project by or on behalf of the Airport Authority, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors (1) shall not impair the structural or architectural integrity of any improvement or property situated on or near the Project Site; (2) shall not be undertaken until all required local, state, and federal permits and authorizations have been procured and paid for; (3) shall be performed in a safe, diligent, and workmanlike manner and in compliance with all applicable laws, ordinances, orders, rules, regulations, and requirements of all governmental authorities of competent jurisdiction; (4) shall be performed by contractors licensed by the State of West Virginia to do the work being undertaken, (5) shall be free from defects in material and workmanship, and (6) shall be diligently prosecuted to completion.

13.    **Compliance with Laws.** The Airport Authority shall be responsible for obtaining and maintaining in full force and effect, at its expense, any permits, licenses, or approvals as may be required from any local, state, or federal authority to permit the exercise of the Airport Authority's rights hereunder, and all work performed by the Airport Authority shall be performed in compliance with such permits, licenses, and approvals and otherwise in accordance with all applicable laws, codes, ordinances, and regulations. The Airport Authority shall be responsible for compliance with all applicable environmental laws, codes, ordinances, regulations, and permitting requirements, including, but not limited to, the National Pollutant Discharge Elimination System.

14.    **Notices.** Any notices or communications required by this Work Agreement shall be in writing and delivered or sent through certified or registered mail to the following:

a.    If the notice is to Corotoman, Inc.:

Corotoman, Inc.
Attn: John H. Wellford, III
200 Association Drive, Suite 140
Charleston, WV 25311

With a copy to:

Robinson & McElwee, PLLC
Attn: Kent J. George, Esq.
Post Office Box 1791
Charleston, WV 25326

License and Work Agreement                     Page 4 of 7

000270
Response to Subpoena Duces Tecum
Confidential

b.  If the notice is to the Central West Virginia Regional Airport Authority:

Central West Virginia Regional Airport Authority
100 Airport Road, Suite 175
Charleston, WV 25311

With a copy to:

Bailey & Wyant, PLLC
Attn: Charles R. Bailey
500 Virginia Street East, Suite 600
Charleston, WV 25301

Either party may change its address for purposes of this Paragraph by notice to the other in accordance with the foregoing requirements.

15.  **Effect of Breach.** Failure by the Airport Authority to strictly abide by the terms and conditions set forth in this Work Agreement shall constitute a material breach of the Agreement. Failure to timely commence the Project shall terminate this Work Agreement and entitle Corotoman to retain any payments due and payable under the Settlement Agreement. The parties acknowledge that any breach by the Airport Authority occurring after commencement of the Project will cause significant harm to Corotoman, including lost profits, revenue, and rents; loss of the use of Corotoman's property; potential third-party litigation costs, including attorney's fees and court costs; and annoyance and inconvenience. Therefore, in event of a breach occurring after commencement of the Project, Corotoman may, in its discretion and as the circumstances reasonably dictate, revoke the License granted herein and/or seek the greater of either (1) actual, compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ten thousand dollars ($10,000.00) per breach. These remedies are cumulative, and a waiver, release, or settlement of one breach shall not operate as a waiver, release, or settlement of any other breach. Notwithstanding anything in this Paragraph to the contrary, Corotoman shall release the Airport Authority from any and all liability for liquidated damages if the Airport Authority requires all of its contractors and subcontractors to pay directly to Corotoman, as a third-party beneficiary, any liquidated damages caused by the acts or omissions of that contractor or subcontractor. Notwithstanding any breach by either party of this Work Agreement, the Settlement Agreement shall remain in force and effect to the fullest extent possible. Failure to complete the Project contemplated by this Work Agreement shall not affect the provisions of the Settlement Agreement regarding mutual release of prior claims and future condemnation of Corotoman's real property.

16.  **Third Parties.** Each party's rights, duties, and obligations under this Work Agreement shall extend to its respective officers, employees, agents, successors, assigns, and contractors and subcontractors. The Airport Authority agrees to incorporate the terms and conditions set forth herein into any agreements with third parties, including its contractors and subcontractors, related to the work to be performed as part of the Project.

17.  **Relationship of Parties.** The parties hereby acknowledge that the relationship of the parties created by this Work Agreement is that of licensor and licensee, and that the Airport

License and Work Agreement                                              Page 5 of 7

000271
Response to Subpoena Duces Tecum
Confidential

Authority is not an employee, independent contractor, joint venturer, or partner of Corotoman. The work performed to complete the Project is for the primary benefit of the Airport Authority.

18.     **Recordation.** Upon Corotoman's written direction, the Airport Authority shall cause this Work Agreement to be recorded in the Office of the Clerk of Kanawha County Commission at its expense.

19.     **Captions.** The captions and headings of this Work Agreement are for convenience of the parties and for context and reference only and in no way define, limit, or describe the scope or intent of this Work Agreement.

20.     **Force Majeure.** In the event either party to this Work Agreement shall be delayed or hindered in or prevented from the performance of any act required under this Work Agreement by reason of acts of God (including inclement weather which prevents normal construction work), strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reason of a like nature not the fault of or reasonably within the control of the party delayed in performing or doing acts required under the terms of this Work Agreement, then performance of such act shall be excused for the duration of the hindrance, and the period for the performance of any such act shall be extended for a period equivalent to the duration of the hindrance. In no event shall financial inability or acts or omissions within the control of the party seeking an excuse or extension be a cause for excuse or extension hereunder. If any event covered by this Paragraph shall occur, the time period of the prohibition on condemnation set forth in the Settlement Agreement shall be extended by the duration of said event.

21.     **Severability.** If any term or provision of this Work Agreement or the applications thereof to any person, agency, entity, or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Work Agreement, or the application of such terms or provision to persons, agencies, entities, or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each and every term and provision of this Work Agreement shall be valid and be enforced to the fullest extent permitted by law.

*[Signatures on Next Page]*

License and Work Agreement                                          Page 6 of 7

000272
Response to Subpoena Duces Tecum
Confidential

**IN WITNESS WHEREOF,** the parties have executed this License and Work Agreement to be effective as of the date first written above.

**CENTRAL WEST VIRGINIA REGIONAL AIRPORT AUTHORITY**

By: _____

Its: _____

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

    This    instrument    was    acknowledged    before    me    this  _____  day    of

_____, 201___, by _____,

as _____ of the Central West Virginia Regional Airport

Authority.

_____
NOTARY PUBLIC

**COROTOMAN, INC.**

By: _____

Its: _____

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

    This    instrument    was    acknowledged    before    me    this  _____  day    of

_____, 201___, by _____,

as _____ of Corotoman, Inc.

_____
NOTARY PUBLIC

This instrument was prepared by    Joseph K. Merical, Esq., ROBINSON & McELWEE, PLLC,
P.O. Box 1791, Charleston, WV 25236

License and Work Agreement                                          Page 7 of 7

000273
Response to Subpoena Duces Tecum
Confidential

**EXHIBIT A-1**

[*"LICENSE AND WORK AGREEMENT" MAP*]

000274
Response to Subpoena Duces Tecum
Confidential

**EXHIBIT A-2**

**GRADING AND CONSTRUCTION PLANS, SPECIFICATIONS, AND SCHEDULES**

[*TO BE AGREED UPON PRIOR TO COMMENCEMENT OF THE PROJECT*]

000275
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT B

# GENERAL WARRANTY DEED
# TO COROTOMAN

000276
Response to Subpoena Duces Tecum
Confidential

**GENERAL WARRANTY DEED**

This **DEED** is made this _____ day of _____, 201___, by and between the **Central West Virginia Regional Airport Authority**, a West Virginia public corporation ("Airport Authority"), and **Corotoman, Inc.**, a West Virginia corporation ("Corotoman").

**W I T N E S S E T H**

For and in consideration of the premises set forth in that certain Settlement Agreement dated _____, 201___, by and between the parties hereto, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Airport Authority does hereby **GRANT AND CONVEY** unto Corotoman all of its right, interest, and title, together with all appurtenances thereto, in and to those certain lots, tracts, or parcels of real estate, all situate in Kanawha County, West Virginia, and more particularly described in **Exhibit B-1**, attached hereto and incorporated herein by reference.

This conveyance is made subject to (1) all those exceptions, reservations, and encumbrances expressly set forth in **Exhibit B-1**; (2) all encumbrances visible on the ground, (3) the lien of real estate taxes for the year 2012; and (4) all easements, rights of way, liens, mortgages, deeds of trust, encumbrances, leases, and other matters affecting title recorded with the Clerk of the Kanawha County Commission prior to the date of this Deed.

Subject to the foregoing, the Airport Authority hereby covenants that it will **WARRANT GENERALLY** the real estate herein conveyed and that the same is clear and free of all liens and encumbrances.

The Airport Authority hereby declares this conveyance is exempt from the tax imposed by W. Va. Code §§ 11-22-1, *et seq.* because it is a conveyance from an instrumentality of the State of West Virginia.

000277
Response to Subpoena Duces Tecum
Confidential

**IN WITNESS WHEREOF,** the Central West Virginia Regional Airport Authority has executed this Deed as of the date first written above.

**CENTRAL WEST VIRGINIA
REGIONAL AIRPORT AUTHORITY**

By: _____

Its: _____

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this _____ day of

_____, 201___, by _____,

as _____ of the Central West Virginia Regional Airport

Authority.

_____
NOTARY PUBLIC

This instrument was prepared by   Joseph K. Merical, Esq., ROBINSON & MCELWEE, PLLC,
P.O. Box 1791, Charleston, WV 25236

000278
Response to Subpoena Duces Tecum
Confidential

## EXHIBIT B-1

### PROPERTY CONVEYED TO COROTOMAN

[Full legal descriptions shall be provided by the Airport Authority prior to Closing. The property conveyed shall consist of the following Parcels as shown on 2011 Tax Map 46, Charleston North District, Kanawha County, West Virginia: Parcels 54, 55, 58, 59, 60, 62, 63, 64, 65, 96, 101, 102, 119, 120, 121, 124, 127, 128, 131, 134, 137, 138, 139, 140, 145, 149, 150, 151, 152, 153, 154, 155, 192, 196, 197, 198, 199, 200, 204, 208, 209, 210, 214, and 215.]

000279
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT C

# GENERAL WARRANTY DEED
# TO THE AIRPORT AUTHORITY

000280
Response to Subpoena Duces Tecum
Confidential

## GENERAL WARRANTY DEED

  This **DEED** is made this _____ day of _____, 201____, by

and between **Corotoman, Inc.**, a West Virginia corporation ("Corotoman"), and **Central West**

**Virginia Regional Airport Authority**, a West Virginia public corporation ("Airport

Authority").

### W I T N E S S E T H

  For and in consideration of the premises set forth in that certain Settlement

Agreement dated _____, 201___, by and between the parties hereto, and other

good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

Corotoman does hereby **GRANT AND CONVEY** unto the Airport Authority all of its right,

interest, and title, together with all appurtenances thereto, in and to those certain lots, tracts, or

parcels of real estate, all situate in Kanawha County, West Virginia, and more particularly

described in **Exhibit C-1**, attached hereto and incorporated herein by reference.

  Corotoman, for itself and its successors, assigns, designees, contractors, and

lessees, hereby expressly **EXCEPTS** and **RESERVES** from the operation of this Deed all of its

interest in the coal, oil, gas, stone, water, and other minerals of every kind and character in, on,

and underlying the property conveyed herein, together with the right to mine, drill for, or

otherwise remove the same therefrom and to engage in any and all undertakings in, upon, under,

and across said property reasonably necessary or prudent for said mining, drilling, or removal,

subject to any applicable state and federal laws, regulations, and permitting requirements.

  This conveyance is made subject to (1) all those exceptions, reservations, and

encumbrances expressly set forth in **Exhibit C-1**; (2) all encumbrances visible on the ground, (3)

the lien of real estate taxes for the year 2012; and (4) all easements, rights of way, liens,

000281
Response to Subpoena Duces Tecum
Confidential

mortgages, deeds of trust, encumbrances, leases, and other matters affecting title recorded with the Clerk of the Kanawha County Commission prior to the date of this Deed.

Subject to the foregoing, Corotoman hereby covenants that it will **WARRANT GENERALLY** the real estate herein conveyed and that the same is clear and free of all liens and encumbrances.

Corotoman hereby declares this conveyance is exempt from the tax imposed by W. Va. Code §§ 11-22-1, *et seq.* because it is a conveyance to an instrumentality of the State of West Virginia.

**IN WITNESS WHEREOF,** Corotoman, Inc. has executed this Deed as of the date first written above.

**COROTOMAN, INC.**

By: _____

Its: _____

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this _____ day of _____, 201___, by _____, as _____ of Corotoman, Inc.

_____
NOTARY PUBLIC

This instrument was prepared by   Joseph K. Merical, Esq., ROBINSON & MCELWEE, PLLC, P.O. Box 1791, Charleston, WV 25236

2

000282
Response to Subpoena Duces Tecum
Confidential

## EXHIBIT C-1

### PROPERTY CONVEYED TO THE AIRPORT AUTHORITY

[Full legal descriptions shall be provided by Corotoman prior to Closing.]

000283
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT D

# AVIGATION EASEMENT

000284
Response to Subpoena Duces Tecum
Confidential

### AVIGATION EASEMENT AGREEMENT

This Avigation Easement Agreement ("Easement Agreement") dated _____, 201___, is entered into between Corotoman, Inc., a West Virginia corporation ("Corotoman"), and the Central West Virginia Regional Airport Authority, a public corporation created pursuant to West Virginia Code §§ 8-29-1 *et seq.* ("Airport Authority").

### W I T N E S S E T H

**WHEREAS,** the Airport Authority is the owner and operator of Yeager Airport ("Airport") in Kanawha County, West Virginia;

**WHEREAS,** Corotoman is the owner of certain tracts of land, all located adjacent to or near the Airport in Kanawha County, West Virginia, collectively referred to herein as the Subject Property and more particularly described in **Exhibit D-1**, attached hereto and incorporated herein by reference;

**WHEREAS,** by agreement dated _____, 201___ ("Settlement Agreement"), Corotoman and the Airport Authority mutually agreed to resolve any and all claims regarding the threatened condemnation of certain real property owned by Corotoman, including parts of the Subject Property;

**WHEREAS,** pursuant to the Settlement Agreement, the Airport Authority desires to obtain, and Corotoman desires to grant, an avigation easement over the Subject Property through a particular portion of the airspace above the Subject Property, said airspace referred to herein as the Aircraft Approach Zone and more particularly described (using the West Virginia Coordinate System of 1983 South Zone expressed in feet) and shown on **Exhibit D-2**, attached hereto and incorporated herein by reference; and

~~**WHEREAS,** the easement to be granted herein shall only be granted for the airspace that lies above an imaginary plane (the elevation of said imaginary plane referred to herein as the "Base Easement Elevation") beginning at an elevation of 936.4 feet above mean sea level along the imaginary line depicted as baseline station 0+00 on **Exhibit D-3** (attached hereto and incorporated herein by reference), then extending and rising in a generally southwesterly direction, conterminously with the Aircraft Approach Zone, at a rate of 0.025 feet vertically for each 1 foot horizontally, and being parallel to and approximately 10 feet below the Runway 5 Approach Elevation illustrated on **Exhibit D-3**.~~

**WHEREAS,** the easement to be granted herein shall only be granted for that airspace that lies above the elevation of the imaginary plane described and shown on **Exhibit D-3**, attached hereto and incorporated herein by reference. The elevation of said imaginary plane shall be calculated for any point within the Aircraft Approach Zone using the calculation set forth on **Exhibit D-3** (said elevation for each such point referred to herein as the "Base Easement Elevation").

**NOW, THEREFORE,** for and in consideration of the premises, and mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and

000285
Response to Subpoena Duces Tecum
Confidential

sufficiency of which the parties hereby acknowledge, the parties hereby covenant and agree as follows:

1. **Incorporating Recitals.** The recitals above shall constitute part of this Easement Agreement and are incorporated herein by reference.

2. **Grant of Avigation Easement.** Corotoman hereby grants and conveys to the Airport Authority, and its successors in ownership of the Airport, an exclusive easement ("Avigation Easement") for the free, unobstructed use and passage of all types of aircraft in and through those portions of the Aircraft Approach Zone exceeding the Base Easement Elevation and situated above the Subject Property.

3. **Reversion.** The Avigation Easement shall only last for so long as it is used for the purpose of an aircraft approach zone for Yeager Airport by the Airport Authority or its successors in ownership of Yeager Airport. Should the Avigation Easement cease to be used for this purpose, it shall be deemed abandoned and shall automatically revert to Corotoman, its successors, and/or assigns in ownership of the Subject Property underlying the Avigation Easement.

4. **Improvements.** Corotoman, for itself and its successors and assigns in ownership of the Subject Property, covenants that no improvement of any type shall be constructed or placed on the Subject Property in such as a way as to interfere with or obstruct the Avigation Easement. Notwithstanding this covenant, Corotoman, its successors, assigns, employees, agents, and contractors shall retain the absolute right to construct any and all improvements on the Subject Property, so long as said improvements do not exceed the Base Easement Elevation, and shall be entitled to make any and all reasonable uses of the Subject Property that do not interfere with the Airport Authority's rights hereunder. Furthermore, notwithstanding anything in this Easement Agreement or any other related agreement to the contrary, the Airport Authority agrees to reasonably accommodate, in good faith, Corotoman's construction efforts that may temporarily exceed the Base Easement Elevation or encroach into any area required to be free of permanent obstructions under applicable federal or state laws, rules, or regulations.

5. **Natural Obstructions.** The Airport Authority shall have the continuing right to keep the Avigation Easement clear and free from any and all crops, trees, and other natural growth of any kind which now extend, or which may, in the immediate future extend, into the Avigation Easement. Upon twenty (20) days' written notice to Corotoman, its successors, or assigns, or in cases of imminent danger to public health, safety, or welfare, the Airport Authority shall have the right to enter onto Corotoman's property for the sole and limited purpose of removing such obstructions. The removal of any obstruction or potential obstruction to the Avigation Easement shall be at the Airport Authority's sole expense. The parties agree that Corotoman, its successors, and assigns, shall be under no obligation to remove, trim, or pay for the removal or trimming of any tree or other natural obstruction.

6. **Airport Safety Devices.** The Airport Authority shall have the continuing right and obligation to construct and maintain any airport safety devices required by federal or state laws, rules, or regulations on, across, over, or above the Subject Property or any improvements

Avigation Easement Agreement                                                    Page 2 of 4

000286
Response to Subpoena Duces Tecum
Confidential

thereon. Upon twenty (20) days' written notice to Corotoman, its successors, or assigns, or in cases of imminent danger to public health, safety, or welfare, the Airport Authority shall have the right to enter onto Corotoman's property for the sole and limited purpose of constructing, maintaining, repairing, replacing, and/or removing said safety devices, including the right to construct and install said safety devices on any structures owned by Corotoman and located on the Property now or in the future. The Airport Authority shall be solely responsible for the construction, maintenance, replacement, repair, removal, and costs of said safety devices. The parties agree that Corotoman, its successors, and assigns, shall be under no obligation to construct, maintain, repair, replace, remove, or pay for said safety devices, including any safety devices install or constructed on Corotoman's structures.

7. **Disclaimer.** Corotoman makes no representation, warranty, or promise regarding the Subject Property, including but not limited to, representation or warranty as to physical or environmental condition, zoning, presence of hazardous substances, or any other matter or thing affecting or related to the Subject Property.

8. **Indemnification.** The Airport Authority agrees to indemnify, defend, and hold Corotoman, its directors, officers, employees, agents, assigns, successors, contractors, and subcontractors, harmless from and against any and all liabilities, costs, demands, actions, judgments, expenses, losses or damages, including (but not limited to) attorneys' fees, which Corotoman may incur, or which may be asserted against Corotoman, arising or alleged to arise, from or in connection with the use of the Avigation Easement by the Airport Authority, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors. The Airport Authority's obligations under this Paragraph shall survive the later termination of this Easement Agreement.

9. **Successors.** This Easement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors in ownership of their respective property.

10. **Recordation.** The Airport Authority shall cause this Easement Agreement to be recorded in the Office of the Clerk of Kanawha County, West Virginia, at its expense.

11. **Runs with the Land.** The Avigation Easement granted herein shall run with and burden the land upon which said easement is located.

*[Signatures on Next Page]*

Avigation Easement Agreement                                               Page 3 of 4

000287
Response to Subpoena Duces Tecum
Confidential

**IN WITNESS WHEREOF,** the parties have executed this Avigation Easement Agreement to be effective as of the date first written above.

**CENTRAL WEST VIRGINIA
REGIONAL AIRPORT AUTHORITY**

By: _____

Its: _____

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this _____ day of

_____, 201___, by _____,

as _____ of the Central West Virginia Regional Airport

Authority.

_____
NOTARY PUBLIC

**COROTOMAN, INC.**

By: _____

Its: _____

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this _____ day of

_____, 201___, by _____,

as _____ of Corotoman, Inc.

_____
NOTARY PUBLIC

This instrument was prepared by   Joseph K. Merical, Esq., ROBINSON & MCELWEE, PLLC,
P.O. Box 1791, Charleston, WV 25236

Avigation Easement Agreement                                        Page 4 of 4

000288
Response to Subpoena Duces Tecum
Confidential

## EXHIBIT D-1

The Subject Property shall consist of all of the following properties, all situate in Charleston North District, Kanawha County, West Virginia:

| Tax Map | Parcel | Description | Deed Bk. | Page |
|---|---|---|---|---|
| | | **COROTOMAN TRACT ONE** | | |
| 46 | 69 | Lot 1 Block 4 Armor Plate Addition (Ballard Street) | 2315 | 819 |
| " | 70 | Lot 2 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 71 | Lot 3 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 72 | Lot 4 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 73 | Lot 5 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 74 | Lot 6 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 75 | Lot 7 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 76 | Lot 8 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 77 | Lot 9 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 78 | Lot 10 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 79 | Lot 11 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| | | | | |
| | | **COROTOMAN TRACT TWO** | | |
| 46 | 80 | Lot 12 Block 4 Armor Plate Addition (Ballard Street) | 2315 | 819 |
| " | 81 | Lot 13 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 82 | Lot 14 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 83 | Lot 15 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 84 | Lot 16 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 85 | Lot 17 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 86 | Lot 18 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 87 | Lot 19 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 88 | Lot 20 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 89 | Lot 21 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 90 | Lot 22 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 91 | Lot 23 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 92 | Lot 24 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 93 | Lot 25 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 94 | Lot 26 Block 4 Armor Plate Addition (Ballard Street) | " | " |
| " | 95 | Lot 27 Block 4 Armor Plate Addition (Ballard Street) | " | " |

000289
Response to Subpoena Duces Tecum
Confidential

| Tax Map | Parcel | Description | Deed Bk. | Page |
|---|---|---|---|---|
| | | **COROTOMAN TRACT THREE** | | |
| 46 | 103 | Lot 5 Block 5 Armor Plate Addition (Twilight Street) | 2315 | 819 |
| " | 104 | Lot 6 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| | | | | |
| | | **COROTOMAN TRACT FOUR** | | |
| 46 | 106 | Lot 8 Block 5 Armor Plate Addition (Twilight Street) | 2315 | 819 |
| " | 107 | Lot 9 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 108 | Lot 10 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 109 | Lot 11 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 110 | Lot 12 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 111 | Lot 13 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 112 | Lot 14 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 113 | Lot 15 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 114 | Lot 16 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 115 | Lot 17 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 116 | Lot 18 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 117 | Lot 19 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| " | 118 | Lot 20 Block 5 Armor Plate Addition (Twilight Street) | " | " |
| | | | | |
| | | **COROTOMAN TRACT FIVE** | | |
| 46 | 129 | Lot 33 Block 5 Armor Plate Addition (Denton Street) | 2376 | 89 |
| | | | | |
| | | **COROTOMAN TRACT SIX** | | |
| 46 | 132 | Lot 38 Block 5 Armor Plate Addition (Denton Street) | 2376 | 80 |
| " | 133 | Lot 39 Block 5 Armor Plate Addition (Denton Street) | " | " |
| | | | | |
| | | **COROTOMAN TRACT SEVEN** | | |
| 46 | 135 | Lot 41 Block 5 Armor Plate Addition (Denton Street) | 2315 | 819 |
| " | 136 | Lot 42 Block 5 Armor Plate Addition (Denton Street) | " | " |
| | | | | |
| | | **COROTOMAN TRACT EIGHT** | | |
| 46 | 190 | Lot 42 Block 6 Armor Plate Addition (A Street) | 2315 | 819 |
| " | 191 | Lot 41 Block 6 Armor Plate Addition (A Street) | " | " |
| | | | | |
| | | **COROTOMAN TRACT NINE** | | |
| 46 | 193 | Lot 38 Block 6 Armor Plate Addition (A Street) | 2315 | 819 |
| " | 194 | Lot 37 Block 6 Armor Plate Addition (A Street) | " | " |
| " | 195 | Corner Lot (109' x 80' x 34') Block 6 Armor Plate Addition (A & B Streets) | " | " |

Page 2 of 5

000290
Response to Subpoena Duces Tecum
Confidential

| Tax Map | Parcel | Description | Deed Bk. | Page |
|---|---|---|---|---|
| | | **COROTOMAN TRACT TEN** | | |
| | | (EXCEPTING ANY UNDIVIDED INTEREST THAT MAY BE OWNED BY | | |
| | | WAYNE NELSON, HIS SUCCESSORS, HEIRS, AND/OR ASSIGNS) | | |
| 46 | 201 | Lots 30-31 Block 6 Armor Plate Addition (Denton Street) | 2376 | 94 |
| | | | | |
| | | **COROTOMAN TRACT ELEVEN** | | |
| 46 | 205 | Lot 26 Block 6 Armor Plate Addition (Denton Street) | 2315 | 819 |
| | | | | |
| | | **COROTOMAN TRACT TWELVE** | | |
| | | (EXCEPTING ANY UNDIVIDED INTEREST THAT MAY BE OWNED BY RICKY | | |
| | | DAVIS, HIS SUCCESSORS, HEIRS, AND/OR ASSIGNS) | | |
| 46 | 216 | Lot 11 Block 6 Armor Plate Addition (B Street) | 2766 | 865 |
| " | 217 | Lot 12 Block 6 Armor Plate Addition (B Street) | " | 886 |
| " | 218 | Lot 13 Block 6 Armor Plate Addition (B Street) | " | 929 |
| " | 219 | Lot 14 Block 6 Armor Plate Addition (B Street) | " | 952 |
| " | 220 | Lot 15 Block 6 Armor Plate Addition (B Street) | " | 906 |
| | | | | |
| | | **COROTOMAN TRACT THIRTEEN** | | |
| 46 | 221 | Lot 16 Block 6 Armor Plate Addition (B Street) | 2315 | 819 |
| " | 222 | Lot 17 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 223 | Lot 18 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 224 | Lot 19 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 225 | Lot 20 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 226 | Lot 21 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 227 | Lot 22 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 228 | Lot 23 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 229 | Lot 24 Block 6 Armor Plate Addition (B Street) | " | " |
| " | 230 | Lot 25 Block 6 Armor Plate Addition (B Street) | " | " |
| | | | | |
| | | **COROTOMAN TRACT FOURTEEN** | | |
| 46 | 56 | Lot 40 Block 2 Armor Plate Addition (Twilight Street) | 2315 | 819 |
| " | 57 | Lot 41 Block 2 Armor Plate Addition (Twilight Street) | 2376 | 114 |
| | | | | |
| | | **COROTOMAN TRACT FIFTEEN** | | |
| 46 | 61 | Lot 33 Block 3 Armor Plate Addition (Twilight Street) | 2447 | 149 |
| | | | | |
| | | **COROTOMAN TRACT SIXTEEN** | | |
| 46 | 144 | Lot 45 Block 7 Armor Plate Addition (Denton Street) | 2315 | 819 |

000291
Response to Subpoena Duces Tecum
Confidential

| Tax Map | Parcel | Description | Deed Bk. | Page |
|---|---|---|---|---|
| | | **COROTOMAN TRACT SEVENTEEN** | | |
| 46 | 66 | Lot 48 Block 3 Armor Plate Addition (Twilight Street) | 2315 | 819 |
| " | 67 | Lot 49 Block 3 Armor Plate Addition (Twilight Street) | " | " |
| " | 68 | Lot 50 Block 3 Armor Plate Addition (Twilight Street) | " | " |
| | | **COROTOMAN TRACT EIGHTEEN** | | |
| 46 | 141 | Lots 50–51–52 Block 7 Armor Plate Addition (Denton Street) | 2447 | 149 |
| " | 142 | Lots 47–48–49 Block 7 Armor Plate Addition (Denton Street) | 2394 | 101 |
| " | 143 | Lot 46 Block 7 Armor Plate Addition (Denton Street) | 2315 | 819 |
| | | **COROTOMAN TRACT NINETEEN** | | |
| 46 | 147 | Lot 1 Block 7 Armor Plate Addition (Denton Street) | 2431 | 318 |
| | | **CORTOMAN TRACT TWENTY** | | |
| 46 | 156 | Lots 14–15 Block 7 Armor Plate Addition (Denton Street) | 2447 | 149 |
| | | **COROTOMAN TRACT TWENTY-ONE** | | |
| 46 | 122 | Lot 25 Block 5 Armor Plate Addition (Denton Street) | 2376 | 91 |
| " | 123 | Lots 26 –27 Block 5 Armor Plate Addition (Denton Street) | " | 97 |
| | | **COROTOMAN TRACT TWENTY-TWO** | | |
| 46 | 202 | Lot 29 Block 6 Armor Plate Addition (Denton Street) | 2315 | 819 |
| " | 203 | Lot 28 Block 6 Armor Plate Addition (Denton Street) | " | " |
| | | **COROTOMAN TRACT TWENTY-THREE** | | |
| 46 | 130 | Lot 34 Block 5 Armor Plate Addition (Denton Street) | 2447 | 149 |
| | | **COROTOMAN TRACT TWENTY-FOUR** | | |
| 46 | 231 | 9.9 Acres Tanyard Brook | 2288 | 309 |
| " | 232 | 30.81 Acres Tanyard Brook (Tracts 10–12) | " | 268 |
| 49 | 140 | 19.81 Acres Coal Bridge Heights | " | " |
| | | **COROTOMAN TRACT TWENTY-FIVE** | | |
| 46 | 146 | Lots 41–42 Block 7 Armor Plate Addition (Denton Street) | 2690 | 342 |

000292
Response to Subpoena Duces Tecum
Confidential

| Tax Map | Parcel | Description | Deed Bk. | Page |
|---------|--------|-------------|----------|------|
| | | **COROTOMAN TRACT TWENTY-SIX** | | |
| 46 | 184 | Lot 30 Block 7 Armor Plate Addition (Kent Street) | 2315 | 819 |
| " | 185 | Lots 31–32 Block 7 Armor Plate Addition (Kent Street) | 2376 | 106 |
| " | 186 | Lot 33 Block 7 Armor Plate Addition (Kent Street) | 2315 | 819 |
| " | 187 | Lot 34 Block 7 Armor Plate Addition (Kent Street) | " | " |
| " | 188 | Lot 35 Block 7 Armor Plate Addition (Kent Street) | " | " |
| " | 189 | Lot 36 Block 7 Armor Plate Addition (Kent Street) | " | " |

[The Subject Property shall also consist of the following Parcels as shown on 2011 Tax Map 46, Charleston North District, Kanawha County, West Virginia: Parcels 54, 55, 58, 59, 60, 62, 63, 64, 65, 96, 101, 102, 119, 120, 121, 124, 127, 128, 131, 134, 137, 138, 139, 140, 145, 149, 150, 151, 152, 153, 154, 155, 192, 196, 197, 198, 199, 200, 204, 208, 209, 210, 214, and 215. Descriptions and deed book references shall be provided by the Airport Authority prior to Closing.]

000293
Response to Subpoena Duces Tecum
Confidential

**EXHIBIT D-2**

[*"AVIGATION EASEMENT LIMITS" MAP*]

000294
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT D-3

## ["*IDENTIFICATION OF RUNWAY 5 APPROACH ELEVATION AT ANY POINT WITHIN APPROACH" MAP*]

# EXHIBIT E

# OFFER PACKAGE
# CORRESPONDENCE

000296
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT J

**Barney, Joan**

| | |
|---|---|
| **From:** | Bailey, Chuck |
| **Sent:** | Wednesday, May 09, 2012 5:03 PM |
| **To:** | 'Rick Atkinson' |
| **Subject:** | FW: Corotoman Agreement |
| **Attachments:** | Settlement Agreement (Corotoman Changes Redlined) (R0699998).DOCX |

Charles R. Bailey, Esq. <mailto:cbailey@baileywyant.com>

Bailey & Wyant, PLLC

500 Virginia Street East, Suite 600

P.O. Box 3710

Charleston, West Virginia 25337-3710

T: 304.345.4222 | F: 304.343.3133

greenleafConserve paper.  Think before you print.

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.

From: Merical, Joe K. [mailto:jkm@ramlaw.com]
Sent: Wednesday, May 09, 2012 3:03 PM
To: Bailey, Chuck
Cc: Kent J. George
Subject: Corotoman Agreement

Chuck;

Redlined version of the settlement agreement is attached.  We have copies of all the maps to be attached as exhibits available for review at our office.  However, I believe they are all based on maps provided by the Airport Authority.  Let us know as soon as possible if the agreement is acceptable.  Thank you.

1

000163
Response to Subpoena Duces Tecum
Confidential

-- Joe


========================

Joseph K. Merical

Robinson & McElwee PLLC

P.O. Box 1791

Charleston, WV 25326

Phone: (304) 347-8318

Fax: (304) 344-9566

jkm@ramlaw.com

http://www.ramlaw.com/

2

# EXHIBIT K

## Barney, Joan

| | |
|---|---|
| **From:** | Bailey, Chuck |
| **Sent:** | Friday, May 11, 2012 1:29 PM |
| **To:** | 'Merical, Joe K.' |
| **Cc:** | Kent J. George; Rick Atkinson; Jackson, Jennifer |
| **Subject:** | RE: Corotoman Agreement |

yes


Charles R. Bailey, Esq. <mailto:cbailey@baileywyant.com>

Bailey & Wyant, PLLC

500 Virginia Street East, Suite 600

P.O. Box 3710

Charleston, West Virginia 25337-3710

T: 304.345.4222 | F: 304.343.3133


greenleafConserve paper.  Think before you print.

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.

From: Merical, Joe K. [mailto:jkm@ramlaw.com]
Sent: Friday, May 11, 2012 1:13 PM
To: Bailey, Chuck
Cc: Kent J. George; Rick Atkinson
Subject: RE: Corotoman Agreement


I am available Monday afternoon, as well.  Does 1:30 work?

-- Joe

1

From: Bailey, Chuck [mailto:cbailey@baileywyant.com]
Sent: Friday, May 11, 2012 1:15 PM
To: Merical, Joe K.
Cc: Kent J. George; Rick Atkinson
Subject: RE: Corotoman Agreement


Would like to review the maps and exhibits Monday afternoon if acceptable with you and make a final review of all agreements. Then. I am available all Monday afternoon. Thanks.


Charles R. Bailey, Esq. <mailto:cbailey@baileywyant.com>

Bailey & Wyant, PLLC

500 Virginia Street East, Suite 600

P.O. Box 3710

Charleston, West Virginia 25337-3710

T: 304.345.4222 | F: 304.343.3133


greenleafConserve paper.  Think before you print.

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.


From: Merical, Joe K. [mailto:jkm@ramlaw.com]
Sent: Wednesday, May 09, 2012 3:03 PM
To: Bailey, Chuck
Cc: Kent J. George
Subject: Corotoman Agreement


Chuck:

Redlined version of the settlement agreement is attached.  We have copies of all the maps to be attached as exhibits available for review at our office.  However, I believe they are all based on maps provided by the Airport Authority.  Let us know as soon as possible if the agreement is acceptable.  Thank you.

-- Joe

000255
Response to Subpoena Duces Tecum
Confidential

========================

Joseph K. Merical

Robinson & McElwee PLLC

P.O. Box 1791

Charleston, WV 25326

Phone: (304) 347-8318

Fax: (304) 344-9566

jkm@ramlaw.com

http://www.ramlaw.com/

3

000256
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT L

**Barney, Joan**

| | |
|---|---|
| **From:** | Bailey, Chuck |
| **Sent:** | Thursday, June 21, 2012 11:41 AM |
| **To:** | 'Merical, Joe K.' |
| **Subject:** | FW: Corotoman Agreement |

Joe please get John to sign asp and I can have Rick sign tomorrow. Could you hand deliver to me today the final version with attachments and I will have Rick sign tomorrow.


Charles R. Bailey, Esq. <mailto:cbailey@baileywyant.com>

Bailey & Wyant, PLLC

500 Virginia Street East, Suite 600

P.O. Box 3710

Charleston, West Virginia 25337-3710

T: 304.345.4222 | F: 304.343.3133


greenleafConserve paper.  Think before you print.

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.


From: Rick Atkinson [mailto:rick@yeagerairport.com]
Sent: Thursday, June 21, 2012 11:39 AM
To: Bailey, Chuck
Subject: Re: Corotoman Agreement


Chuck

000302
Response to Subpoena Duces Tecum
Confidential

Rick

Sent from my iPad

On May 9, 2012, at 5:03 PM, "Bailey, Chuck" <cbailey@baileywyant.com> wrote:

Charles R. Bailey, Esq. <mailto:cbailey@baileywyant.com>

Bailey & Wyant, PLLC

500 Virginia Street East, Suite 600

P.O. Box 3710

Charleston, West Virginia 25337-3710

T: 304.345.4222 | F: 304.343.3133

<image001.png>Conserve paper.  Think before you print.

This electronic message transmission contains information from the law firm of Bailey & Wyant, P.L.L.C. which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (304) 345-4222 immediately.

From: Merical, Joe K. [mailto:jkm@ramlaw.com]
Sent: Wednesday, May 09, 2012 3:03 PM
To: Bailey, Chuck
Cc: Kent J. George
Subject: Corotoman Agreement

Chuck:

2

000303
Response to Subpoena Duces Tecum
Confidential

Redlined version of the settlement agreement is attached.  We have copies of all the maps to be attached as exhibits available for review at our office.  However, I believe they are all based on maps provided by the Airport Authority.  Let us know as soon as possible if the agreement is acceptable.  Thank you.

-- Joe


=========================

Joseph K. Merical

Robinson & McElwee PLLC

P.O. Box 1791

Charleston, WV 25326

Phone: (304) 347-8318

Fax: (304) 344-9566

jkm@ramlaw.com

http://www.ramlaw.com/


<Settlement Agreement (Corotoman Changes Redlined) (R0699998).DOCX>

000304
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT M

## SETTLEMENT AGREEMENT BETWEEN
## THE CENTRAL WEST VIRGINIA REGIONAL AIRPORT AUTHORITY
## AND COROTOMAN, INC.

This Settlement Agreement, dated July 5, 2012, is entered into between Corotoman, Inc., a West Virginia corporation ("Corotoman"), and the Central West Virginia Regional Airport Authority, a public corporation created pursuant to West Virginia Code §§ 8-29-1 *et seq.* ("Airport Authority").

### RECITALS

WHEREAS, the Airport Authority owns and operates Yeager Airport, located in Kanawha County, West Virginia, and owns additional undeveloped real property in the vicinity of Yeager Airport;

WHEREAS, Corotoman owns and operates a major commercial development, North Gate, and owns multiple additional tracts of land, all of which are adjacent to and/or otherwise located near Yeager Airport;

WHEREAS, the Airport Authority seeks to obtain certain interests in real property presently owned by Corotoman in connection with an aircraft approach zone for a proposed runway improvement at Yeager Airport;

WHEREAS, pursuant to W. Va. Code § 8-29-12, the Airport Authority has the power to exercise eminent domain to acquire said property rights from Corotoman, and the Airport Authority has contacted Corotoman and made offers to purchase multiple tracts and portions of tracts from Corotoman under threat of condemnation;

WHEREAS, the taking of Corotoman's property by the Airport Authority will result in certain direct and indirect damages, including, without limitation, the value of any and all property taken and severance damages to Corotoman's remaining property; and

WHEREAS, the Airport Authority and Corotoman have agreed upon the terms of a settlement, in lieu of condemnation, that (1) meets the needs of the Airport Authority, (2) fairly and adequately compensates Corotoman for the property interests which it agrees to relinquish and for the severance damages that such relinquishment will cause to the value of Corotoman's remaining property, and (3) is acceptable to both parties.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### SECTION ONE
### RECITALS & EXHIBITS

The recitals above and the Exhibits attached to this Settlement Agreement shall constitute part of this Settlement Agreement and are hereby incorporated herein by reference.

Response to Subpoena Duces Tecum
Confidential

## SECTION TWO
## NATURE OF AGREEMENT

In lieu of condemnation, Corotoman agrees to grant a license for certain work to be performed on certain real property currently owned by Corotoman and to grant an easement for the passage of aircraft over certain real property. As fair and just compensation for said rights, including severance damages to Corotoman's remaining property rights, the Airport Authority agrees to perform certain work on certain real property owned by Corotoman, exchange certain other real property with Corotoman, and reimburse Corotoman for the severance damages caused by the Airport Authority's acquisition of property rights under this Settlement Agreement.

## SECTION THREE
## PARTIES' OBLIGATIONS

3.01   <u>License and Work Agreement.</u>   Within thirty (30) days of execution of this Settlement Agreement, the parties agree to execute a License and Work Agreement, in substantially similar form to that instrument set forth in **Exhibit A**, regarding the Airport Authority's blasting, excavating, and grading of certain real property, situate in Kanawha County, West Virginia, now owned, in part or in whole, by Corotoman and described more particularly in **Exhibit A-1** (said work to be completed under the License and Work Agreement collectively referred to herein as the "Project"). The Project shall be completed in strict accordance with the Grading and Construction Plans, Specifications, and Schedules set forth in **Exhibit A-2**. In performing its obligations under the License and Work Agreement, the Airport Authority shall purchase and maintain insurance, including workers' compensation insurance for its employees, adequate and reasonable to protect against claims that may arise out of or result from its own operations under the License and Work Agreement or this Settlement Agreement,. Further, the Airport Authority shall require all of its contractors and subcontractors to purchase and maintain insurance, including workers' compensation insurance for their employees, adequate and reasonable to protect against claims that may arise out of or result from their operations under the License and Work Agreement or this Settlement Agreement. All insurance policies required by this Paragraph shall name Corotoman, its successors, and assigns, as additional insureds.

3.02   <u>Conveyance to Airport Authority.</u>   Pursuant to the provisions of Section Four of this Settlement Agreement, Corotoman agrees to convey to the Airport Authority, by General Warranty Deed in substantially similar form to that set forth in **Exhibit B**, and the Airport Authority agrees to accept, certain real property, situate in Kanawha County, West Virginia, and more particularly described in **Exhibit B-1**, free of all liens and encumbrances except those of record in the Office of the Clerk of the Kanawha County Commission and those specifically set forth in said exhibits.

3.03   <u>Conveyance to Corotoman.</u>   Pursuant to the provisions of Section Four of this Settlement Agreement, the Airport Authority agrees to convey to Corotoman, by General Warranty Deed in substantially similar form to that set forth in **Exhibit C**, and Corotoman agrees to accept, certain real property, situate in Kanawha County, West Virginia, and more particularly described in **Exhibit C-1**, free of all liens and encumbrances except those of record in the Office of the Clerk of the Kanawha County Commission and those specifically set forth in said exhibits.

Settlement Agreement                                                                                   Page 2 of 8

Response to Subpoena Duces Tecum
Confidential

3.04   **Avigation Easement.** Contingent upon the exchange of real property set forth in Paragraphs 3.02 and 3.03 and pursuant to the provisions of Section Four of this Settlement Agreement, Corotoman agrees to grant to the Airport Authority, and the Airport Authority agrees to accept, certain interests in, and obligations with respect to, real property, to be memorialized in substantially similar form to the instrument set forth in **Exhibit D** (said interests herein collectively referred to as the "Avigation Easement"). Notwithstanding anything to the contrary in this Settlement Agreement or any exhibit, attachment, or addendum thereto, Corotoman reserves and retains all property rights not expressly conveyed by any deed, easement, or other instrument executed pursuant to this Settlement Agreement, including all rights in fee to the property underlying the Avigation Easement, and all mineral rights and all surface rights inherent in the final grade of the property.

3.05   **Severance and Other Damages.** As fair and just compensation for Corotoman's severance and other damages caused by the grant of the Avigation Easement rights to the Airport Authority and for the loss of and limitations placed upon Corotoman's remaining property interests as a result thereof, the Airport Authority agrees to pay Corotoman the sum of two hundred fifty thousand dollars ($250,000.00). As fair and just compensation for Corotoman's severance and other damages caused by the grant of the rights contained in the License and Work Agreement and for the loss of and limitations placed upon Corotoman's remaining property interests as a result thereof, the Airport Authority agrees to pay Corotoman the sum of one hundred thousand dollars ($100,000.00). The full sum of three hundred thousand dollars ($350,000.00) owed to Corotoman under this Paragraph is due and payable upon execution of this Settlement Agreement. The parties hereby acknowledge that the consideration described herein constitutes full and complete satisfaction for the property rights taken from Corotoman by the Airport Authority under the threat of the Airport Authority's exercise of its condemnation authority, and that these property rights include but are not limited to severance damages.

## SECTION FOUR
## CLOSING

4.01   **Closing Date.** All interests in real property to be conveyed under Section Three of this Settlement Agreement shall be conveyed at a Closing to be held within sixty (60) days of the execution of this Settlement Agreement, at a time and place to be agreed upon by the parties.

4.02   **Inspection of Property and Title.** Each party agrees to accept any deed or other conveyance required to be conveyed to it by this Settlement Agreement, unless the receiving party determines, in good faith, that (1) the deed or conveyance does not substantially satisfy the terms and conditions of this Settlement Agreement and the exhibits attached hereto, (2) a defect exists over the granting party's title to the property interest, or (3) any physical or environmental hazards exist on the property interest. Within a reasonable time after the request of the other party, each party shall provide to the other party, at the requesting party's expense, copies of any documents (including deeds, title opinions, abstracts, certifications, and title insurance policies) in that party's possession evidencing, certifying, or insuring the that party's claim of title to any property interest to be conveyed by that party. Prior to Closing, each party agrees to allow the other party reasonable physical access to any real property interest to be conveyed pursuant to this Settlement Agreement for the purposes of determining whether to accept or reject said property interest. If a property interest is rightfully rejected by the receiving party under this

000584
Response to Subpoena Duces Tecum
Confidential

Paragraph, the granting party must, within thirty (30) days of receiving written notice of said rejection or prior to Closing, whichever is earlier, either cure any defects in the deed, conveyance, title, or property, or pay to the receiving party the fair market value of the property interest affected, provided that the fair market value is calculated as though the defect or hazard did not exist. Each party agrees that it shall not unreasonably reject any deed or other conveyance to be conveyed to it under this Settlement Agreement.

**4.03    Deliveries at Closing.**  At Closing, the parties shall first simultaneously execute and deliver the deeds to be conveyed under Paragraphs 3.02 and 3.03 of this Settlement Agreement.  Immediately thereafter, both parties shall execute the Avigation Easement to be granted under Paragraph 3.04 of this Settlement Agreement.

**4.04    Closing Costs.**  Each party shall bear its own costs and expenses associated with the transactions contemplated herein, including costs of inspection of title and property, costs of preparing any deeds, conveyances, maps, plats, surveys, or other documents, and attorneys' fees.

**4.05    Recordation.**  After receipt of any interest in real property under this Settlement Agreement, the receiving party shall, at its own expense, promptly and properly record any and all deeds, conveyances, and other documents necessary to protect its rights and interests.

## SECTION FIVE
## INDEMNIFICATION

**5.01    Indemnification by the Airport Authority.**  The Airport Authority shall defend, indemnify, and hold harmless Corotoman, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors, against and from all expenses, liabilities, obligations, damages, penalties, claims, actions, and costs (including reasonable attorneys' fees) paid in connection with loss of life, bodily injury, or damage to property (1) caused by an intentional or negligent act or omission (including blasting or any other abnormally dangerous activity) of the Airport Authority or its licensees and invitees, (2) caused by the Airport Authority's failure to perform any obligation under this Settlement Agreement, or (3) arising out of the use by the Airport Authority or its licensees and invitees of any portion of Corotoman's property, unless such expense, liability, obligation, damage, penalty, claim, action, or cost is caused by an intentional or negligent act or omission of Corotoman or its licensees and invitees or by the failure of Corotoman to perform any of its obligations under this Settlement Agreement.  The Airport Authority's obligations under this Paragraph are independent of any obligations they may have with respect to liability insurance and shall not be negated or reduced because of the existence of any insurance or the denial of insurance coverage for any occurrence or the refusal of any insurer to provide a defense.

**5.02    Indemnification by Corotoman.**  Corotoman shall defend, indemnify, and hold harmless the Airport Authority, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors, against and from all expenses, liabilities, obligations, damages, penalties, claims, actions, and costs (including reasonable attorneys' fees) paid in connection with loss of life, bodily injury, or damage to property (1) caused by an intentional or negligent act or omission of Corotoman or its licensees and invitees, (2) caused by Corotoman's failure to perform any obligation under this Settlement Agreement, or (3) arising out of the use

000585
Response to Subpoena Duces Tecum
Confidential

by Corotoman or its licensees and invitees of any portion of the Airport Authority's property, unless such expense, liability, obligation, damage, penalty, claim, action, or cost is caused by an intentional or negligent act or omission of the Airport Authority or its licensees and invitees or by the failure of the Airport Authority to perform any of its obligations under this Settlement Agreement. Corotoman's obligations under this Paragraph are independent of any obligations they may have with respect to liability insurance and shall not be negated or reduced because of the existence of any insurance or the denial of insurance coverage for any occurrence or the refusal of any insurer to provide a defense.

## SECTION SIX
## SETTLEMENT & RELEASE

**6.01    Final Resolution.** The parties acknowledge that this Settlement Agreement shall constitute the full, complete, and final resolution of any and all disputes between Corotoman and the Airport Authority arising out of the threatened condemnation or acquisition of Corotoman's real property that was the subject of offer package correspondence, dated February 24, 2011, sent by O.R. Colan Associates of Florida, LLC, to Corotoman, attached hereto as **Exhibit E** and incorporated for purposes of defining the scope of the real property covered by this Settlement Agreement.

**6.02    Mutual Release.** Each party mutually agrees to release the other party, its successors and assigns, from any and all claims, known or unknown, that arose or may arise out of the prior acts or omissions of the parties related to the threatened condemnation or acquisition of any property that is the subject of this Settlement Agreement, including, but not limited to, any and all claims for compensatory, statutory, or punitive damages; declaratory or injunctive relief; and any other costs and expenses, including attorneys' fees and surveying and/or appraisal costs.

**6.03    Limitation on Further Condemnation.** The Airport Authority acknowledges that the property rights conveyed to it by this Settlement Agreement are sufficient for its present and immediate needs. The Airport Authority agrees not to exercise its rights of eminent domain with respect to the Project and the remaining property interests of Corotoman for the duration of the period of either five (5) years from the completion of the Project or seven (7) years from the effective date of this Settlement Agreement, whichever is longer. If any event covered by Paragraph 7.07 of this Settlement Agreement shall occur, the time period set forth in this Paragraph shall be extended by the duration of said event.

## SECTION SEVEN
## OTHER PROVISIONS

**7.01    Entire Agreement.** This Settlement Agreement, together with its Exhibits, contains the entire agreement of the parties with respect to the subject matter hereof. All prior understandings and agreements between the parties are set forth within this Settlement Agreement, which alone fully and completely sets forth the understanding of the parties.

Settlement Agreement                                                  Page 5 of 8

000586
Response to Subpoena Duces Tecum
Confidential

**7.02**   **Notices.** Any notices or communications required by this Settlement Agreement shall be in writing and delivered or sent through certified or registered mail to the following:

a. If the notice is to Corotoman, Inc.:

Corotoman, Inc.
Attn: John H. Wellford, III
200 Association Drive, Suite 140
Charleston, WV 25311

With a copy to:

Robinson & McElwee, PLLC
Attn: Kent J. George, Esq.
Post Office Box 1791
Charleston, WV 25326

b. If the notice is to the Central West Virginia Regional Airport Authority:

Central West Virginia Regional Airport Authority
100 Airport Road, Suite 175
Charleston, WV 25311

With a copy to:

Bailey & Wyant, PLLC
Attn: Charles R. Bailey
500 Virginia Street East, Suite 600
Charleston, WV 25301

Either party may change its address for purposes of this Paragraph by notice to the other in accordance with the foregoing requirements.

**7.03**   **Further Assurances.**   The parties agree to execute any and all documents reasonably necessary to consummate this Settlement Agreement.

**7.04**   **Binding Effect.** This Settlement Agreement shall be binding on the parties, all of their related and affiliated companies and persons, and their successors and assigns.

**7.05**   **Captions.** The titles, captions, and headings of the sections and paragraphs of this Settlement Agreement are for context and reference only and in no way define, limit, or describe the scope or intent of this Settlement Agreement.

**7.06**   **Amendments.** This Settlement Agreement may be amended only by a writing executed by both parties.

**7.07**   **Force Majeure.** In the event either party to this Settlement Agreement shall be delayed, hindered in, or prevented from the performance of any act required under this

Settlement Agreement                                                                                       Page 6 of 8

000587
Response to Subpoena Duces Tecum
Confidential

Settlement Agreement by reason of an act of God (including inclement weather which prevents normal construction work), strike, lockout, labor trouble, failure of power, riot, insurrection, war, or other reason of a like nature not the fault of or reasonably within the control of the party delayed in performing or doing acts required under by the terms of this Settlement Agreement, then performance of such act shall be excused for the duration of the hindrance, and the period for the performance of any such act shall be extended for a period equivalent to the duration of the hindrance.  This provision shall likewise apply to the exercise of affirmative rights granted to either party by this Settlement Agreement, and any such aforementioned occurrence shall operate to extend the period for the exercise of said rights for a period equivalent to the duration of the hindrance.  In no event shall financial inability or acts or omissions within the control of the party seeking an excuse or extension be a cause for excuse or extension hereunder.

7.08    **Compliance with Laws.**  Each party shall perform all obligations required by it under this Settlement Agreement only after obtaining all required governmental licenses, permits, and approvals, and thereafter in compliance with all such licenses, permits, and approvals, and otherwise in compliance with all applicable constitutional provisions, laws, rules, regulations, and directives of authorities of competent jurisdiction.  This Settlement Agreement, and all related agreements, conveyances, or other instruments, shall be governed by and construed in accordance with West Virginia law.

7.09    **Severability.**  If any term or provision of this Settlement Agreement, or the application thereof to any person, agency, entity, or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Settlement Agreement, or the application of such terms or provisions to persons, agencies, entities, or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each and every term and provision of this Settlement Agreement shall be valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement to be effective as of the date first written above.

*[Signatures on Next Page]*

Settlement Agreement

Page 7 of 8

Response to Subpoena Duces Tecum
Confidential

CENTRAL WEST VIRGINIA
REGIONAL AIRPORT AUTHORITY

By: _____

Its: AIRPORT DIRECTOR

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this 22 day of
June , 201 2 , by Richard A. Atkinson ,
as Airport Director of the Central West Virginia Regional Airport

Authority.

OFFICIAL SEAL
Notary Public, State of West Virginia
JENNIFER N SIZEMORE
Bailey & Wyant PLLC
PO Box 3710
Charleston, WV 25337
My commission expires February 15, 2022

_____
NOTARY PUBLIC

COROTOMAN, INC.

By: _____

Its: _____

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this 5 day of
July , 201 2 , by John H Wellford ,
as President of Corotoman, Inc.

_____
NOTARY PUBLIC

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
KATHY STRICKMAKER
107 DRY BRANCH RD.
PO BOX 34
DRY BRANCH, WV 25061
My commission expires April 7, 2019

Settlement Agreement                                    Page 8 of 8

000589
Response to Subpoena Duces Tecum
Confidential

# EXHIBIT N

**Central West Virginia Regional Airport Authority**

John D. Rockefeller IV Terminal
100 Airport Road, Suite 175  •  Charleston, WV 25311 -1080
Phone: 304-344-8033                    Fax: 304-344-8034
E-Mail: fly@yeagerairport.com          www.yeagerairport.com



June 25, 2012

Kim Lewis
Asst. Airport Director
Central West Virginia Regional Airport Authority
John D. Rockefeller IV Terminal
100 Airport Road, Suite 175
Charleston, WV 25311

      Parcel:     54
      Occupant:  Corotoman, Inc.
      Project:    Yeager Airport - Runway 5/23 Approach Ground Obstruction Removal

The above-mentioned owner has provided us with the appropriate documentation
necessary to process a warrant for an Acquisition Payment. Therefore we are
requesting a check to be processed from the Airport Authority representing the eligible
amount.

The above listed check should be made payable to Corotoman, Inc. in the amount of
$250,000

Sincerely,

Richard A. Atkinson III
Airport Director

Enclosures:  Settlement Agreement

Cc:    File

# EXHIBIT O

# EXHIBIT A

# LICENSE & WORK AGREEMENT

## LICENSE AND WORK AGREEMENT

This License and Work Agreement ("Work Agreement"), dated _____, 2012, is entered into between Corotoman, Inc., a West Virginia corporation ("Corotoman"), and the Central West Virginia Regional Airport Authority, a public corporation created by the Kanawha County Commission pursuant to West Virginia Code §§ 8-29-1 *et seq.* ("Airport Authority").

### RECITALS

**WHEREAS,** the Airport Authority seeks to augment and maintain an approach zone for aircraft landing and taking off from Yeager Airport in Kanawha County, West Virginia;

**WHEREAS,** Corotoman now owns or will acquire certain real property, all situate in Charleston North District, Kanawha County, West Virginia, underlying the desired approach zone, (said real property hereinafter referred to as the "Project Site" and more particularly demonstrated on **Exhibit A-1**, attached hereto and incorporated herein by reference);

**WHEREAS,** by agreement ("Settlement Agreement") dated _____, 2012, Corotoman and the Airport Authority mutually agreed to resolve any and all claims regarding the threatened condemnation of Corotoman's property, including the Project Site;

**WHEREAS,** pursuant to the Settlement Agreement, Corotoman will grant the Airport Authority certain property rights in the form of an avigation easement ("Avigation Easement") over the Project Site and certain other property that is currently owned by or will be acquired by the Airport Authority and that will be conveyed to Corotoman; and

**WHEREAS,** in order to completely and safely utilize the Avigation Easement, the grade and elevation of the Project Site and surrounding real property that is now owned or will be acquired by the Airport Authority must be altered by excavating, blasting, grading, removing the surface thereof, and/or other similar work (said alteration of the grade and elevation of the Project Site and surrounding property interests herein collectively referred to as the "Project").

**NOW, THEREFORE,** in consideration of the recitals above, the mutual promises and covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    **Incorporating Recitals.**  The recitals above shall constitute part of this Work Agreement and are hereby incorporated herein by reference.

2.    **Grant of License.**  Corotoman hereby grants to the Airport Authority, and its officers, employees, agents, successors, assigns, and contractors and subcontractors, a non-exclusive license ("License") to enter onto the Project Site for the purpose of excavating, blasting, grading, and/or removing any portion of the Project Site, as necessary for the Airport Authority's completion of the Project.  The Airport Authority shall be responsible for properly repairing any damage caused by the exercise of its rights under this Paragraph and/or compensating Corotoman for the same.  This License shall extend to any real property within the

COPY

Project Site that Corotoman acquires from the Airport Authority after execution of this Work Agreement.

    3.    **Term.** This License shall be irrevocable until the earlier of the completion of the Project or twenty-four (24) months from the date of this Work Agreement.

    4.    **Use of License.** The Airport Authority agrees to use the License solely for the purposes of the undertaking and completion of the Project. The Airport Authority further agrees to exercise its rights under the License in strict compliance with the terms and conditions of this Work Agreement.

    5.    **Scope of Project.** As consideration for the License granted herein, the Airport Authority agrees to undertake the Project in strict accordance with the terms and conditions set forth in this Work Agreement. The Airport Authority agrees to complete the Project in accordance with the Grading and Construction Plans, Specifications, and Schedules, attached hereto as **Exhibit A-2** and incorporated herein by reference.

The Airport Authority agrees to overblast at least thirty-five (35) feet below the planned final grade, on drill dates and blasting plan acceptable to Corotoman and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules.

The Airport Authority agrees the finished grade will be at least ten (10) feet below the elevation of the planned Avigation Easement at any point on the area covered by this Work Agreement and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules.

    6.    **Commencement of Project.** The Airport Authority agrees to commence the Project no later than December 31, 2012. At least ninety (90) days prior to commencement of the Project, the Airport Authority shall provide Corotoman with written notice of its intended commencement date. Prior to commencement of the Project, Corotoman shall have the right, but not the obligation, to remove any or all timber then growing on the Project Site.

    7.    **Completion of Project.** The Airport Authority agrees that the Project will be completed no later than twenty-four (24) months after commencement, excepting any time during which work stoppages are necessitated by weather, state of emergency, strike, riot, war, or other extraordinary event beyond the control of the Airport Authority. The parties agree that time is of the essence in completing the Project. For purposes of this Work Agreement, the completion of the Project shall only occur when Corotoman receives a copy of a duly executed certificate of substantial completion or similar document, signed by an engineering professional licensed by the State of West Virginia and evidencing that the Project has been substantially completed in accordance with the Grading and Construction Plans, Specifications, and Schedules attached hereto.

    8.    **Stormwater Retention and Control.** During all phases of the Project, the Airport Authority shall construct, maintain, and clean stormwater retention facilities sufficient to prevent an increase in stormwater discharge on properties adjoining or near the Project Site. Upon completion of the Project, the Airport Authority shall leave in place any stormwater settlement ponds and related facilities constructed as part of the Project, whether on the Project Site or on property to be conveyed to Corotoman under the Settlement Agreement. At the time

of completion of the Project, the Airport Authority shall clean and repair these settlement ponds and any related stormwater handling facilities and/or construct additional features such that the ponds and related facilities can retain and handle one hundred percent (100%) of their design capacity.

9.    **Costs of Project.** All costs and expenses of the Project shall be borne by the Airport Authority, its contractors, subcontractors, employees, and assigns. The Airport Authority expressly waives any claims against Corotoman for restitution, quantum meruit, contribution, or any other claim for payment for any aspect of the Project.

10.    **Insurance.** Prior to commencement of the Project and throughout the duration of the Project, the Airport Authority agrees to provide, either directly or through its contractors or subcontractors, liability insurance to the benefit of Corotoman, its successors, and assigns, which shall be listed as additional named insureds in any such policy, in the following types and minimum amounts:

a.  **Commercial General Liability Insurance.** Commercial general liability insurance, which shall include premises operation (including explosion, collapse, and underground coverage), independent contractors, completed operations, and blanket contractual liability on all written contracts, including this Work Agreement, in the minimum amounts of:

i.  Five million dollars ($5,000,000) for personal injury per occurrence;

ii.  Five million dollars ($5,000,000) for property damage per occurrence; and

iii.  Five million dollars ($5,000,000) additional per occurrence for personal injury or property damage arising from blasting or other ultrahazardous activities.

b.  **Motor Vehicle Coverage.** Motor vehicle coverage, which shall cover claims for damages because of bodily injury or death of any person or property damage arising out of the ownership, maintenance, or use of any motor vehicle, in the minimum amount of one million dollars ($1,000,000.00) per occurrence for personal injury or property damage.

c.  **Workers' Compensation Coverage.** Adequate workers' compensation coverage that shall cover claims for damages because of bodily injury, occupational sickness or disease, or death of its employees under any applicable employers' liability law, including claims brought under West Virginia Code § 23-4-2 and the decision of the West Virginia Supreme Court in *Mandolidis v. Elkins Industries, Inc.*

11.    **Indemnification.** The Airport Authority agrees to indemnify, defend, and hold Corotoman, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors, harmless from and against any and all liabilities, costs, demands, actions, judgments, expenses, losses or damages, including (but not limited to) attorneys' fees, which Corotoman may incur, or which may be asserted against Corotoman, arising or alleged to arise,

from or in connection with the performance or breach of this Work Agreement (including, but not limited to, blasting or other ultrahazardous activities) by the Airport Authority, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors. The obligations created by this Paragraph shall survive the termination of this Work Agreement and the completion of the Project and forever inure to the benefit of Corotoman, its successors and assigns.

       12.    **Standard of Work.** All work to be performed in connection with the Project by or on behalf of the Airport Authority, its directors, officers, employees, agents, assigns, successors, contractors, and/or subcontractors (1) shall not impair the structural or architectural integrity of any improvement or property situated on or near the Project Site; (2) shall not be undertaken until all required local, state, and federal permits and authorizations have been procured and paid for; (3) shall be performed in a safe, diligent, and workmanlike manner and in compliance with all applicable laws, ordinances, orders, rules, regulations, and requirements of all governmental authorities of competent jurisdiction; (4) shall be performed by contractors licensed by the State of West Virginia to do the work being undertaken, (5) shall be free from defects in material and workmanship, and (6) shall be diligently prosecuted to completion.

       13.    **Compliance with Laws.** The Airport Authority shall be responsible for obtaining and maintaining in full force and effect, at its expense, any permits, licenses, or approvals as may be required from any local, state, or federal authority to permit the exercise of the Airport Authority's rights hereunder, and all work performed by the Airport Authority shall be performed in compliance with such permits, licenses, and approvals and otherwise in accordance with all applicable laws, codes, ordinances, and regulations. The Airport Authority shall be responsible for compliance with all applicable environmental laws, codes, ordinances, regulations, and permitting requirements, including, but not limited to, the National Pollutant Discharge Elimination System.

       14.    **Notices.** Any notices or communications required by this Work Agreement shall be in writing and delivered or sent through certified or registered mail to the following:

      a.    If the notice is to Corotoman, Inc.:

> Corotoman, Inc.
> Attn: John H. Wellford, III
> 200 Association Drive, Suite 140
> Charleston, WV 25311

With a copy to:

> Robinson & McElwee, PLLC
> Attn: Kent J. George, Esq.
> Post Office Box 1791
> Charleston, WV 25326

b.    If the notice is to the Central West Virginia Regional Airport Authority:

Central West Virginia Regional Airport Authority
100 Airport Road, Suite 175
Charleston, WV 25311

With a copy to:

Bailey & Wyant, PLLC
Attn: Charles R. Bailey
500 Virginia Street East, Suite 600
Charleston, WV 25301

Either party may change its address for purposes of this Paragraph by notice to the other in accordance with the foregoing requirements.

15.    **Effect of Breach.**  Failure by the Airport Authority to strictly abide by the terms and conditions set forth in this Work Agreement shall constitute a material breach of the Agreement.  Failure to timely commence the Project shall terminate this Work Agreement and entitle Corotoman to retain any payments due and payable under the Settlement Agreement.  The parties acknowledge that any breach by the Airport Authority occurring after commencement of the Project will cause significant harm to Corotoman, including lost profits, revenue, and rents; loss of the use of Corotoman's property; potential third-party litigation costs, including attorney's fees and court costs; and annoyance and inconvenience.  Therefore, in event of a breach occurring after commencement of the Project, Corotoman may, in its discretion and as the circumstances reasonably dictate, revoke the License granted herein and/or seek the greater of either (1) actual, compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ten thousand dollars ($10,000.00) per breach.  These remedies are cumulative, and a waiver, release, or settlement of one breach shall not operate as a waiver, release, or settlement of any other breach.  Notwithstanding anything in this Paragraph to the contrary, Corotoman shall release the Airport Authority from any and all liability for liquidated damages if the Airport Authority requires all of its contractors and subcontractors to pay directly to Corotoman, as a third-party beneficiary, any liquidated damages caused by the acts or omissions of that contractor or subcontractor.  Notwithstanding any breach by either party of this Work Agreement, the Settlement Agreement shall remain in force and effect to the fullest extent possible.  Failure to complete the Project contemplated by this Work Agreement shall not affect the provisions of the Settlement Agreement regarding mutual release of prior claims and future condemnation of Corotoman's real property.

16.    **Third Parties.**  Each party's rights, duties, and obligations under this Work Agreement shall extend to its respective officers, employees, agents, successors, assigns, and contractors and subcontractors.  The Airport Authority agrees to incorporate the terms and conditions set forth herein into any agreements with third parties, including its contractors and subcontractors, related to the work to be performed as part of the Project.

17.    **Relationship of Parties.**  The parties hereby acknowledge that the relationship of the parties created by this Work Agreement is that of licensor and licensee, and that the Airport

Authority is not an employee, independent contractor, joint venturer, or partner of Corotoman. The work performed to complete the Project is for the primary benefit of the Airport Authority.

18.   **Recordation.**  Upon Corotoman's written direction, the Airport Authority shall cause this Work Agreement to be recorded in the Office of the Clerk of Kanawha County Commission at its expense.

19.   **Captions.**  The captions and headings of this Work Agreement are for convenience of the parties and for context and reference only and in no way define, limit, or describe the scope or intent of this Work Agreement.

20.   **Force Majeure.**  In the event either party to this Work Agreement shall be delayed or hindered in or prevented from the performance of any act required under this Work Agreement by reason of acts of God (including inclement weather which prevents normal construction work), strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reason of a like nature not the fault of or reasonably within the control of the party delayed in performing or doing acts required under the terms of this Work Agreement, then performance of such act shall be excused for the duration of the hindrance, and the period for the performance of any such act shall be extended for a period equivalent to the duration of the hindrance.  In no event shall financial inability or acts or omissions within the control of the party seeking an excuse or extension be a cause for excuse or extension hereunder.  If any event covered by this Paragraph shall occur, the time period of the prohibition on condemnation set forth in the Settlement Agreement shall be extended by the duration of said event.

21.   **Severability.**  If any term or provision of this Work Agreement or the applications thereof to any person, agency, entity, or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Work Agreement, or the application of such terms or provision to persons, agencies, entities, or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each and every term and provision of this Work Agreement shall be valid and be enforced to the fullest extent permitted by law.

*[Signatures on Next Page]*

**IN WITNESS WHEREOF,** the parties have executed this License and Work Agreement to be effective as of the date first written above.

CENTRAL WEST VIRGINIA
REGIONAL AIRPORT AUTHORITY

By: _____ II

Its: _Airport Director_

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this _____ day of

_____, 201__, by _____,

as _____ of the Central West Virginia Regional Airport

Authority.

_____
NOTARY PUBLIC

COROTOMAN, INC.

By: _____

Its: _President_

STATE OF WEST VIRGINIA;
COUNTY OF KANAWHA, to wit:

This instrument was acknowledged before me this _5_ day of

_July_____, 201_2_, by _John H Wellford_____,

as _President_ of Corotoman, Inc.

_Kathy Strickmaker_
NOTARY PUBLIC

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
KATHY STRICKMAKER
167 DRY BRANCH RD.
PO BOX 34
DRY BRANCH, WV 25061
My Commission expires April 7, 2019

This instrument was prepared by   Joseph K. Merical, Esq., ROBINSON & MCELWEE, PLLC,
P.O. Box 1791, Charleston, WV 25236





# EXHIBIT P



## MINUTES OF THE MEETING
## OF THE
## BOARD OF MEMBERS OF THE
## CENTRAL WEST VIRGINIA AIRPORT AUTHORITY

The monthly meeting of the Board of Members of the Central West Virginia Regional Airport Authority was held in the Public Use Conference Room of the Airport Director's Office, Yeager Airport, Charleston, West Virginia, on July 25, 2012, beginning at 12:00 p.m., pursuant to proper notice to the public and media.

**Board members present:** R. Edison Hill , Keith Wood, Karen Haddad, Pricilla Haden and Col. Bill Peters, Ret., representatives of the Kanawha County Commission; James E. Foster and Norman W. Shumate representatives of the City of Charleston; Gary Tillis representative of the Putnam County Commission; Dave Hill  a representative of the Boone County Commission.

**Board Members Absent:**  Harold Carter, Henry C. Shores, Charles T. Jones, H. B. Wehrle, III, and Todd Goldman representatives of the Kanawha County Commission; Gregory Tucker, a representative of the Nicholas County Commission.

**Also present:** Richard Atkinson, Airport Director, Timothy Murnahan, Assistant Airport Director, Terry Sayre, Assistant Airport Director, Kimberly Lewis, Assistant Airport Director, Lorie Wynes, Airport Comptroller, Nicholas Keller, Security and Safety Manager, Brian Belcher, Air Service and Marking Director; Anthony Gilmer, Air Service and Marking;  April Payne, Executive Secretary, Melissa Beckford, Accounts Payable Coordinator, Jacob Ruddle Safety and Security, Dan Kennedy, Executive Air,  Mike Plante, Plante and Associates, Allison Matas, Charleston Gazette Newspaper; Larry McKay, WQBE Radio; Leslie Koepsel, Kanawha County Commission; Charles Bailey, Legal Counsel , Bailey & Wyant, LLC; Jay Happla, Intern; Kerry McClanhan, Charleston Daily Mail; Rodney Terry, Enterprise; Delegate Danny Wells; Joe Felix, L. Robert Kimball; Larry Pierce, Daily Mail and Grover Tadlock, WSAZ.

1

Mr. Hill called the meeting to order and introductions were made. Mr. Hill then called for approval of the minutes for the meeting of June 27, 2012. Ms. Haddad made the motion to approve the June 27, 2012 minutes, seconded by Mr. Foster and was unanimously approved.

**_Personnel-_** Nothing to report for this meeting.

**_Construction- RSA Runway 5/23 and Taxiway A_** – Mr. Atkinson reported that Cast and Baker has only one item left on the punch list to complete it is the reapplication of the caulk in the centerline of the taxiway, this will be completed in early August.

**_Construction- Runway 5 Approach –Obstruction Removal Project_** Bids were opened on July 24, 2012 at 11:30 AM, three firms submitted bids. Trumball was the lowest bidder of the three. The Construction Committees upon review of all bids recommendation was to award the contract to Trumball the lowest responsible bidder, upon review by counsel. The project/ contract will be in three phases. Mr. Tillis made the motion to award the contract to Trumball upon review by counsel, seconded by Mt. Foster, and was unanimously approved.  Joe Felix of L. Robert Kimball was in attendance to discuss the obstruction removal project and answer questions. The staff will also need authorization to submit the grant paperwork to the FAA for funding of the first phase of the contract. Mr. Foster made the motion for authorization of the staff to prepare and submit the grant paperwork for AIP 51 to the FAA, seconded by Mr. Tillis which was unanimously approved. We set up community meetings for people affected by the project to come and voice concerns.

**_TSA-Project Up-date-_** Wiseman Construction has completed new entrance and the TSA is using the second entrance during peak times.

**_Finance-Approval of Invoices-_** Mr. Foster provided the following invoices over $5,000.00 for Board approval.

> Share Corporation            $ 5,277.07
> 55gal aqua broom weed killer

2

Ms. Haden made the motion to approve the invoices, which was seconded by
Ms. Haddad and was unanimously approved.

Mr. Foster provided the following invoices that had been paid pursuant to the
policy of the Board:

Corotoman, Inc                 $ 250,000.00
land acquisition/obstruction removal project

Goldman Associates            $ 12,879.55
land acquisition/obstruction removal project

Johnson and Lopez             $ 90,000.00
land acquisition/obstruction removal project

**_Director's Performance and Pay Raise-_** Mr. Foster reported that the Finance
Committee had met earlier to discuss the pay increase for the Director. At the
previous meeting in June there was discussion of the Director's performance
and the Board was undecided on his compensation. After review the Finance
Committee recommended to the Board to increase the Director's salary from
$125,000 annually to $140,000 annually retro to July 1, 2012.  The Chairman,
Mr. Hill praised him for the outstanding job he has done at the Airport.  Ms.
Haden made the motion to increase the Director's salary from $125,000
annually  to $140,000 annually retro to July 1, 2012, seconded by Ms. Haddad
and was unanimously approved.

**_Finance- Airline Use Agreement-_** Mr. Atkinson reported Trillion has
submitted the Airline Use Agreement and the Budget for FY 12 to the airlines.
Trillion will meet with the staff on August 13, 2012 for final discussion, and on
August 14, 2012 the staff and Trillion will meet with the Airlines to present
the agreement for approval.  Billings for July will go in August will the billing
rates.

**_General Aviation-_** Ms Haddad reported that RC General has made substantial
progress on the FBO Terminal project. The following have been installed, floor
tile, glass on the airlock, the lighting fixtures, panels on the conference room
walls and the cabinets are in place. The next two major items to install will be
the ceiling tiles and the glass panels for the conference room.

3

CWVRAA_000076

**_Marketing-_** Ms. Haden reported the Better Foods has started work on the back wall of the cafe', the next work will be to install the flooring. Mill work will be delivered for installation in three weeks. Mr. Belcher introduced Carney McCracken of Rainmaker, she has designed a new logo and web page for the Airport. She gave a presentation on both. The staff has been working on the tenth annual a

**_Military Affairs-_** Col. Peters reported that FEMA has been on site at the ANG for assistance to family's that were affected by the recent storms.

### Contracts and Leases

**_Gas Well Proposals -_**Mr. Atkinson reported that L. Robert Kimball is working on the additional environmental documents required by the FAA. he also reported that approval is needed to enter into an agreement with L. Robert Kimball for the work they are preparing for the gas well drilling project. Mr. Foster made the motion to approve entering into an agreement with L. Robert Kimball, seconded by Mr. Tillis, and was unanimously approved.

**_RAC Concessions Agreement-_** The current RAC agreement will expire on December, 31, 2012. We will schedule a pre-bid for interested Rental Car Agencies for late August or early September. We propose to limit the award to a total of four agencies and allow for multi-brand agencies. The term will be for four years and the minimum guarantee annual bid amount will be $ 120,000 per year. The new terminal rates will be in effect during the bid period for the rental car agencies. Bid packages will be released by September 21, 2012 and bids submitted on October 19, 2012. Bids will be considered for award at the October 24, 2012 Board meeting. The Director will need authorization to submit an RFP for RAC Concessions. Ms. Haddad made the motion for authorization to submit an RFP for RAC Concessions, seconded by Mr. Foster and was unanimously approved.

**_Operations Report-_** Mr. Murnahan reported that the FAA wants to disable the Henderson VOR. (Ohio River). He recommends that the Authority protest the decommissioning of the VOR . The ANG will also be protesting the closure. The taxiway d project continues . He also reported that there were changes to the Wildlife Plan and he had to resubmit the plan again to the FAA.

4

**_Security Update-_** Nothing to report for this meeting.

There being no further business to discuss the meeting adjourned.

R. Edison Hill, Chairman        Norman W. Shumate, III, Acting Secretary

5

CWVRAA_000078

# EXHIBIT Q

## Natalie Taylor

| | |
|---|---|
| **From:** | Rick Atkinson |
| **Sent:** | Thursday, April 18, 2013 10:01 AM |
| **To:** | 'Kimberly Lewis'; Terry Sayre; 'Tim Murnahan'; Roger Hill; Lorie Wynes; 'Brian Belcher'; 'Jake Ruddle'; 'Anthony Gilmer'; 'Chief Long'; Chris Keyser |
| **Cc:** | 'Bailey, Chuck' |
| **Subject:** | Contracts or agreements on behalf of the airport authority |

As a reminder, no employee, including me, is authorized to bind the CWVRAA (Airport Authority) by contract or agreement, unless authorized to do so by the Board of the CWVRAA. It is our practice to have legal council review each contract document prior to execution in order to ensure that the terms are in accordance with state law and are do not place undue burden on the Airport Authority. For example we have not signed contracts with Waste Management for a number of years because of the unfair terms on the contract that they will not change, so we operate on a month to month with them without a contract. If a supplier or vendor demand or request that you sign any agreement or contract, tell them that you are not authorized to execute any agreement but that you would be happy to take the agreement or contract through the proper channels to be reviewed and executed.

Thank you,

## Richard A. Atkinson, III | Airport Director

Central West Virginia Regional Airport Authority
100 Airport Rd. Suite 175, Charleston, WV 25311
W: 304.344.8033
F: 304.344.8034
C: 304.741.0500


YEAGER AIRPORT
West Virginia's Gateway

1

CWVRAA_001577

# EXHIBIT R